1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHANAAZ MANGROE p/k/a Channii Monroe, | Case No. 2:24-cv-04639-SPG-PVC |
| Plaintiff, | **ORDER GRANTING DEFENDANT SONY MUSIC ENTERTAINMENT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT [ECF NO. 48]** |
| v. | |
| TERIUS GESTEELDE-DIAMANT p/k/a The-Dream; CONTRA PARIS, LLC; and SONY MUSIC ENTERTAINMENT, | |
| Defendants. | |

Before the Court is the Motion to Dismiss (ECF No. 48-1 ("Motion")) filed by Defendant Sony Music Entertainment. The Court has read and considered the Motion and concluded that it is suitable for decision without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Having considered the parties' submissions, the relevant law, and the record in this case, the Court GRANTS the Motion.

## I.    BACKGROUND

### A.    Factual Background

The following allegations are taken from the First Amended Complaint ("FAC"). (ECF No. 32 ("FAC")). Plaintiff Chanaaz Mangroe ("Plaintiff"), professionally known as Channii Monroe, is a singer and songwriter from the Netherlands. (*Id.* ¶¶ 3, 16)).

Defendant Terius "The-Dream" Gesteelde-Diamant (formerly known as Terius Youngdell Nash) ("Dream"), is an award-winning singer, songwriter, and producer, who has authored hit songs for numerous artists, including Beyonce and Rihanna.  (*Id.* ¶¶ 1, 20-21). Defendant Contra Paris, LLC, ("Contra") is a Delaware limited liability company owned and operated by Dream and his partner Christopher "Tricky" Stewart ("Tricky").  (*Id.* ¶ 18). Defendant Sony Music Entertainment ("SME," or, along with Contra and Dream, "Defendants") is a record company, which includes, as an unincorporated division, Epic Records ("Epic").  (*Id.* ¶ 19).

In brief, Plaintiff alleges that, from 2014 to 2016, while she was working as a singer and songwriter in the United States, Dream lured Plaintiff into a violent and abusive sexual relationship by fraudulently promising to help her secure a recording and publishing contract.  (*Id.* ¶¶ 3-7).  Plaintiff alleges that, rather than follow through on these promises, Dream engaged in a pattern of sexual abuse that culminated in battery and rape, in violation of the California Penal Code and federal sex trafficking laws.  (*Id.* ¶¶ 301-319).  Plaintiff further alleges that Contra and SME knowingly participated in, and benefitted from, this venture, in violation of federal sex trafficking laws.  (*Id.* ¶¶ 301-313).

## 1.    Initial Contact with Dream (Late 2014 to February 2015)

In 2012, at the age of twenty-one, Plaintiff obtained a three-year O-1B visa to work as a singer and songwriter in the United States.  (*Id.* ¶ 43).  In late 2014, as Plaintiff was considering her options for renewing her visa, Chris Garland ("Garland"), an associate of Dream, reached out to Plaintiff via Instagram and asked her to send him music to share with Dream.  (*Id.* ¶ 46).  Excited by the opportunity, Plaintiff sent some of her music to Dream's manager, who arranged for her to meet with Dream in Atlanta.  (*Id.* ¶¶ 48-50).

During the trip, Plaintiff recorded music with Dream's sound engineer.  (*Id.* ¶¶ 53-55).  Plaintiff also socialized with Dream at a basketball game and a strip club, the latter of which made her "visibly uncomfortable."  (*Id.* ¶ 56-59).  Towards the end of the trip, Dream texted Plaintiff for the first time, asking her if she had a boyfriend, and indicating that "boyfriends aren't allowed."  (*Id.* ¶ 61).  Plaintiff was surprised to be asked such a

personal question, but she "wanted to be cooperative and responded in the negative." (*Id.* ¶ 61).

Shortly before she was scheduled to leave Atlanta, Dream told Plaintiff that he wanted to sign her to his label, Contra, and that he would make her the next Beyonce. (*Id.* ¶ 63). After Plaintiff explained her visa situation, Dream assured her that Contra would sponsor her visa renewal, and he promised that she would receive an advance and a written contract soon. (*Id.* ¶ 65). Dream asked Plaintiff to go to Los Angeles with him for ten days to continue recording, and Plaintiff agreed. (*Id.*).

In text messages shortly thereafter, Dream told Plaintiff that, in order to write songs for her, he had to know everything about her, and she needed to "belong" to him. (*Id.* ¶¶ 68-69). Dream asked her when she lost her virginity and told Plaintiff that if she allowed him to assume complete control over her life, they could create the ultimate "sanctuary" together. (*Id.* ¶¶ 79-80). Dream frequently name-dropped both Beyonce and Rihanna in his communications and told Plaintiff that, if everything went well, Plaintiff could open for Beyonce on her upcoming tour. (*Id.* ¶¶ 69-72, 74-75, 77-78, 80, 82-85). Dream reminded Plaintiff that she should be "grateful" that he was working with her and that she had to "respect him correctly." (*Id.* ¶¶ 74, 76).

2.    Start of the Abusive Sexual Relationship (February 2015 – March 2015)

On February 4, 2015, Plaintiff arrived in Los Angeles to record with Dream. (*Id.* ¶ 88). Shortly after she arrived, Plaintiff began receiving flirtatious messages from Dream, asking her if she wanted to lose her virginity "again." (*Id.*). That night, Plaintiff recorded music in a recording studio in the home of Tricky, who co-owned Contra with Dream. (*Id.* ¶ 89). Throughout the evening, Dream pressured Plaintiff to have sex with him, suggesting that it was a necessary part of the recording process. (*Id.* ¶ 91).

