1  DOUGLAS H. WIGDOR (NY SBN 2609469)
   dwigdor@wigdorlaw.com
2  MEREDITH A. FIRETOG (NY SBN 5298153)
   mfiretog@wigdorlaw.com
3  MONICA HINCKEN (NY SBN 5351804)
   mhincken@wigdorlaw.com
4  KATHERINE VASK (NY SBN 6094635)
   kvask@wigdorlaw.com
5  (All admitted *pro hac vice*)
6  **WIGDOR LLP**
7  85 Fifth Avenue, Fifth Floor
   New York, NY 10003
8  Tel.: (212) 257-6800
   Fax.: (212) 257-6845
9
10 ROBERT J. GIRARD II (BAR NO. 216949)
   rgirard@girardbengali.com
11 OMAR H. BENGALI (BAR NO. 276055)
   obengali@girardbengali.com
12
13 **GIRARD BENGALI, APC**
   355 S. Grand Street, Suite 2450
14 Los Angeles, CA 90071
   Tel.: (323) 302-8300
15 Fax.: (323) 302-8310
16 *Attorneys for Plaintiff Chanaaz Mangroe p/k/a Channii Monroe*

17                    **UNITED STATES DISTRICT COURT**
18                    **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 19  CHANAAZ MANGROE<br>p/k/a Channii Monroe, | Case No.  2:24-CV-04639-SPG-PVC |
| 20          Plaintiff, | **MEMORANDUM OF POINTS<br>AND AUTHORITIES IN<br>OPPOSITION TO SONY MUSIC** |
| 21       vs. | **ENTERTAINMENT'S MOTION TO<br>DISMISS THE SECOND<br>AMENDED COMPLAINT** |
| 22  TERIUS GESTEELDE-DIAMANT<br>p/k/a "THE-DREAM"; CONTRA | |
| 23  PARIS, LLC; and SONY MUSIC<br>ENTERTAINMENT, | **Hearing:** |
| 24          Defendants. | Date:  September 24, 2025<br>Time:  1:30 p.m.<br>Location:  Courtroom 5C |
| 25 | Judge:  Hon. Sherilyn Peace Garnett |
| 26 | |

27  MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S
28        MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

PRELIMINARY STATEMENT .................................................................. 1

STATEMENT OF FACTS ........................................................................ 2

PROCEDURAL HISTORY ...................................................................... 11

LEGAL STANDARD .............................................................................. 11

LEGAL ARGUMENT .............................................................................. 12

    I.    Mangroe Sufficiently Pleaded a Claim for Trafficking Victims Protection Reauthorization Act ("TVPRA") Beneficiary Liability Against SME ................................................................................... 12

        A. The SAC Sufficiently Alleges that SME Knew or Should Have Known About the Sex Trafficking ............................................ 12

        B. The FAC Sufficiently Alleges that SME Participated in the Sex Trafficking Venture ........................................................... 17

        C. The FAC Sufficiently Alleges that SME Knowingly Benefitted from the Sex Trafficking Venture ............................................ 17

    II.    The SAC States a Claim Against Dream Under the TVPRA .................. 21

CONCLUSION ......................................................................................... 25

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

---

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

i

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                          <u>Pages</u>

*A. B. v. Salesforce.com, Inc.,*
    No. 4:20 Civ. 01254 (ASH), 2021 WL 3616097 (S.D. Tex. 2021).....................13

*Acevedo v. eXp Realty, LLC*,
    713 F. Supp. 3d 740 (C.D. Cal. 2024)........................................... 12, 19

*Ardolf v. Weber*,
    332 F.R.D. 467 (S.D.N.Y. 2019)...........................................................22

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...............................................................11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...............................................................11

*Campos v. Fresno Deputy Sheriff's Ass'n,*
    441 F. Supp. 3d 945 (E.D. Cal. 2020) ..........................................11

*Doe #1 v. Red Roof Inns, Inc.*,
    21 F.4th 714 (11th Cir. 2021) ................................................ 17, 20

*Doe (S.M.A.) v. Salesforce*,
    2024 WL 1337370 (N.D.T.X. 2024) ....................................................19

*Doe v. Mindgeek USA Inc.*,
    558 F. Supp. 3d, 828.......................................................... 12, 17

*Hilton Franchise Holding LLC, et al.*,
    2024 WL 4773981 (D. Nev. Nov. 12, 2024)................................... 12, 17

*J.M. v. Choice Hotels Int'l, Inc.,*
    No. 22 Civ. 00672 (KJM) (JDP), 2023 WL 3456619 (E.D. Cal. May 15, 2023) 12

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

ii

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

*Kwan v. SanMedica, Int'l*,
   854 F.3d 1088 (9th Cir. 2017) ..................................................................11

*Ratha v. Phatthana Seafood Co.*,
   35 F.4th 1159 (9th Cir. 2022) ..................................................................12

*United States v. Andrews*,
   No. 18 Cr. 000256 (JAM), 2022 WL 9466146 (E.D. Cal. Oct. 14, 2022)...........23

*United States v. Bazar*,
   747 Fed. Appx. 454 (9th Cir. 2018) ..........................................................22

*United States v. Mondaca*,
   No. 23-283, 2024 WL 4274703 (9th Cir. Sept. 24, 2024) ..................................23

*United States v. Raniere*,
   55 F.4th 354 (2d Cir. 2022)......................................................................22


<u>Statutes</u>
18 U.S.C. § 1595 ........................................................................ 12, 17

18 U.S.C. § 1595 (a) ................................................................... 12, 20

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

iii

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

1   Plaintiff Chanaaz Mangroe p/k/a Channii Monroe ("Mangroe" or "Plaintiff")
2   submits this Memorandum of Points and Authorities in Opposition to Defendant
3   Sony Music Entertainment's ("SME" or "Defendant") Motion to Dismiss ("Def's
4   Br.," Dkt. No.71) the Second Amended Complaint ("SAC," Dkt. No. 59).