Eventually, Dream took Plaintiff to a bedroom and the two had sexual intercourse, despite Plaintiff stating, "I don't know about this," and "I don't want to ruin this." (*Id.* ¶¶ 96-98). When others in the studio began looking for them, Dream left the bedroom,

locking Plaintiff inside. (*Id.* ¶ 99). Dream eventually returned to have sex with Plaintiff. (*Id.* ¶ 100). Over the course of several hours, this pattern continued, with Dream not permitting Plaintiff to leave the bedroom until around 6 a.m. (*Id.* ¶¶ 100-01).

Throughout the rest of the Los Angeles trip, Dream expected Plaintiff to be available to have sex whenever he demanded it. (*Id.* ¶ 107). Dream refused to use contraception and would hold down Plaintiff and ejaculate inside her over her physical and verbal protests. (*Id.* ¶ 108). In between sexually explicit texts, Dream would include business promises, stating that her record would "have major distribution in about 30 days." (*Id.* ¶ 110). At the end of the trip, Plaintiff returned to Amsterdam but promised to move to Atlanta shortly. (*Id.* ¶ 114). While Plaintiff was in Amsterdam, Dream continued to text her a mixture of business-related updates and sexually explicit comments and commands. (*Id.* ¶¶ 117-125).

Plaintiff arrived in Atlanta on February 21, 2015, and was placed in an isolated hotel, to which Dream had his own key. (*Id.* ¶¶ 126-27). Dream told Plaintiff that she needed to check in with him every day and to be available whenever he called. (*Id.* ¶ 131). At Dream's behest, Garland would call Plaintiff at all hours of the day or night to ensure she was in her hotel room and, if Plaintiff was unavailable, Dream would become furious. (*Id.* ¶ 143). On February 25, 2015, while at a recording studio, Dream forced Plaintiff to have sex with him while he recorded it, despite her protests. (*Id.* ¶ 139).

Despite Plaintiff's repeated requests, Dream rarely allowed Plaintiff to get into the studio to continue recording. (*Id.* ¶¶ 134-136). Dream pushed off her requests and considered it an insult when she asked if she could start writing her own songs. (*Id.* ¶ 148). Plaintiff also continued to ask about her recording contract, but Dream stated only that it would be finished soon. (*Id.* ¶ 149). On the rare occasions that Plaintiff was allowed to go into the studio, Dream told Garland to make sure Plaintiff was "liquored up" before getting there. (*Id.* ¶ 160). If Dream was at the studio, he would check to make sure Plaintiff was sufficiently intoxicated and, if not, he would pull her hair back and force her to drink more alcohol. (*Id.* ¶ 161).

In mid-March, Plaintiff discovered bedbugs in her hotel room and asked to be placed in a new hotel. (*Id.* ¶ 151). This request infuriated Dream, who yelled at her, before forcing her to perform oral sex on him. (*Id.* ¶ 152). Dream then began to choke Plaintiff with both hands and, as she began to pass out, continued to scream at her. (*Id.*). Shortly afterwards, Dream left Atlanta for work obligations. During the trip, Dream repeatedly texted Plaintiff, accusing her of failing to check in and suggesting that she was cheating. (*Id.* ¶¶ 154-58).

### 3.     Signing with Contra and Epic Records (March 2015 – August 2015)

In or around March 2015, Dream told Plaintiff that Antonio Reid ("Reid") from Epic Records, a division of SME, had reached out to him about signing Plaintiff to Epic. (*Id.* ¶ 164). Dream stated that he would handle all negotiations with Epic and refused to include Plaintiff. (*Id.* ¶ 165). Seeking to distance herself from Dream, Plaintiff asked if she could go back to Amsterdam until the recording contract was in place, which Dream permitted her to do on the condition that she leave her belongings in Atlanta. (*Id.* ¶¶ 168-69).

Prior to Plaintiff's trip, Dream allegedly engaged in several more instances of sexual assault. On one occasion, Dream took Plaintiff to a movie theater and demanded that she perform oral sex on him. When she refused, he forced her to have sex with him in the theater in front of a stranger. (*Id.* ¶ 170). On the same evening, Dream forced Plaintiff into the back of his van, where he pinned her down and started forcibly having sex with her, covering her mouth and nose and choking her, possibly causing her to lose consciousness. (*Id.* ¶¶ 172-73).

Plaintiff left for Amsterdam on April 7, 2015, with plans to return in a few weeks once the recording contract and distribution deal were finalized. (*Id.* ¶ 174). On April 16, 2015, Dream texted Plaintiff to tell her that Reid and Epic were going to be their partners on her record deal, meaning that once she signed a recording contract with Contra, she would sign a distribution contract with Epic. (*Id.* ¶ 180). On April 21, 2015, Plaintiff signed the "recording and shopping" contract with Contra, which provided Contra with the exclusive rights to all of her audio and audio-visual recordings. (*Id.* ¶ 181).