5   ## PRELIMINARY STATEMENT

6   In granting Defendant's motion to dismiss Plaintiff's federal sex trafficking
7   claim, the Court held that Mangroe did not sufficiently allege that SME had
8   constructive knowledge of, or participation in, a venture that engaged in an act of
9   sex trafficking.  Dkt. No. 58 ("Order").  Any alleged deficiency has been remedied
10  by the SAC, which alleges, in detail, that SME knew or should have known that co-
11  Defendant Terius Gesteelde-Diamant ("Dream") used force, fraud or coercion to
12  cause Mangroe to engage in commercial sex acts and benefited from its business
13  venture with Dream.

14  Plaintiff has plausibly alleged that SME had both constructive and actual
15  knowledge of Dream's use of force, fraud and coercion.  In particular, SME
16  employee, Erica Coulter ("Coulter), who worked as Mangroe's A&R at Epic
17  Records, underline personally witnessed Dream engage in force and coercion on August 1,
18  2025 when during a recording (i.e., work) session, he forcibly pulled Mangroe's hair,
19  poured a glass of vodka down her throat, physically groped her and grinded his penis
20  into her body, and then dragged an intoxicated Mangroe into a private room before
21  she was permitted to continue recording her song.  Knowledge under the trafficking
22  statute does not require that SME witnessed the sexual act that occurred when
23  Mangroe was dragged into that private room.  Instead, SME should have known
24  based upon the circumstances of a woman being force fed alcohol, touched in a
25  sexual way by the person who was in control of producing her music, and being

26  1

27  MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S
    MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
28

dragged into a room while intoxicated *at work* that force and coercion were being used to ensure that Dream's sexual demands were met before Mangroe was allowed to continue working.

It is evident that as of August 1, 2015, Coulter personally witnessed both force and coercion. That knowledge compounded with SME executives witnessing Dream stroke Mangroe's leg and making fraudulent promises during a business meeting in May 2015, being directly informed by Mangroe that she was being abused and controlled by Dream on August 17, 2015 and August 21, 2015, and the logical inference SME should have drawn based on its knowledge that Mangroe was not actually producing the music her contracts anticipated, should have made it clear to SME that illicit means were being used to elicit a commercial sex act.

Therefore, Mangroe has stated a claim against Defendant for beneficiary liability because, in addition to pleading a commercial sex act, the SAC plausibly alleges that SME should have known about the sex trafficking based on multiple red flags, including that several SME executives personally witnessed and/or were informed about Dream's abuse, but chose to ignore it in order to directly benefit from Dream's relationships with important artists. For these reasons, and as explained below, Defendant's motion to dismiss the SAC should be denied.

## STATEMENT OF FACTS

In 2014, Mangroe was 23 years old hoping to land her big break as a singer and songwriter when a member of award-winning singer, songwriter, and producer Terius Gesteelde-Diamant's ("Dream") team reached out to her via social media and requested music samples. SAC ¶¶ 3-4, 20. Mangroe immediately sent along samples of her work and was quickly invited to join Dream and his partner, Christopher "Tricky" Stewart, in Atlanta. *Id*. ¶ 4.

2

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

When Ms. Mangroe agreed to go to Atlanta, she had no idea that Dream had been twice arrested for domestic violence, including charges of felony assault and strangulation, reckless endangerment, and child endangerment. *Id.* ¶¶ 34-35, 38. Instead, Mangroe was thrilled at the opportunity to get her music in front of Dream and have the chance to work with someone who had significant connections and influence in the music industry. *Id.* ¶ 48. Dream flew Mangroe from Atlanta to Los Angeles allegedly to begin recording her album. *Id.* ¶ 87. However, while she was in Los Angeles, Dream subjected Mangroe to a horrific pattern of sexual violence and manipulation. *Id.* ¶¶ 88-113.

Dream convinced Mangroe to move to Atlanta by promising her that a recording contract was forthcoming, and that he would find her an apartment and pay her expenses in Atlanta. *Id.* ¶ 116. While living in Atlanta, Dream became increasingly controlling of Mangroe. She was expected to check in daily, be available whenever Dream called, change her social media handle to "ChanniiContra," remove any social media posts Dream did not approve of, stop taking birth control, allow Dream to conduct "walk throughs" of her hotel room to check all of her belongings, and keep Chris Garland ("Garland"), a member of Dream's team, updated on what she was eating and how often she was going to the gym. *Id.* ¶¶ 127, 131-133, 137. Dream's escalating anger resulted in violent sexual assaults and psychological torture. *Id.* ¶ 152. Mangroe became so isolated and dependent on Dream for food and shelter in such a short period of time that it became increasingly difficult for her to comprehend the reality of her situation. *Id.* ¶ 163.

In the very early morning of February 25, 2015, while at Triangle Sounds Studio, Dream plied Mangroe with alcohol and marijuana and forced her to have sex with him while he recorded it. Mangroe, who was highly intoxicated, tried to stop

3

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

Dream from recording, but he refused.  *Id.* ¶ 139.  Dream regularly used the recording to threaten Mangroe by telling her that he could share it with anyone he wanted.  *Id.* ¶ 141.

By March 2015, Mangroe knew that her physical and mental state was deteriorating and asked if she could leave for a few days to visit her mother; Dream agreed, but only on the condition that she left all of her belongings with Garland.  *Id.* Dream's sexual assaults intensified before she left for Amsterdam.  *Id.* ¶¶ 170-173.

In or around March 2015, Dream told Mangroe that Antonio "L.A." Reid ("Reid") contacted him about signing her to SME (d/b/a Epic Records).  Dream insisted on handling all of the negotiations and refused to include Mangroe in the conversation.  *Id.* ¶¶ 164-165.  On April 16, 2015, Dream texted Mangroe that Reid and SME/Epic Records were going to be their partners on her record deal.  *Id.* ¶ 180.