On May 1, 2015, Plaintiff signed the contract with Epic, which stated that it was an agreement between Epic and Contra "for the services of" Plaintiff.  (*Id.* ¶¶ 184-85).  Dream maintained complete control over communications concerning the deal with Epic and refused to connect Plaintiff to anyone at Epic or include her on email or text chains.  (*Id.* ¶ 186).  On or around May 19, 2015, Epic wired Plaintiff a $35,000 advance on the contract. (*Id.* ¶ 197).

In late May 2015, Plaintiff was told that Reid and Joey Arbagey ("Arbagey"), an executive vice president at Epic, wanted to meet her in person.  (*Id.* ¶ 190).  Plaintiff returned to Atlanta, where she performed in front of the Epic executives.  (*Id.* ¶ 191).  While talking with the Epic executives afterwards, Dream placed his hand on Plaintiff's bare inner thigh and stroked her leg.  (*Id.* ¶ 192).  During the conversation, Reid mentioned that he liked how "sexy" Plaintiff was, which infuriated Dream.  (*Id.* ¶ 193).  After Reid and Arbagey left, Dream mentioned the comment and forcefully had sex with Plaintiff, causing her to bleed vaginally.  (*Id.* ¶ 194).

Dream told Plaintiff that they would finish recording the album in Las Vegas, but Plaintiff was given no timeframe for the project.  (*Id.* ¶ 199).  Plaintiff was afraid to ask Dream about the timeframe and could not get details from others she reached out to.  (*Id.* ¶¶ 198, 200).  Plaintiff continued to wait for updates through mid-July, when Dream reached out to say that he was planning Plaintiff's first showcase for the label in August and was working on the radio edit for one of her songs.  (*Id.* ¶ 207).  Sometime thereafter, Dream coerced Plaintiff to have sex in the bathroom, where he purposefully banged her face against the sink, causing her right eye to swell and bruise.  (*Id.* ¶ 217).

Plaintiff finally got back into the studio in early August 2015.  (*Id.* ¶ 223).  While recording, another artist complimented Plaintiff's shoes, which angered Dream, and after which he locked her in a room next to the studio and sexually and physically assaulted her while Garland guarded the door.  (*Id.* ¶ 224).  On another occasion, Ericka Coulter ("Coulter"), a representative at Epic, joined Dream and Plaintiff in the studio.  (*Id.* ¶ 225). During the recording session, Coulter witnessed Dream pull Plaintiff's hair back and

forcibly pour vodka down her throat.  (*Id.*).  When Plaintiff caught Coulter's eye, she motioned to her, asking if she saw what had just happened, but Coulter brushed off the actions.  (*Id.*).  Coulter also witnessed Dream touch Plaintiff's body and saw explicit sexual text messages between Dream and Plaintiff.  (*Id.*).

Following the recording sessions, Dream began getting pushy about meeting Plaintiff's mother.  (*Id.* ¶ 229).  Later, Plaintiff's mother arrived in Atlanta while Plaintiff was recording, and she met Plaintiff and the sound engineer at the recording studio.  (*Id.* ¶ 230).  When Dream found out that the sound engineer had met Plaintiff's mother before he did, he became furious.  (*Id.* ¶ 231).  Dream pulled Plaintiff to the staircase of the studio, pulled up her dress, and forcibly raped her while pulling on the collar of her dress, leaving her gasping for breath and fearing for her life.  (*Id.* ¶ 232).

### 4.    Fallout with Dream and Termination from Epic Records (August 2015 – July 2016)

On or around August 15, 2015, Dream told Plaintiff to meet him at the studio, but when she went to the studio, he did not show up.  (*Id.* ¶ 237).  The following day, Dream texted her, saying, "I don't feel like we have the same interest for each other," and, "I can't do it for you and it's lopsided."  (*Id.*).  He then told her not to contact him about the album.  (*Id.* ¶ 238).

On August 17, 2015, Plaintiff confided in Coulter, telling her that Dream was sexually and emotionally abusive, had been violent with her, and was preventing her from finishing the record.  (*Id.* ¶ 241).  After initially offering support, Coulter spoke with Dream and told Plaintiff that she needed to figure out a way to work with Dream again.  (*Id.*).  On August 21, 2015, Plaintiff again met with Coulter and reiterated that Dream was abusive and controlling.  (*Id.* ¶ 247).  Plaintiff made clear that, regardless of Dream, she was committed to completing the record and moving forward with her contract.  (*Id.*).  Coulter informed Plaintiff that Dream was withholding the music she recorded with him from Epic.  (*Id.* ¶ 248).  Plaintiff asked for help from Epic to intervene and retrieve her music.  (*Id.* ¶ 249).

In early November 2015, Plaintiff met with representatives at Epic in New York to discuss the future of her album. (*Id.* ¶ 250). Shortly before the meeting, Dream texted her, accusing her of trying to "play" him and stating that the record would be a "mistake" if she put it out. (*Id.* ¶ 251). At the meeting, Plaintiff reiterated how much she wanted to move forward and make the best record possible for Epic, but she explained that she was not getting any of her music from Dream and did not know what to do. (*Id.* ¶ 254). During the meeting, Reid stated that Dream was the problem standing in the way and appeared to agree that they should move forward with other producers. (*Id.* ¶¶ 254, 256).

However, in early December 2015, Plaintiff was informed that Reid wanted Dream to be involved in the record again. (*Id.* ¶ 258). While she expressed that she wanted to work with other producers, Plaintiff said that she was professional enough to work with Dream, if required. (*Id.* ¶ 259). In late January 2016, Plaintiff texted Coulter stating that she was "a little lost" as to why she had not been able to record anything further but expressing that she wanted to move forward with the album. (*Id.* ¶ 262).