Mangroe signed her contract with Contra on April 21, 2015, which provided Contra with exclusive rights to all audio and audio-visual recordings in addition to a six-month time period to enter into or substantially negotiate a distribution agreement.  *Id.* ¶ 181.  On May 1, 2015, Mangroe signed the SME/Epic Records contract.[1]  *Id.* ¶ 184; see also Dkt. No. 73, Ex. B at 18-19.  In addition to the SME-Epic contract including the provision that Epic would sponsor Mangroe's visa renewal, Mangroe believed that the SME-Epic/Contra Paris contract would provide a measure of safety and security, as it specifically stated:

---

[1]    Defendant argues that Mangroe is not a party to the SME d/b/a/ Epic-Contra Paris, LLC Agreement.  Yet, it is evident from the contract that Mangroe was a signatory.  Indeed, page 18 of the contract specifically references "additional signatures on the following page" and the contract language permits Mangroe to be substituted for Contra Paris, LLC under specific circumstances.

4

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

> If during the term of the Agreement, [Contra Paris, LLC] for any reason ceases to entitled to [Mangroe's] services, or fails to furnish [her] services to Epic, in accordance with the terms of the Agreement, [Mangroe] agree[s] that [she] will be substituted for [Contra Paris, LLC] as a party to the Agreement…and will render such services and perform such acts as will give Epic the same rights, privileges and benefits it would have received under the Agreement with [Contra Paris, LLC] as a party to the Agreement.

*Id.*, Ex. B at 19.

Further, the SME-Epic/Contra Paris contract also provided that in the event of a dispute with Contra [i.e., Dream] about "recording costs paid or incurred in connection with LP 1 in accordance with a mutually approved written recording budget," Epic's decision controlled. *Id.*, Ex. B at 3. As a result, Mangroe believed that the SME-Epic/Contra contract would allow her to keep working in the United States while also protecting her from Dream's control and abuse. SAC ¶ 188.

Yet, any belief that Mangroe had in the contracts providing protection from Dream's abusive behavior was tested in late May 2015 when she met with Reid, Dream, and Executive Vice President of A&R at Epic, Joey Arbagey ("Arbagey") in an Atlanta studio. *Id.* ¶ 191. After Mangroe performed, Dream turned his chair toward her and placed his hand on her bare inner thigh and stroked her leg in front of Reid and Arbagey while the group spoke about her performance. *Id.* ¶ 192. It was humiliating for Mangroe and served only to assert Dream's dominance over her while showing Reid and Arbagey that Dream's relationship with Mangroe was far from strictly professional. *Id.* In addition, during the group conversation, Dream bragged about his close relationship with Beyonce and his ability to get Mangroe featured as an opening act on Beyonce's opening tour. *Id.* ¶ 193. Yet, Beyonce was not planning a tour at that time. *Id.* Notably, Beyonce was a signed SME artist and

5

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Reid, as the SME Chairman and CEO, and Arbagey, an Epic Executive Vice President, would plainly have known that Dream's promises were fraudulent. *Id.*

Throughout the next several months, Mangroe was desperate to get back into the studio, but Dream maintained full control over her recording budget and, in turn, complete control over Mangroe's ability to work. *Id.* ¶¶ 218-219. In mid-July 2015, Dream told Mangroe that he was planning her first showcase for Epic Fest in August 2015. *Id.* ¶¶ 208, 210. However, on July 27, 2015, without speaking to Mangroe about it, Dream sent an email to Reid to cancel her planned showcase. *Id.* ¶ 210. Reid apparently conceded to Dream because Mangroe was never permitted to perform at Epic Fest. *Id.* Dream promised Mangroe that she would perform at a showcase in Paris instead of Epic Fest. *Id.* ¶ 211. Of course, Paris never happened, as both Dream and SME-Epic are well aware. *Id.* ¶ 212.

After signing her contracts in April/May 2015, Mangroe was not permitted to return to the studio until August 2015. *Id.* ¶ 227. On or around the evening of August 1, 2015 into the early hours of August 2, 2015, Mangroe's A&R at Epic Records, Erica Coulter ("Coulter"), joined Dream and Mangroe in the studio for a work session. *Id.* ¶ 229. Coulter's role as Mangroe's A&R was, among other things, to advocate and support Mangroe and serve as her direct liaison to Epic/SME. *Id.* ¶ 230. Yet, on August 1-2, 2015, Coulter personally witnessed Dream, *in the middle of a recording session*, pull Mangroe's hair back to open her mouth and forcibly pour an entire large glass of vodka down her throat before she was permitted to leave the vocal booth. *Id.* ¶ 231. Mangroe, who is 5'4 and approximately 100 pounds, was heavily intoxicated as a result. *Id.* ¶ 232. When Mangroe left the vocal booth, Dream began touching her body, tightly wrapping his arms around her while grinding his penis into her and then dragging her away to a private room – all in full view of

6

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

Coulter who was there as a representative of SME/Epic and participating in the recording session as part of her employment. *Id.* Dream later texted Mangroe that he knew Coulter saw that he was aroused. *Id.* Importantly, Mangroe was not permitted to get back into the vocal booth to complete recording her song until after she satisfied Dream's sexual demands.

Coulter witnessed this entire incident, yet she failed to take any steps to protect Mangroe. Instead of doing her job, Coulter brushed off Dream's violent actions and said that Dream just wanted Mangroe to "loosen up." *Id.* During this same work session, Coulter also saw explicit sexual text messages between Dream and Mangroe. *Id.* ¶ 233. There is no doubt that Coulter knew of Dream's true intentions. *Id.* The non-professional nature of the relationship and the abuse she witnessed, compounded with Coulter's knowledge that Mangroe was not actually producing the music her contracts anticipated, should have made it clear to Epic that there was fraud at play.