In February 2016, Plaintiff was told that Epic approved a budget for her to shoot a music video for one of her songs. (*Id.* ¶ 263). Although Dream refused to participate, the video shoot was eventually scheduled for March 2016. (*Id.* ¶¶ 265-66). When Plaintiff arrived on the day of the shoot, she was given a bag of generic clothes that did not fit the style of the shoot, and her suggestions for the video were ignored. (*Id.* ¶ 268). Dream texted her afterwards to say that he heard the video was terrible and that she had been "played." (*Id.* ¶ 270). Plaintiff flew to Los Angeles in April 2016 to do reshoots of the video. (*Id.* ¶ 271). Plaintiff's team sent the revised video to Epic. Plaintiff heard that Reid loved the video and that Epic was planning the premiere. (*Id.* ¶ 273-74). However, Coulter later told Plaintiff that Dream complained about the video, that nobody at Epic liked it, and that Plaintiff should have worked with Dream on the video. (*Id.* ¶ 275). Plaintiff pleaded with Coulter to see the games that Dream was playing, but Coulter refused to provide any help, saying only that Plaintiff needed to "get on the same page as Dream." (*Id.* ¶¶ 276-77).

On June 25, 2016, Plaintiff attended Epic Fest, a music festival showcasing artists signed to Epic's label. (*Id.* ¶ 280). While Plaintif was at Epic Fest, Dream called Plaintiff to tell her that Epic was "washing their hands" of her. (*Id.* ¶ 282). Plaintiff ran into Reid, Arbagey, and Coulter, who evaded her, with Coulter telling her that she had been dropped and that her management should have talked to her already. (*Id.* ¶ 283). On July 15, 2016, Plaintiff got the official word that Epic no longer wanted to distribute her music because Dream failed to deliver the records and was too difficult to work with. (*Id.* ¶ 288).

Plaintiff alleges that after her experience with Defendants, she lost her passion for music and life in general and spent several years rarely leaving her house. (*Id.* ¶ 296). She has suffered from panic attacks, insomnia, and lethargy, and has sought treatment for anxiety and depression. (*Id.* ¶ 299). Now, nearly a decade later, Plaintiff remains unable to engage in her work as a recording artist due to the pain and devastation she endured. (*Id.* ¶ 300).

### B.  Procedural History

Plaintiff filed suit against Defendants on June 4, 2024, alleging claims of sex trafficking against all Defendants, as well as claims of sexual battery and rape against Dream. (ECF No. 1). Because the original complaint improperly listed Epic as a defendant instead of SME, Plaintiff sought leave to amend the case caption on July 15, 2024, which the Court granted on August 28, 2024. (ECF No. 23, 31). On August 16, 2024, Dream and Contra filed a motion to dismiss the complaint. (ECF No. 27). Plaintiff then filed the FAC on September 6, 2024, which rendered the motion to dismiss moot. (FAC). In response to the FAC, Dream and Contra submitted an answer on October 4, 2024. (ECF No. 44).

SME filed the instant Motion on November 18, 2024, seeking dismissal of the sex trafficking claim against SME. (Mot.). Plaintiff filed an opposition on December 30, 2024, (ECF No. 51 ("Opposition"), and SME replied in support of the Motion on January 15, 2024, (ECF No. 54 ("Reply")).

## II.   LEGAL STANDARD

### A.   Motion to Dismiss

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013). To survive a 12(b)(6) motion, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks and citation omitted).

If a claim sounds in fraud or mistake, courts apply the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires such claims to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To meet this standard, a plaintiff must identify "[t]he time, place, and content of [any] alleged misrepresentation," as well as the "circumstances indicating falseness" or the "manner in which the representations at issue were false and misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547–48 (9th Cir. 1994) (internal quotation marks, citation, and alterations omitted). Those allegations "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted). Although the circumstances of the alleged fraud must be alleged with specificity, knowledge "may be alleged generally." Fed. R. Civ. P. 9(b).

When ruling on a Rule 12(b)(6) motion, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The Court is "not required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice," nor must it accept "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Seven Arts Filmed Ent., Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013) (internal quotation marks and citation omitted). Where dismissal is appropriate, a court should grant leave to amend unless the plaintiff could not possibly cure the defects of the pleading. *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009).

## B.    Trafficking Victims Protection Reauthorization Act (TVPRA)

Congress enacted the Trafficking Victims Protection Act in 2000 to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." *Ditullio v. Boehm*, 662 F.3d 1091, 1094 (9th Cir. 2011) (quoting Pub. L. No. 106-386, § 102, 114 Stat. 1464 (Oct. 28, 2000)). The law created several criminal offenses for forced labor and sex trafficking, and was "intended to more comprehensively and effectively combat human trafficking." *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1164 (9th Cir. 2022) ("*Ratha I*") (citation omitted). Congress subsequently reauthorized and expanded the legislation in the Trafficking Victims Protection Reauthorization Act (TVPRA), which established a private right of action against traffickers. Pub. L. No. 108-193, § 4, 117 Stat. 2875 (Dec. 19, 2003).