Dream's violent behavior continued to escalate, including regularly placing a gun next to Mangroe when forcing her to have sex, forcibly raping her from behind while choking her and scolding her for not respecting him enough, and threatening to no longer work with her when she did not do what he wanted. *Id.* ¶¶ 236, 241, 246-247. Mangroe confided in Coulter on August 17, 2015 that Dream was sexually and emotionally abusive, had been violent, and was preventing her from finishing her record. *Id.* ¶ 250. At first, Coulter said she would take care of Mangroe, but within the hour, Coulter spoke to Dream and told Mangroe that she needed to figure out a way to work with him, despite directly witnessing Dream's abuse on August 1-2, 2015 and being told in detail about the extensive pattern of abuse on August 17, 2015. *Id.*

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

1  On August 21, 2015, Mangroe met with Coulter in person and again reiterated

2  that Dream was abusive and controlling. *Id.* ¶ 256. Mangroe made clear that she

3  was committed to completing her record and moving forward with her contract but

4  that she needed to be protected from Dream. *Id.* Coulter confided to Mangroe that

5  Dream was withholding the music she recorded from Epic and pushed Mangroe to

6  get on the same page as Dream and work with him despite knowing about Dream's

7  abuse and control. *Id.* ¶ 257. Coulter told Mangroe that it was very important for

8  Epic to see that she was in a good place with Dream and that if she could make up

9  with Dream, her life would change. *Id.*

10  Mangroe asked her new management team and others at Epic for help

11  intervening in the situation. *Id.* ¶ 259. Epic was aware that Mangroe quite literally

12  fled Atlanta to protect herself from Dream's escalating abuse and control. *Id.* ¶ 260.

13  Epic was also aware that from the time Mangroe fled Atlanta, Dream stood in the

14  way of her record being completed while demanding that she return to Atlanta, which

15  is why Coulter continued to pressure Mangroe to meet in person with Dream. *Id.*

16  On or around October 29, 2015, as a result of Coulter's continued pressure to

17  meet with Dream and "get on the same page," Mangroe ultimately felt she had no

18  choice but to agree to meet with him in person, but insisted that the meeting be held

19  in a public location in Los Angeles. *Id.* ¶ 261. Epic paid for Mangroe to stay in Los

20  Angeles to attend the meeting with Dream. *Id.* There was no other business purpose

21  for Mangroe to be in Los Angeles, as Epic did not arrange studio time or any other

22  meetings. *Id.*

23  When Ms. Mangroe arrived at the scheduled "meeting," Dream began

24  questioning why she left Atlanta. *Id.* ¶¶ 262-263. He told her that he would not

25  speak to her about anything unless she returned to Atlanta because he was "the most

8

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

important part" of the project and "nothing happens" without him. *Id.* ¶ 263. Mangroe immediately began apologizing for leaving to appease Dream. *Id.* ¶ 264. This was Mangroe's constant cross to bear during this time because she continued to receive pressure from Coulter to "make things right" with Dream before she would agree to arrange a meeting with Reid to discuss her record. *Id.* ¶ 267. Mangroe, thus, put herself in danger by meeting with Dream alone in person so that Epic would believe that they were on good terms, and she could finish her record. *Id.* ¶ 268.

Indeed, on or around October 30, 2015—just one day after Mangroe met Dream in person—Coulter's assistant sent an email confirming a meeting for Mangroe with Reid and other Epic executives to discuss the future of her album. *Id.* ¶ 269. On or around November 4, 2015, Mangroe met with Epic representatives, including Reid; then-President of Epic, Sylvia Rhone ("Rhone"); Arbagey; and a full marketing team. *Id.* ¶ 271. Mangroe reiterated how much she wanted to move forward and make the best record possible for Epic, but that she was not getting any of her music from Dream and did not know what to do. *Id.* ¶ 275. When Mangroe said that there was a problem standing in her way, both Rhone and Reid responded "Dream" at the same time. *Id.* Mangroe left the meeting believing that Reid and his team understood the situation with Dream and would help. *Id.* ¶ 277.

In January 2016, Dream continued to pressure Mangroe to meet with him alone in Atlanta while refusing to meet with Mangroe's management or schedule studio time. Both Epic and Mangroe's management team were well aware of Dream's continued threats that he would not only refuse to support her career but would actively work against her if she did not return to Atlanta. *Id.* ¶ 282. Throughout this entire time, Epic had the ability to schedule studio time, hire producers, schedule meetings, and so forth. *Id.* ¶ 285. Epic failed to do so. *Id.*

9

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

1    Mangroe repeatedly pleaded with Coulter to see that Dream was creating

2    roadblocks to derail her career. *Id.* ¶ 301. Coulter, who knew about Dream's abuse

3    and his refusal to work with Mangroe unless she agreed to meet with him in person

4    (and be subjected to continued abuse), again refused to help Mangroe; instead, she

5    simply told Mangroe to "get on the same page as Dream." *Id.* ¶ 302. Coulter also

6    refused to answer Mangroe's repeated questions about who was in possession of her

7    music—even though, as her label, Epic should have been able to provide that

8    information to her. *Id.* Mangroe pleaded with Coulter to arrange another meeting

9    with Reid to figure out how to move forward. *Id.* ¶ 304.

10    In June 2016, Mangroe attended Epic Fest, a music festival showcasing Epic

11    artists, and hoped to get the opportunity to talk to Reid about the next steps. *Id.* ¶

12    306. During the festival, Dream called her and said Epic was "washing their hands"

13    of her. *Id.* ¶ 308. Mangroe thought Dream was trying to harass her, but then ran into

14    Reid, Arbagey, and Coulter. *Id.* ¶ 309. While Reid and Arbagey ran off without

15    speaking to her, Coulter turned to Mangroe and said, "talk to your manager, why are

16    you here? You're dropped…" *Id.* Mangroe later asked Rhone if she knew what

17    Coulter meant; Rhone said she had no idea and offered to investigate. *Id.* ¶ 312.

18    On July 15, 2016, Mangroe got the official word that she was dropped by Epic

19    because Dream failed to deliver the record and was difficult to work with. *Id.* ¶ 314.

20    Yet, Mangroe was left in the dark throughout the entire process despite both Contra

21    and Epic owing contractual and corporate responsibilities to her, and despite agents

22    of both entities knowing that she had been the subject of Dream's violent and

23    coercive manipulation, which they knew or should have known were predicated on

24    fraudulent promises. *Id.* Mangroe lost everything–her ability to work as an artist,

25

26    10

27    MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

28

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

her ability to work in the United States, and her ability to live a life free from trauma. *Id.* ¶ 321.