Two provisions of the TVPRA are relevant to this case. First, 18 U.S.C. § 1591 establishes criminal penalties for sex trafficking of children by any means, or of adults by force, fraud, or coercion. In relevant part, § 1591 states:

(a) Whoever knowingly--

(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States,

> recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be cause to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a). Thus, to state a claim for a direct violation of § 1591, a plaintiff must allege that the defendant, knowingly and in interstate or foreign commerce: (1) recruited, enticed, harbored, or transported a person; (2) knowing, or in reckless disregard of the fact, that means of force, threats, or fraud would be used; (3) to cause the person to engage in a commercial sex act. *See Acevedo v. eXp Realty, LLC*, 713 F. Supp. 3d 740, 765 (C.D. Cal. Jan. 29, 2024). The statute defines "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

Second, 18 U.S.C. § 1595 establishes a private right of action for violations of the TVPRA, including § 1591. As relevant here, § 1595 states:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a). Thus, § 1591 establishes private rights of action against both perpetrators of trafficking ("direct liability"), and those who knowingly financially benefit

from trafficking ("beneficiary liability").  *Doe v. Mindgeek USA Inc.*, 558 F. Supp. 3d 828, 835 (C.D. Cal. 2021).  To state a claim for beneficiary liability, a plaintiff must show: (1) the defendant knowingly benefited;[1] (2) from participating in a venture; (3) that the person "knew or should have known has engaged in an act in violation of this chapter."  18 U.S.C. § 1591(a); *see Croft v. Dolan*, No. CV 24-371 PA (AGRx), 2024 WL 3915148, at *6 (C.D. Cal. June 21, 2024).

## III.    DISCUSSION

As to SME, Plaintiff raises a single claim of beneficiary liability under § 1595(a), based on Dream's alleged violation of § 1591.[2]  SME seeks dismissal of this claim on five grounds: (1) Plaintiff has not alleged a commercial sex act and therefore cannot establish the underlying claim for criminal sex trafficking by Dream; (2) Plaintiff fails to allege that Dream had the required knowledge at the time of recruitment or enticement that force, threats, fraud, or coercion would be used to cause Plaintiff to engage in a commercial sex act; (3) Plaintiff does not allege facts showing SME had actual or constructive knowledge that Dream was trafficking Plaintiff; (4) SME did not participate in any sex trafficking

---

[1] The TVPRA was amended on January 5, 2023, to impose liability not just on those who "knowingly benefit[]" but also those who "attempt[] or conspire[] to benefit."  15 U.S.C. § 1595(a); *see* Pub. L. 117-347, § 102, 136 Stat. 6200 (Jan. 5, 2023).  Prior to that amendment, the Ninth Circuit had concluded that "the phrase 'knowingly benefits' as used in § 1595(a) does not encompass attempts to benefit."  *Ratha I*, 35 F.4th at 1176.  Following the amendment, the Ninth Circuit concluded that the change did not apply retroactively to "pre-enactment conduct."  *Ratha v. Rubicon Res., LLC*, 111 F.4th 946, 969 (9th Cir. 2024) ("*Ratha II*").  However, on March 4, 2025, the Ninth Circuit vacated this decision for rehearing en banc.  *See Ratha v. Rubicon Res., LLC*, 129 F.4th 1212 (9th Cir. 2025).  As detailed below, because the FAC fails to adequately allege SME's participation in, or knowledge of, a venture that engaged in an act of sex trafficking, the Court does not reach the question of whether to apply the amended language.

[2] As SME notes, the FAC is arguably ambiguous as to whether it also seeks to assert direct liability against SME under 18 U.S.C. § 1591(a)(2).  However, SME stated in its Motion that "[d]uring a conference prior to the filing of this motion, Plaintiff's counsel confirmed that Plaintiff is not asserting that SME itself violated section 1591."  (Mot. at 30).  Given this attestation and Plaintiff's lack of opposition, the Court understands Plaintiff to raise only a claim for beneficiary liability under § 1595(a).

venture; and (5) SME did not knowingly benefit from participation in a sex trafficking venture. (Mot.).

Because the first two arguments would require the Court to determine the viability of one of Plaintiff's claims against Dream, and because Dream has answered the FAC rather than seeking dismissal of that claim, the Court will begin its analysis with Plaintiff's other arguments. As discussed in greater detail below, the Court concludes that Plaintiff has failed to state a claim against SME because it has not adequately alleged SME's constructive knowledge of, or participation in, a venture that engaged in an act of sex trafficking. In so concluding, the Court does not reach the question of whether Plaintiff has stated a claim for a § 1591 violation by Dream.

### A. Knowledge

To state a claim for beneficiary liability under § 1595(a), Plaintiff must first allege that SME "knew or should have known" of TVPRA violations by a venture. This requires Plaintiff to show that SME "had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 726 (11th Cir. 2021) ("*Red Roof Inns*"). As the Ninth Circuit has explained, "the phrase 'knew or should have known' usually connotes negligence." *Ratha I*, 35 F.4th at 1177 (citation omitted).