## PROCEDURAL HISTORY

Mangroe filed this action on June 4, 2024, asserting sex trafficking claims against all Defendants and claims of sexual battery and rape against Dream. The Court granted SME's Motion to Dismiss Plaintiff's First Amended Complaint on April 21, 2025, with leave to amend. Dkt. No. 58 ("Order"). Mangroe filed her Second Amended Complaint on May 20, 2025, adding additional factual allegations to cure deficiencies identified by the Court. SME again moved to dismiss. Dkt. No. 71.

## LEGAL STANDARD

To defeat a Rule 12(b)(6) motion to dismiss, the complaint must provide enough factual detail to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must only be "plausible on its face," meaning that it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). A plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level," but no more. *Twombly*, 550 U.S. at 555.

In ruling on a Rule 12(b)(6) motion, "all well-pleaded allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Campos v. Fresno Deputy Sheriff's Ass'n*, 441 F. Supp. 3d 945, 949 (E.D. Cal. 2020) citing *Kwan v. SanMedica, Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017).

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

---

11

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

**LEGAL ARGUMENT**

I.   **Mangroe Sufficiently Pleaded a Claim for Trafficking Victims Protection Reauthorization Act ("TVPRA") Beneficiary Liability Against SME**

   A.   **The SAC Sufficiently Alleges that SME Knew or Should Have Known About the Sex Trafficking**

   The SAC now includes substantial additional details that address deficiencies identified by the Court, particularly as to SME's knowledge of Dream's sex trafficking.   Mangroe successfully stated a claim for beneficiary liability under section 1595(a) because the SAC sufficiently alleges that SME "(1) knowingly benefitted (2) from participation in a venture (3) that it knew or should have known has engaged in trafficking" her to state a claim.   *See J.M. v. Choice Hotels Int'l, Inc*., No. 22 Civ. 00672 (KJM) (JDP), 2023 WL 3456619, at *3 (E.D. Cal. May 15, 2023) (cleaned up); 18 U.S.C. § 1595(a).   The allegations must demonstrate that the defendant had at least "constructive knowledge," rather than actual knowledge, of the trafficking—a negligence standard.   *Doe v. Mindgeek USA Inc.*, 558 F. Supp. 3d, 828, 835 *reconsideration denied*, 574 F. Supp. 3d 760 (C.D. Cal. 2021) (citing 18 U.S.C. § 1595); *S.C. v. Hilton Franchise Holding LLC, et al.,* 2024 WL 4773981, at *5 (D. Nev. Nov. 12, 2024) (citing *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1177 (9th Cir. 2022)); *see also Acevedo v. eXp Realty, LLC*, 713 F. Supp. 3d 740, 779-80 (C.D. Cal. 2024) (holding that constructive knowledge "invokes a negligence standard," which is satisfied "along a spectrum").   Constructive knowledge is sufficiently pleaded through the allegations of red flags that should have alerted defendants—or a reasonably prudent person in defendant's position—that the venture they are benefiting from or participating in is involved in sex trafficking. Courts must consider the particular circumstances alleged to determine whether it is

12

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

1   plausible that a defendant "was in a position to learn" about the illegal practices of

2   their co-defendant.  *A. B. v. Salesforce.com, Inc.*, No. 4:20 Civ. 01254 (ASH), 2021

3   WL 3616097, at *3 (S.D. Tex. 2021).

4          The SAC sufficiently pleads that SME had, at the very least, constructive

5   knowledge of Dream's use of force, threats, fraud, or coercion connected to the

6   commercial sex acts.  Mangroe has alleged more than just abuse or knowledge of a

7   sexual relationship, as she has alleged a litany of red flags which, taken together,

8   show that SME was in a position where it should have known that force, fraud, or

9   coercion was being used to induce Mangroe into sex acts.  First, and crucially, she

10  has alleged how that SME ceded full control over Mangroe's career to Dream and

11  therefore was in a position to understand his power over her career.  SAC ¶¶ 210-

12  12, 223.  She further alleged that agents of SME witnessed behavior that suggested

13  that this power was being used to elicit sex, such as Reid and Arbagey's seeing

14  Dream grab her thigh and stroke her leg during a business meeting on May 27, 2015.

15  SAC ¶ 192.  She further alleged that during the meeting with Reid and Arbagey,

16  Dream bragged about his close relationship with Beyonce and his ability to get

17  Mangroe featured as an opening act on Beyonce's upcoming tour—which, as alleged

18  (and therefore must be taken as true for purposes of this motion), Reid and Arbagey

19  were in a position to know was not a truthful promise.  SAC ¶ 193.  Additionally,

20  the SAC recounts how Coulter, another SME agent, witnessed: (1) Dream use force

21  to pour vodka down Mangroe's throat while in the recording studio; (2) Mangroe's

22  unwillingness to engage in this behavior; (3) Dream engage in sexual behavior with

23  Mangroe on the very same night, including dragging her away to a private room

24  while she was visibly intoxicated as a result of being forced to drink a large glass of

25  vodka; and (4) explicit sexual text messages between Dream and Mangroe.  SAC ¶¶

26                                         13

27  MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S
    MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

28

231-233.  From these facts, Coulter and SME were in a position to know that Dream was using force and coercion to elicit sex.  And, given that Coulter was overseeing the supposed recording of music by Dream and Mangroe for SME's benefit, she was uniquely positioned to see that the agreement to produce music was a farce, as Dream was not providing SME with the promised songs.