Plaintiff identifies the following allegations relevant to SME's knowledge of Dream's alleged sex trafficking: (1) Dream maintained complete control over communications concerning Plaintiff's deal with Epic, (FAC ¶ 186); (2) in late May 2015, Reid and Arbagey saw Dream place his hand on Plaintiff's inner thigh and stroke her leg while the group spoke about her performance, (*id.* ¶ 192); (3) in August 2015, Coulter witnessed Dream pull Plaintiff's hair back and forcibly pour vodka down her throat, saw Dream touch Plaintiff's body, and saw explicit text messages between Dream and Plaintiff, (*id.* ¶ 225); (4) on August 17, 2015, Plaintiff confided in Coulter that Dream was "sexually and emotionally abusive, had been violent with her, and was preventing her from finishing her record," (*id.* ¶ 241); (5) on August 21, 2015, Plaintiff met with Coulter and again

1   reiterated that Dream was abusive and controlling, that Plaintiff was committed to
2   completing the record, and that Plaintiff needed to be protected from Dream, (*id.* ¶ 247);
3   (6) Plaintiff asked several people at Epic for help intervening in the situation to retrieve her
4   music from Dream, (*id.* ¶ 249); (7) during a meeting with Epic executives in early
5   November 2015, Plaintiff expressed that she wanted to move forward with the record, but
6   Dream was standing in the way, (*id.* ¶ 254); (8) in May 2016, Plaintiff pleaded with Coulter
7   to see the games that Dream was playing and explained that her team had spent weeks
8   reaching out to Dream about the music video, with no response, (*id.* ¶ 276); and (9) on July
9   15, 2016, Plaintiff was dropped from Epic because Contra failed to deliver the records and
10  Dream was difficult to work with, (*id.* ¶ 288).

11          Taking all of these allegations as true, the FAC does not establish that SME knew or
12  should have known of Dream's alleged TVPRA violations. To state a claim for beneficiary
13  liability based on an underlying § 1591 violation, Plaintiff would have to allege that SME
14  had at least constructive knowledge that means of force, threats, fraud, or coercion would
15  be used to cause her to engage in a commercial sex act. 18 U.S.C. §§ 1591(a), 1595(a);
16  *see Doe (S.M.A.) v. Salesforce, Inc.*, No. 3:23-CV-0915-B, 2024 WL 1337370, at *16 (N.D.
17  Tex. Mar. 28, 2024) (requiring constructive knowledge "that each Plaintiff would be forced
18  to engage in commercial sex acts by illicit means"); *Croft*, 2024 WL 3915148, at *6
19  (requiring showing of "knowledge that [the primary defendant] was using fraud or coercion
20  to obtain [commercial] sex"). To be sure, the FAC plausibly alleges that, at least as of mid-
21  August 2015, SME was aware that Dream and Plaintiff had a sexual relationship and that
22  Dream had engaged in acts of physical violence against Plaintiff. But the FAC does not
23  establish that SME was aware that the force was connected in any way to a commercial sex
24  act or that Dream had induced Plaintiff's actions through fraud or other illicit means.

25          As to force, Plaintiff's allegations fail to establish any constructive knowledge of a
26  causal connection between Dream's use of violence and any commercial sex act. Mere
27  knowledge of sexual abuse does not establish beneficiary liability under § 1595. For
28  example, in *Eckhart v. Fox News Network, LLC*, the court dismissed a claim for beneficiary

liability against Fox News because none of the allegations as to which Fox News had knowledge "involve[d] [the primary defendant] using force or fraud to obtain a commercial sex act from any of these women." *Eckhart v. Fox News Network, LLC*, 20-CV-5593 (RA), 2021 WL 4124616, at *11 (S.D.N.Y. Sept. 9, 2021).  While the plaintiff, by alleging Fox News' knowledge of the primary defendant's affair, his sex addiction, his reputation as a serial harasser, and the previous complaints against him for sexually inappropriate conduct, had established that "Fox News [was] on notice that [the primary defendant] was engaged in sexual harassment," this was not sufficient to state a claim for beneficiary liability for sex trafficking.  *Id.*  Similarly, in *Edmondson v. Raniere*, the court dismissed a claim for beneficiary liability under § 1595 because the complaint "allege[d] no facts to bridge the gap between [the defendant's] knowledge" of the "coercive branding" of plaintiffs with the initials of the primary defendant "and an awareness (or even constructive awareness) that the threats . . . were connected to a commercial sex act." *Edmondson v. Raniere*, 751 F. Supp. 3d 136, 183 (E.D.N.Y. 2024).

The same is true here.  Plaintiff argues that force "was present and known to SME based on what its agents and executives themselves witnessed." (Opp. at 22).  But force by itself does not establish a TVPRA violation.  While Plaintiff may have adequately alleged SME's awareness of some other crime, such as battery, there is no allegation that SME should have known that force would be used to cause Plaintiff to engage in a commercial sex act.  As in *Eckhart* and *Edmondson*, the FAC is deficient in this regard both as to SME's knowledge of any commercial sex act and as to SME's knowledge of any causal connection between the use of force and any such act.[3]  Plaintiff seeks to distinguish *Eckhart* based on the fact that in that case, Fox News lacked knowledge that the primary defendant was specifically harassing the plaintiff, whereas here, SME was aware that

---

[3] While Plaintiff does not discuss either threats of force or coercion in any detail in her Motion, the Court's conclusion applies equally to those elements of § 1591(a) as well.  To the extent that Dream engaged in threats or coercion and SME was made aware of such conduct, Plaintiff has not alleged that SME was aware of any causal connection between that behavior and any commercial sex act.

-16-

Dream was targeting Plaintiff with his actions.  (Opp. at 25).  But the *Eckhart* court's

reasoning was based not on this distinction, but on the lack of allegations as to Fox News'

knowledge that the primary defendant "was specifically engaged in sex trafficking."