Indeed, the SAC makes clear that in addition to this constructive knowledge (which is all that is required under the TVPRA), Coulter and SME gained *actual* knowledge of what Dream was doing on August 17, 2015 and August 21, 2015 when Mangroe confided in Coulter, sharing that Dream was sexually and emotionally abusive and was preventing her from finishing her record.  SAC ¶¶ 250-256.  Yet even upon receiving actual knowledge of the fraudulent and coercive nature of Dream's supposed business arrangement with Mangroe, Coulter confirmed that Dream was withholding music she recorded from Epic Records and pushed Mangroe to try to work with Dream regardless because it "was very important that Epic sees that she is in a good place with Dream." *Id.* ¶ 257.  Thus, SME actually knew that Dream was using force, fraud, and coercion to induce commercial sex acts from Mangroe, and nevertheless repeatedly pressured her to "get on the same page" as Dream, paid for her to stay in Los Angeles to meet with Dream, and were cognizant that Dream remained the obstacle to Mangroe following through on her recording obligations to SME. *Id.* ¶¶ 261, 271-75.  The SAC further sufficiently alleges that SME was aware that Dream had induced Plaintiff's actions through fraud or other illicit means, as its agents were told about the physical, emotional, and sexual violence Dream inflicted, were specifically aware that Mangroe fled Atlanta to escape the abuse, and further had actual knowledge that Dream refused to honor the Epic and Contra contracts.  Together, these facts made it clear to SME, who was in

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

14

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

a unique position of power to know and see these facts unfold, that the Epic contract was never legitimate to begin with and was instead based upon numerous fraudulent promises to manipulate Mangroe into believing that she was being brought into a legitimate business arrangement. *Id.* ¶ 317. Yet SME continued to encourage Mangroe to abide by the contract, work things out with her abuser, and produce music pursuant to a business arrangement they knew was premised on fraud and coercion.

The Court previously concluded that the FAC did not allege that "SME was told about these promises [or] that it could have or should have by some means acquire knowledge about the promises…." Order at 17. But the amendments to the SAC make it clear that SME executives and agents heard Dream's promises regarding getting Mangroe to open for Beyonce's upcoming tour, and further that they would have known—given their position—that these promises were fraudulent and manipulative. SAC ¶ 190-193. The SAC alleges that those facts were known to be fraudulent to someone like Reid, as the Chairman and CEO of SME, and Abragey as an Executive Vice President of Epic. Taken as true and compounded with the allegation that Reid and Abragey saw Dream's sexual advances towards Mangroe in this very meeting, Reid and Abragey (and therefore SME) should have known that fraud was being used to elicit a commercial sex act.

By January 2016, SME knew that "(1) Dream was physically, emotionally, and sexually violent toward Mangroe; (2) after Mangroe fled Atlanta to get away from Dream, he repeatedly refused to perform any work on her record; (3) Mangroe was coerced by Coulter to meet with Dream alone despite the risk it posed to Mangroe; (4) Epic refused to schedule a meeting for Mangroe with Reid and other Epic executives until after Mangroe agreed to meet Dream alone and in person; and

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

15

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

(5) like Dream, Epic refused to do anything to advance Mangroe's recording career despite its contractual obligations." *Id.* ¶ 284. Had SME "genuinely invested" into Mangroe "with the belief that she could be a successful and profitable recording artist," as the Court read the FAC to suggest (Order at 17), SME could have—but did not—"schedule studio time, hire producers, schedule meetings" and take other business initiatives to ensure compliance with the contract. *Id.* ¶ 284-286. Indeed, it simply allowed the knowingly fraudulent contractual relationship between itself, Dream, and Mangroe to remain in place.

Defendants argue that pursuant to SME's contract with Contra, SME apparently had limited "creative control" and "could not unilaterally compel Contra to produce works" and "had no right to dictate the day-to-day details of the recording process." Def's Br. at 11.[2] But that is an inaccurate reading of the SME/Contra recording contract. For instance, SME had "standard mutual approval of songs, producers, and studios, and treatment, director and storyboard of videos." Def's Ex. B § 9. "Standard mutual approval" does not, as Defendants suggest, mean that SME has *no* or *limited* control in the recording process. With respect to promotional services, the contract states, "[Contra] will cause the Artist to appear at such times and places as we may reasonably designate for the purpose of assisting us in the sale, promotion, marketing and general exploitation of Master Recordings and the Artist." Def's Ex. B § 4.h. As Mangroe alleges in the SAC, the SME/Contra contract provided her "with the basis to believe that she would be protected from Dream's

---

[2]     Mangroe does not object to Defendants request that the Court consider the contract between SME and Contra under the incorporation by reference doctrine. Def's Br. 10.

16

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

control and abuse, as it specifically stated with respect to creative control that 'Epic's

good faith decision shall control.'"  SAC ¶ 188; Def's Ex. B. § 9.

### B.    The FAC Sufficiently Alleges that SME Participated in the Sex Trafficking Venture

Participation in a sex trafficking venture under section 1595 means "an

undertaking or enterprise involving risk and potential profit."  *See Hilton Franchise*

*Holding LLC*, 2024 WL 4773981, *2 (citing *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th

714, 724 (11th Cir. 2021)).  Plaintiff must "allege at least a showing of a continuous

business relationship between the trafficker and [Defendants] such that it would

appear that the trafficker and [Defendants] have established a pattern of conduct or

could be said to have a tacit agreement." *Mindgeek USA Inc.*, 558 F. Supp. 3d 828,

837 (C.D. Cal.), *reconsideration denied*, 574 F. Supp. 3d 760 (C.D. Cal. 2021)

(citations omitted).

First, the Court determined that Plaintiff's FAC failed to sufficiently allege

SME's participation in a sex trafficking venture, in part, due to an issue in timing.

Order at 19.  The Court read the FAC to allege that "the earliest allegations that SME

acquired specific knowledge of Dream's alleged violent sexual abuse are from

August 17, 2025, when Plaintiff confided in Coulter" and that the FAC did not allege

"a single commercial sex act after early August 2015." *Id.* at 20.  But "specific

knowledge" is not what is required under the TVPRA, and the SAC alleges that SME

had constructive knowledge as early as May 2015.  The  SAC further provides

additional details establishing that in the very first days of August 2015, SME

acquired actual knowledge of Dream's violent sexual abuse before Dream forced

Mangroe to engage in another commercial sex act.