*Eckhart*, 2021 WL 4124616, at *11.  The Court therefore does not find this distinction to

be material.

As to fraud, Plaintiff alleges that SME knew that Plaintiff "had been the subject of

Dream's violent and coercive manipulation, which [SME] knew or should have known

were predicated [on] fraudulent promises of record contracts, Grammys, and opening for

Beyonce." (FAC ¶ 288).  However, as an initial matter, the FAC never alleges that SME

was told about these promises, that it could have or should have by some means acquired

knowledge about the promises, or that SME itself made any such promises.  Moreover, to

the extent that SME was aware of any such promises, it had no reason to suspect that they

were fraudulent; Dream was, after all, a Grammy-award winning artist with personal

connections to Beyonce, and Plaintiff was "enormously talented" in her own right.  (*Id.*

¶¶ 20, 22, 48).  Far from establishing SME's constructive knowledge that the recording

contract and associated promises were fraudulent, the FAC suggests that SME genuinely

invested into Plaintiff with the belief that she could be a successful and profitable recording

artist.  The FAC alleges that it was SME that first reached out about signing Plaintiff, that

SME then signed her to a contract and paid a $35,000 advance, that two SME executives

came to meet Plaintiff in person to listen to her perform, that SME organized a meeting

with Plaintiff and top executives at Epic to discuss Plaintiff's record, and that SME paid

for Plaintiff to shoot a music video.  (*Id.* ¶¶ 164, 184, 190, 197, 250, 263).  As currently

alleged, it is not plausible that SME would have taken these actions if it knew that Dream

was acting fraudulently.  SME's later actions—pushing Plaintiff to continue working with

Dream and dropping Plaintiff as an act for failing to work with Dream—may be

objectionable in light of SME's knowledge of Dream's abuse, but they do not suggest

SME's awareness that the recording contract was fraudulent.  To the contrary, they suggest

that SME entered into an earnest commercial venture to pair Plaintiff's singing with

Dream's producing, and that, when Dream allegedly refused to participate in the venture, SME lost interest in continuing.

None of Plaintiff's arguments to the contrary are persuasive.  Plaintiff first argues that under Federal Rule of Civil Procedure 9(b), she need only allege knowledge "generally."  (Opp. at 21).  But as the Supreme Court has explained, Rule 9(b) "merely excuses a party from pleading [knowledge] under an elevated pleading standard," it does not give Plaintiff "license to evade . . . [the] strictures of Rule 8."  *Ashcroft*, 556 U.S. at 686-87.  As analyzed above, Plaintiff has not met the requirements of Rule 8.

Plaintiff next argues that SME should have been aware of Dream's fraud because Plaintiff was not actually producing the music she had contracted to produce and because she repeatedly expressed willingness to produce the music.  (Opp. at 23, 26).  Plaintiff also argues that, because SME was aware that Dream was supporting Plaintiff's work visa, SME should have been "on high alert that the legal process surrounding her contract and her visa were being abused."  (*Id.* at 23).  Finally, Plaintiff argues that SME knew about Dream's prior domestic violence arrest and presumably therefore should have connected the dots here.  (Opp. at 23).  None of these allegations, either individually or in the aggregate, establish that SME knew or should have known about the alleged sex trafficking.  The TVPRA requires allegations that the defendant "should have known" about the alleged sex trafficking, not simply that the defendant "might have been able to guess about sex trafficking."  *Doe v. Wyndham Hotels & Resorts, Inc.*, No. 2:24-cv-204, 2025 WL 725268, at *7 (E.D. Va. Mar. 6, 2025) (citation omitted).  As to Dream's prior domestic violence history, allegations of domestic violence are clearly distinct from sex trafficking, and knowledge of previous allegations of domestic violence does not make it negligent for SME to fail to learn of the alleged sex trafficking.  *See Eckhart*, 2021 WL 4124616, at *11 (dismissing § 1595 beneficiary claim where the only allegations were of sexual harassment, not the use of "force or fraud to obtain a commercial sex act").

Accordingly, the Court concludes that Plaintiff has failed to adequately allege that SME knew or should have known of Dream's alleged sex trafficking.

### B. Participation

Next, Plaintiff must allege SME's "participation in a venture" that engaged in an act of sex trafficking.  18 U.S.C. § 1595(a).  Plaintiff argues that SME participated in the venture between Plaintiff, SME, and Contra "by providing financial support to Dream and gaining the benefit of Dream's relationships with important artists, while ignoring Plaintiff's reports of abuse and Dream's refusal to allow her to honor her SME contract." (Opp. at 28).  Plaintiff points in particular to SME's agents ordering Plaintiff to figure out a way to continue working with Dream.  (*Id.*).