17

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

The SAC makes clear that Coulter witnessed Dream forcibly pour a large glass of vodka down her throat in the studio before allowing her to leave the vocal booth on August 1, 2015, into the early hours of August 2, 2015.  SAC ¶ 229-231.  Coulter heard Mangroe's pleas to not drink the alcohol because it was "too strong" and brushed Dream's violence off as an attempt to "loosen" Mangroe "up."  *Id.* at 231.  During this session, Coulter saw explicit sexual test messages between Dream and Mangroe.  *Id.* at 233.  Mangroe, 5'4 and approximately 100 pounds, was heavily intoxicated as a result.  *Id.* at 232.  In plain sight of Coulter, Dream touched Mangroe's body when she left the vocal booth, "tightly wrapping his arms around her while grinding his penis into her and dragging Ms. Mangroe away to a private room."  *Id.* at 232.  Dream later texted Mangroe that he knew Coulter saw he was aroused.  *Id.*

This all occurred before August 14, 2025, when Mangroe's mother visited her in Atlanta and Dream forcibly raped and choked Mangroe in the studio staircase.  *Id.* ¶ 239-241.  Coulter's direct witnessing of Dream's violence and failing to intervene, coupled with Dream's highly publicized and well-known arrests for domestic violence, before Dream violently sexually assaulted Mangroe demonstrates that SME did, in fact, participated in a sex trafficking venture.  And while the timing set forth in the SAC rectifies the Court's concerns about Plaintiff's initial allegations, regardless of these details, it is clear that after SME acquired actual knowledge of the trafficking taking place, it *remained* in the business venture with Dream—continuing to anticipate a benefit from a venture it undisputably knew was using force, fraud, and coercion to induce Plaintiff into engaging in sex acts with her trafficker.

18

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Second, the Court opined that the FAC failed to show that SME "acted in any way that would establish the existence of a tacit agreement to support the sex trafficking." Order at 20. As the Court accurately noted, "[t]he key to a finding of tacit agreement is that 'the alleged participant have an ongoing interest in the success of a specific venture and elect to further the ends of the venture beyond what would reasonably be expected in an ordinary commercial transaction.'" Order at 21 (citing *Doe (S.M.A.) v. Salesforce*, 2024 WL 1337370, at *13 (N.D.T.X. 2024)). Mangroe need not allege that SME committed an "overt act" that furthered sex trafficking to demonstrate participation in the sex trafficking venture. *See Acevedo,* 713 F. Supp. at 775 ("[A] beneficiary's 'participation' need not include an overt act in furtherance of or actual knowledge of a sex trafficking venture.").

Coulter's responsibilities were, *inter alia*, to assist in Mangroe's development as an artist and the record, ensure contract terms are complied with, and advocate and support Mangroe. SAC ¶ 230. By failing to intervene in overt displays of Dream's sexual violence, fraud, and control—and instead—instructing Mangroe to figure out a way to continue working with Dream despite having specific knowledge of his sexual abuse, SME demonstrated an ongoing interest in the success of the sex trafficking venture and prioritizing its commercial relationship with Dream.

Even after Mangroe confided in Coulter on August 17, 2015, sharing that Dream was sexually violent and emotionally abusive and preventing her from finishing her record, Coulter instructed Mangroe again to figure out a way to work with Dream. *Id.* ¶ 250. On August 21, 2015, Mangroe reiterated to Coulter that Dream punished her with physical and sexual abuse when she did not comply with his demands. *Id.* ¶ 256. Coulter, in response, informed Mangroe that Dream was withholding music she had recorded from Epic Records and instructed Mangroe that

19

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

"it was very important that Epic sees that she is in a good place with Dream" so that her life would change. *Id.* ¶ 257. After putting continuous pressure on Mangroe to meet with Dream in person to "make things right," SME paid for Mangroe to meet with Dream in Los Angeles, during which Dream refused to discuss the record, arranged for massages, and suggested they get a room. *Id.* ¶ 262-265. Not only did SME provide financial support to Dream, gaining the benefit of his professional relationships, SME pressured Mangroe to appease her abuser after witnessing and having specific knowledge of Dream's sexual violence and paid for her to do so.

Taken together, the SAC adequately alleges that SME has knowledge "that undertaking or enterprise violated the TVPRA as to the plaintiff." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 726 (11th Cir. 2021).

## C.    The FAC Sufficiently Alleges that SME Knowingly Benefitted from the Sex Trafficking Venture

Defendant again improperly attempts to limit the definition of "benefit" under the statute. Def's Br. at 21-22. The plain language of Section 1595 makes clear that "benefit" is broad and includes "anything of value." 18 U.S.C. § 1595(a) ("An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture…)"). Defendant argues that the SAC does not allege that SME derived any benefit from the SME/Contra contract because it lost money and did not derive profits from the venture. Citing to Black's Law Dictionary, Defendant improperly attempts to misconstrue the plain language of the TVPRA, which does not limit the benefit to mean solely "financial" benefit. *See* 18 U.S.C. § 1595(a). As the SAC alleges, SME derived a significant benefit

20

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

from maintaining a strong relationship with Dream as a result of his relationships with important figures in the music industry.  SAC ¶ 187.

The SAC alleges that the SME contract is an agreement between Contra and SME for the services of Mangroe, making it clear that SME signed the contract to gain Mangroe's services, and in doing so would provide profit (including production fees and an advance of said fees) to Dream and Contra.  *Id.* ¶ 185.  SME additionally benefitted from its contract with Contra and Mangroe because the agreement further solidified the professional connection between SME and Dream—an extremely successful songwriter who had a close personal and professional relationship with popular artists in the music industry including Beyonce, one of the most profitable and popular artists signed to SME.  *Id.* ¶187.  It received this benefit knowing, by virtue of its agents such as Abragey, Reid, and Coulter, that Dream did not intend to truly produce music for Mangroe, but instead to use her for his own violent and sexual desires.  *Id.* ¶ 310.

## II.    <u>The SAC States a Claim Against Dream Under the TVPRA</u>

Defendants' assertion that the SAC does not allege a commercial sex act, Defs.' Brf., at 23-24, lacks merit.  SME argues that Mangroe's claims against Dream under §1591 of the TVPRA should be denied because (1) she does not allege that someone sold her sexual services for an economic profit (Def's Br. at 23) and (2) Dream did not know, when he enticed Plaintiff to work with him, that Mangroe would have to engage in commercial sex by means of force, fraud, or coercion.  Def's Br. at 25.  Notably,  Dream did not move to dismiss these claims.  *See* ECF 44.