Plaintiff's theory of SME's participation is inconsistent with the text of § 1595.  As numerous courts have held, the venture itself need not be solely a "sex-trafficking venture." *See, e.g.*, *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 559 (7th Cir. 2023); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 970 (S.D. Ohio 2019); *Red Roof Inns*, 21 F.4th at 727.  This makes sense given that § 1591 defines venture only as "any group of two or more individuals associated in fact, whether or not a legal entity," 18 U.S.C. § 1591(e)(6), and Congress presumably "did not intend 'venture' in Section 1595, which establishes civil liability, to be any more demanding than 'venture' in Section 1591, which establishes criminal liability," *G.G.*, 76 F.4th at 554.  However, while the venture need not strictly be a "sex-trafficking venture," the venture itself still must have committed an act of sex-trafficking.  *See* 18 U.S.C. § 1595(a) (imposing beneficiary liability on one who "knowingly benefits . . . from participation in a *venture which* that person knew or should have known *has engaged in an act* in violation of this chapter" (emphasis added)); *G.G.*, 76 F.4th at 559 ("It is the venture that must violate Section 1591, and not the participant."); *Red Roof Inns*, 21 F.4th at 725 (stating that the plaintiff "must plead sufficient facts to plausibly allege that the venture in which the franchisors participated committed one of these crimes").  Nothing in the FAC establishes SME's participation in such a venture.

This is partially an issue as to timing.  Even setting aside the Court's conclusion above that Plaintiff has not adequately alleged SME's knowledge, the earliest allegations that SME acquired specific knowledge of Dream's alleged violent sexual abuse are from

August 17, 2025, when Plaintiff confided in Coulter.  (FAC ¶ 241).  Thus, the earliest time that SME could have participated in a venture that SME knew had engaged in an act of sex trafficking was mid-August 2015.  *See Ratha I*, 35 F.4th at 1180 (analyzing defendant's participation in, and knowing benefit from, a venture only after the date on which the defendant acquired knowledge of the venture's violations).  However, the FAC does not allege a single commercial sex act after early August 2015.  *See* (FAC ¶ 232).  Plaintiff only confided in Coulter after Dream told her that he no longer wanted to speak with her, and, after that date, Plaintiff does not allege any instance of a commercial sex act necessary to establish a § 1591 violation.  Thus, SME could not possibly have participated in a venture that engaged in an act in violation of the sex trafficking laws.

In addition to the timing issue, Plaintiff's allegations of participation fail to show that SME either participated directly in the sex trafficking or acted in any way that would establish the existence of a tacit agreement to support the sex trafficking.  Section 1591 defines the phrase "participation in a venture" as "knowingly assisting, supporting, or facilitating a [TVPRA] violation."  *Id.* § 1591(e)(4).  However, numerous courts have held that, in light of the "should have known" language in § 1595, importing this definition from the criminal statute would be nonsensical.  *See, e.g.*, *Acevedo*, 713 F. Supp. 3d at 775; *Red Roof Inns*, 21 F.4th at 724-25; *G.G.*, 76 F.4th at 559.  Instead, the majority of courts have held that, in the absence of direct participation, a plaintiff may still establish "participation in a venture" by alleging the existence of "a continuous business relationship between the trafficker and the [defendant] such that it would appear that the trafficker and the [defendant] have established a pattern of conduct or could be said to have a tacit agreement."[4]  *M.A.*, 425 F. Supp. 3d at 970; *see Acevedo*, 713 F. Supp. 3d at 783; *Mindgeek*

---

[4] At least one court in the § 1595 context has required that the plaintiff allege specific conduct that furthered a sex trafficking venture.  *See Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018).  However, the Court is not persuaded by the *Noble* court's reasoning, which was drawn from case law in the context of a § 1591 criminal prosecution.  *See id.* (citing *United State v. Afyare*, 632 F. App'x 272, 285 (6th Cir. 2016)).

*USA Inc.*, 558 F. Supp. 3d at 837; *J.B. v. G6 Hospitality, LLC*, No. 19-cv-07848-HSG, 2020 WL 4901196, at \*9 (N.D. Cal. Aug. 20, 2020); *G.G.*, 76 F.4th at 559; *see also Ricchio v. McLean*, 853 F.3d 553, 555 (1st Cir. 2017) (Souter, J.) (concluding that participation could be inferred where trafficker and civil defendants "had prior commercial dealings . . . which the parties wished to reinstate for profit").

Plaintiff's allegations fall well short of this standard. Plaintiff has not identified any "continuing business relationship" between SME and Dream nor any "pattern of conduct" that would allow an inference that there was a "tacit agreement" among Defendants. *M.A.*, 425 F. Supp. 3d at 970. Rather, the FAC alleges a single recording contract, under which no record was ever produced and which SME terminated on the grounds that "Contra Paris failed to deliver the records and Dream was difficult to work with." (FAC ¶ 288). The key to a finding of tacit agreement is that "the alleged participant have an ongoing interest in the success of a specific venture and elect to further the ends of the venture beyond what would reasonably be expected in an ordinary commercial transaction." *Doe (S.M.A.)*, 2024 WL 1337370, at \*13. The allegations here fail to show that SME sought to further the ends of any venture beyond what would reasonably be expected in an ordinary commercial venture. Plaintiff has therefore not adequately alleged SME's participation in a venture that engaged in an act of sex trafficking.

//
//
//
//
//
//
//
//
//
//

**IV.    CONCLUSION**

     For the foregoing reasons, the Court GRANTS the Motion and DISMISSES the FAC as to SME.  Because it is not yet clear that amendment would be futile, Plaintiff's claim against SME is dismissed with leave to amend.  Should Plaintiff seek to amend the Complaint, she may file an Amended Complaint within twenty-one (21) calendar days from the issuance of this order.  If Plaintiff does not file an Amended Complaint within twenty-one calendar days, the claim against SME will be dismissed with prejudice.

     **IT IS SO ORDERED.**

DATED:  April 21, 2025

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE

-22-