With respect to SME's first argument, the case law is clear that a plaintiff need only allege "something of value" was given or received by "any person" because of

21

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

the sex act.  *See United States v. Raniere*, 55 F.4th 354, 363 (2d Cir. 2022)
(recognizing that the phrase "because of" is "virtually indistinguishable" from the
phrase "on account of").  Indeed, courts have interpreted this language broadly,
including intangible promises of future jobs or career advancement as "things of
value."  *Id.* (citing *Ardolf v. Weber*, 332 F.R.D. 467, 478 (S.D.N.Y. 2019)); *see also
United States v. Bazar*, 747 Fed. Appx. 454, 456 (9th Cir. 2018) (recognizing that
"commercial sex act" is not "limited to sexual intercourse for money").

Here, the SAC expressly alleges that Mangroe received multiple things of
value in exchange for being subjected to Dream's violent sex acts and psychological
torture.  For example, Mangroe received: (i) assurances from Dream that he would
sponsor the extension of her O-1 international visa that allowed her to work in the
United States (*Id.* ¶ 65); (ii) studio time to record music with producers paid by
Dream and/or Contra (*Id.* ¶¶ 53, 55); (iii) assurances from Dream that he would share
the specific formula he used when working with Beyonce to help her reach career
success (*Id.* ¶ 75); (iv) promises from Dream that opening for Beyonce on tour was
not "a big deal" because she was "family" (*Id.* ¶¶ 83, 193); and (v) money for food
and shelter (*Id.* ¶ 163).  Moreover, the SAC further alleges that Dream directly tied
time in the recording studio and recording contracts in exchange for being available
to have sex with him.  *Id.* ¶¶ 107, 110, 120, 127, 137, 184.

The Court should similarly reject Defendant's argument that Mangroe has not
pleaded facts showing that at the time Dream "enticed Plaintiff to work with
him…she would be caused to engage in commercial sex acts by means of force,
fraud, or coercion—nor does she alleged any 'established modus operandi' or that
Dream was 'familiar with a pattern of conduct.'"  Def's Br. at 24-25 (internal
citations omitted).

22

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

First, there is no *modus operandi* requirement. While *United States v. Mondaca*, No. 23-283, 2024 WL 4274703, at *1 (9th Cir. Sept. 24, 2024) recognized that multiple victims could show that a defendant knew that force, fraud, or coercion would be used to cause a victim to engage in commercial sex act, the courts did not hold that a pattern of victims is the only way to establish the requisite knowledge. *See United States v. Andrews*, No. 18 Cr. 000256 (JAM), 2022 WL 9466146, at *2 (E.D. Cal. Oct. 14, 2022) ("Defendant has misinterpreted the holding in *Todd* and improperly narrowed the statutory language of § 1591 to the illogical conclusion that sex trafficking can only be proven through evidence of the sex trafficking of a prior victim. This interpretation is not supported by the Ninth Circuit's holding in *Todd* nor is there any language in § 1591 to support such a limitation").

Second, the SAC alleges that Dream specifically used his age and influence in the music industry to manipulate Mangroe into believing that she needed him to be successful and roped her into his world through false promises while never actually having any intention to support her career. SAC ¶¶ 7-9. These fraudulent promises were used to induce Mangroe to fly to Atlanta and Los Angeles, and once she was in physical proximity to Dream, those fraudulent promises ultimately resulted in violent, physical, and psychological force and coercion.

Further, Dream promised Mangroe that he would sign her to his record label, Contra, yet it still remains unclear whether Contra was ever anything more than an illegitimate business to assist Dream in his trafficking scheme, or whether Contra ever signed any artist other than Mangroe. *Id.* ¶ 27. Defendant's argument that it is "implausible" that Dream intended to defraud Plaintiff because he developed her work and managed to procure an agreement with SME (Def's Br. at 25) is nonsensical. The SAC repeatedly alleges that Dream did not, in fact, develop her

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

work; instead, he actively worked against Mangroe's ability to perform any work once she was no longer in physical proximity to him.  And, as is clear in the SAC, the actions (or lack thereof) by SME rendered the contract between SME, Contra, and Mangroe meaningless because Mangroe was not permitted to record her album, and SME was complicit in her inability to do so by ceding full control over Mangroe's career to Dream.

These allegations alone more than plausibly allege that Dream knowingly planned to and ultimately did use force, fraud, or coercion to cause Mangroe to engage in a commercial sex act at *all* times—including before, during, and after Mangroe was flown to Atlanta and Los Angeles allegedly to record music.

Finally, Defendant's argument that Dream's refusal to work on Mangroe's album unless she moved back to Atlanta is insufficient to show that Dream knew, when he persuaded Plaintiff to work with him, that she would be caused to engage in commercial sex by means of force, fraud, or coercion," Def's Br. at 25, simply continues to ignore and/or misstate the facts alleged in the SAC, which is replete with examples of Dream's false promises from the very start.  *See* SAC ¶¶ 71, 75, 83, 110, 119, 193, 314, 317.

WIGDOR LLP
85 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NY 10003
(212) 257-6800

24

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

## **CONCLUSION**

For all of the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's motion to dismiss in its entirety.

Dated: August 6, 2025
      New York, New York

**WIGDOR LLP**

By: _Meredith Firetog_
      Douglas H. Wigdor
      Meredith A. Firetog
      Monica Hincken
      Katherine Vask

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
mfiretog@wigdorlaw.com
mhincken@wigdorlaw.com
kvask@wigdorlaw.com

*Counsel for Plaintiff*

25

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff, certifies that this brief is 25 pages or less, in compliance with this Court's Standing Order dated October 24, 2023.

Dated: August 6, 2025
        New York, New York

**WIGDOR LLP**

By: _____

Douglas H. Wigdor
Meredith A. Firetog
Monica Hincken
Katherine Vask

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
mfiretog@wigdorlaw.com
mhincken@wigdorlaw.com
kvask@wigdorlaw.com

*Counsel for Plaintiff*

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SME'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT