# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHANAAZ MANGROE p/k/a Channii Monroe,<br><br>  Plaintiff,<br><br>  v.<br><br>TERIUS GESTEELDE-DIAMANT p/k/a "THE-DREAM"; CONTRA PARIS, LLC; and SONY MUSIC ENTERTAINMENT,<br><br>  Defendants. | Case No. 2:24-CV-04639-SPG-PVG<br><br>**ORDER GRANTING DEFENDANT SONY MUSIC ENTERTAINMENT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br>**[ECF NO. 71]** |

Before the Court is the Motion to Dismiss (ECF No. 71 ("Motion")) filed by Defendant Sony Music Entertainment ("SME"). The Court has read and considered the Motion and concluded that it is suitable for decision without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Having considered the parties' submissions, the relevant law, and the record in this case, the Court GRANTS the Motion.

## I. BACKGROUND

### A. Factual Background

The Court previously set out the factual background of this action in its Order granting SME's Motion to Dismiss Plaintiff Chanaaz Mangroe's ("Plaintiff") First Amended Complaint (ECF No. 32 "FAC"). *See generally* (ECF No. 58 ("*Mangroe I*") at 1–9). In short, Plaintiff alleges that, while she was working as a singer and songwriter, Defendant Terius "The Dream" Gesteelde-Diamant ("Dream") lured her into a violent and abusive sexual relationship by fraudulently promising to help her secure a recording and publishing contract. (ECF No. 59 ("SAC") ¶¶ 3–8). Plaintiff alleges that, instead of following through on these promises, Dream engaged in a pattern of sexual abuse that culminated in battery and rape, in violation of the California Penal Code and federal sex trafficking laws. (*Id.* ¶¶ 329–47). Plaintiff further alleges that SME knowingly participated in, and benefitted from, this venture in violation of federal sex trafficking laws. (*Id.* ¶¶ 329–41).

The SAC largely relies on the same allegations as Plaintiff's FAC, alleging only a handful of new allegations. For example, the FAC alleged that, in March 2015, Dream told Plaintiff that Antonio Reed from Epic Records, a division of SME, had reached out to him about signing Plaintiff. (FAC ¶ 164); *see also* (SAC ¶ 164). Dream told Plaintiff that he would handle all negotiations with Epic and refused to include her in negotiations or conversations with Epic executives. *See* (FAC ¶ 165); *see also* (SAC ¶ 165).

In May 2015, Plaintiff performed music for Reid and Joey Arbagey, another Epic executive. *See* (FAC ¶¶ 190-92); *see also* (SAC ¶¶ 190–92). After Plaintiff's performance, during a conversation with Reid and Arbagey, Dream placed his hand on Plaintiff's inner thigh and stroked her leg. *See* (FAC ¶ 192); *see also* (SAC ¶ 192). Plaintiff now further alleges that, during this conversation, "Dream bragged about . . . his ability to get [Plaintiff] featured as an opening act on Beyonce's upcoming tour," when, in fact, "Beyonce was not planning a tour at that time." (SAC ¶ 193).

The FAC also alleged that, in mid-July 2015, Dream told Plaintiff he was planning her label showcase for August 2015. *See* (FAC ¶ 207); *see also* (SAC ¶ 208). The SAC further alleges that, on July 27, 2015, Dream emailed Reid to cancel Plaintiff's showcase. *See* (SAC ¶ 210). Dream told Reid that "he knew that Reid wanted [Plaintiff] to perform" but Dream "wanted [Plaintiff's] first showcase to take place in Paris" instead. (*Id.*).

The FAC alleged that, in August 2015, Epic representative Ericka Coulter attended a recording session where Dream forcibly pulled Plaintiff's hair back and poured vodka down her throat. (FAC ¶ 225); *see also* (SAC ¶¶ 229, 231). During the same session, Coulter also saw Dream touch Plaintiff's body, as well as explicit sexual text messages between Dream and Plaintiff. *See* (FAC ¶ 225); *see also* (SAC ¶¶ 232–33). After Dream forced Plaintiff to drink, Plaintiff caught Coulter's eye, motioned to her, and asked if Coulter saw what had happened. (FAC ¶ 225); *see also* (SAC ¶ 231). In response, Coulter simply "brushed off Dream's violent actions." (FAC ¶ 225); *see also* (SAC ¶ 231). The SAC adds that Coulter told Plaintiff "Dream just wanted her to 'loosen up,'" (SAC ¶ 231), and further alleges that Coulter saw Dream touch Plaintiff in a sexually explicit manner, then "drag[] [her] away to a private room," (*id.* ¶ 232).

Finally, the SAC provides additional detail about an August 21, 2025, conversation in which Plaintiff spoke with Coulter about Dream's abusive conduct. *See* (FAC ¶¶ 247–48); *see also* (SAC ¶¶ 256–57). The FAC alleged that, on August 21, 2025, Plaintiff told Coulter that Dream was abusive and controlling. (FAC ¶ 247); *see also* (SAC ¶ 256). In that conversation, Plaintiff also made clear that she was "committed to completing [her] record and moving forward with her contract but that she needed to be protected from [Dream]." (FAC ¶ 247); *see also* (SAC ¶ 256). In response, Coulter told Plaintiff that "Dream was withholding the music she recorded with him from Epic." (FAC ¶ 248); *see also* (SAC ¶ 257).

Plaintiff now further alleges that Coulter "pushed [Plaintiff] to get on the same page as Dream and work with him despite knowing about Dream's abuse and control." (SAC ¶ 257). Coulter told Plaintiff "that it was very important that Epic sees that she is in a good

place with Dream and that if she was able to make up with Dream, her life would change." (*Id.*). Faced with "Coulter's continued pressure to meet with Dream," Plaintiff contacted Dream to meet on or around October 29, 2015. (*Id.* ¶ 261). Epic paid for Plaintiff "to stay in Los Angeles to attend the meeting with Dream." (*Id.*). The day after they met, "Coulter's assistant sent an email confirming a meeting for [Plaintiff] with Reid and other Epic executives to discuss the future of her album." (*Id.* ¶ 269).

As alleged in the FAC, that meeting took place in November 2015. (FAC ¶¶ 250, 254); *see also* (SAC ¶¶ 271, 275). There, Plaintiff told Reid that she "wanted to move forward and make the best record possible for Epic" but she was not getting any of her music from Dream. (FAC ¶ 254); *see also* (SAC ¶ 275). In response, Reid asked Dream's partner, Christopher "Tricky" Stewart, to speak with Dream and appeared to agree that "they should move forward with other producers." (FAC ¶¶ 254, 256); *see also* (SAC ¶¶ 275, 277). In February 2016, Epic approved the budget for one of Plaintiff's music videos. (FAC ¶ 263); *see also* (SAC ¶ 289). Initially, in May 2016, Plaintiff's product manager at Epic texted her "that the video was 'dope.'" (FAC ¶ 274); *see also* (SAC ¶ 300). However, Coulter later told Plaintiff that "Dream complained about the video," "nobody at Epic . . . liked the video," and "she should have worked with Dream on the video." (FAC ¶ 275); *see also* (SAC ¶ 301). Months later, in June 2016, Dream told Plaintiff that Epic was "washing their hands" of her. (FAC ¶ 282); *see also* (SAC ¶ 308). In July 2016, Plaintiff was officially told that "Epic no longer wanted to distribute her music because Dream failed to deliver [her] records." (FAC ¶ 288); *see also* (SAC ¶ 314).

### B. Procedural History

Plaintiff filed suit against Defendants on June 4, 2024, alleging claims of sex trafficking against all Defendants, as well as claims of sexual battery and rape against Dream. (ECF No. 1). Because the original complaint improperly listed Epic as a defendant instead of SME, Plaintiff sought leave to amend the case caption on July 15, 2024, which the Court granted on August 28, 2024. (ECF Nos. 23, 31). On August 16, 2024, Dream and Contra Paris LLC ("Contra"), a record label operated by Dream and Christopher

"Tricky" Stewart, *see* (SAC ¶¶ 9, 18), filed a motion to dismiss the complaint, *see* (ECF No. 27). Plaintiff then filed the FAC on September 6, 2024, which rendered the motion to dismiss moot. *See generally* (FAC). Dream and Contra answered the FAC on October 4, 2024. (ECF No. 44).

On November 18, 2024, SME moved to dismiss the FAC. (ECF No. 48). On April 21, 2025, the Court granted SME's Motion to Dismiss. *See generally* (*Mangroe I*). On May 14, 2025, Plaintiff filed her SAC. (ECF No. 59). Dream and Contra answered the SAC on May 28, 2025. (ECF No. 61). On June 25, 2025, SME filed this Motion to Dismiss. (ECF No. 71). Plaintiff filed a brief in opposition on August 6, 2025 (ECF No. 81 ("Opp.")), and SME filed a brief in reply on August 27, 2025 (ECF No. 83 ("Reply")).

## II. LEGAL STANDARD

### A. Motion to Dismiss

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013). To survive a 12(b)(6) motion, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks and citation omitted).

If a claim sounds in fraud or mistake, courts apply the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires such claims to "state with particularity the circumstances constituting fraud or mistake." To meet this standard, a

plaintiff must identify "[t]he time, place, and content of [any] alleged misrepresentation," as well as the "circumstances indicating falseness" or the "manner in which the representations at issue were false and misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547–48 (9th Cir. 1994) (internal quotation marks, citation, and alterations omitted). Those allegations "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted). Although the circumstances of the alleged fraud must be alleged with specificity, knowledge "may be alleged generally." Fed. R. Civ. P. 9(b).

When ruling on a Rule 12(b)(6) motion, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The Court is "not required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice," nor must it accept "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Seven Arts Filmed Ent., Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013) (internal quotation marks and citation omitted). Where dismissal is appropriate, a court should grant leave to amend unless the plaintiff could not possibly cure the defects of the pleading. *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009).

### B. Trafficking Victims Protection Reauthorization Act (TVPRA)

Congress enacted the Trafficking Victims Protection Act in 2000 to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." *Ditullio v. Boehm*, 662 F.3d 1091, 1094 (9th Cir. 2011) (quoting Pub. L. No. 106-386, § 102, 114 Stat. 1464 (Oct. 28, 2000)). The law created several criminal offenses for forced labor and sex trafficking and was "intended to more comprehensively and effectively combat human trafficking." *Ratha v. Phatthana Seafood*

*Co.*, 35 F.4th 1159, 1164 (9th Cir. 2022) ("*Ratha I*") (citation omitted). Congress subsequently reauthorized and expanded the legislation in the Trafficking Victims Protection Reauthorization Act ("TVPRA"), which established a private right of action against traffickers. Pub. L. No. 108-193, § 4, 117 Stat. 2875 (Dec. 19, 2003).

Two provisions of the TVPRA are relevant to this case. First, 18 U.S.C. § 1591 establishes criminal penalties for sex trafficking of children by any means, or of adults by force, fraud, or coercion. In relevant part, § 1591 states:

> (a) Whoever knowingly--
>
>> (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>>
>> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a). Thus, to state a claim for a direct violation of § 1591, a plaintiff must allege that the defendant, (1) knowingly and in interstate or foreign commerce recruited, enticed, harbored, or transported a person; (2) knowing, or in reckless disregard of the fact, that means of force, threats, or fraud would be used; (3) to cause the person to engage in a commercial sex act. *See Acevedo v. eXp Realty, LLC*, 713 F. Supp. 3d 740, 765 (C.D. Cal. Jan. 29, 2024). The statute defines "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

1   Second, 18 U.S.C. § 1595 establishes a private right of action for violations of the
2   TVPRA, including § 1591.  As relevant here, § 1595 states:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a).  Thus, § 1591 establishes private rights of action against both perpetrators of trafficking ("direct liability"), and those who knowingly financially benefit from trafficking ("beneficiary liability").  *Doe v. Mindgeek USA Inc.*, 558 F. Supp. 3d 828, 835 (C.D. Cal. 2021).  To state a claim for beneficiary liability, a plaintiff must show: (1) the defendant knowingly benefited; (2) from participating in a venture; (3) that the person "knew or should have known has engaged in an act in violation of this chapter."  18 U.S.C. § 1595(a); *see Croft v. Dolan*, No. CV 24-371 PA (AGRx), 2024 WL 3915148, at *6 (C.D. Cal. June 21, 2024).

### III.   DISCUSSION

Plaintiff alleges that SME is liable under a single claim of beneficiary liability under § 1595(a), based on Dream's alleged violation of § 1591.  The Court previously dismissed Plaintiff's § 1595(a) claim against SME based on Plaintiff's failure to allege that (a) SME had actual or constructive knowledge that Dream was trafficking Plaintiff; and (b) SME participated in a venture that engaged in an act of sex trafficking.  *See* (*Mangroe I*, at 14–21).  Here, without addressing whether the additional allegations in the SAC are enough to show SME had constructive knowledge, Plaintiff has still not alleged that SME participated in a venture that engaged in an act of sex trafficking.

#### A.   § 1595

The Court previously found that Plaintiff failed to plead participation for two reasons.  First, SME "could not possibly have participated in a venture that engaged in an

act in violation of the sex trafficking laws" because, based on the allegations of the FAC, "mid-August 2015" was "the earliest time that SME could have participated in a venture that SME knew had engaged in an act of sex trafficking" and Plaintiff did not allege any commercial sex acts after mid-August 2015. (*Mangroe I* at 20). Further, "Plaintiff's allegations of participation fail to show that SME either participated directly in the sex trafficking or acted in any way that would establish the existence of a tacit agreement to support the sex trafficking." (*Id.*). The SAC does not allege sufficient facts to cure these deficiencies.

As to the timing issue, Plaintiff still has not alleged any commercial sex acts occurred after the earliest allegations that SME executives knew of a venture engaged in sex trafficking. In opposition to SME's Motion, Plaintiff argues that "SME had constructive knowledge as early as May 2015." (Opp. at 21). However, the SAC only alleges that, by May 2015: (1) Dream negotiated a contract with Epic, on Plaintiff's behalf, *see* (SAC ¶¶ 164–65); (2) Reid and Arbagey saw Dream place his hand on Plaintiff's inner thigh and stroke her leg, *see* (*id.* ¶ 192); and (3) Reid and Arbagey heard Dream brag that he could have Plaintiff featured as an opening act on an upcoming Beyonce tour, *see* (*id.* ¶ 193). None of these allegations show SME's knowledge of a venture engaged in sex trafficking.

SME had no basis to infer Dream was engaged in sex trafficking based on Plaintiff's lack of participation in contract negotiations between Epic and Contra Paris "for the services" of Plaintiff. (SAC ¶ 185); *see also* (ECF No. 71-4, Ex. B, at 2, 19). Likewise, Plaintiff's allegations regarding what Reid or Arbagey saw and heard following Plaintiff's May 2015 performance are insufficient to show constructive knowledge of SME. At most, after seeing Dream touch Plaintiff's inner thigh, Reid and Arbagey could have inferred that the two were in a sexual relationship. *See* (SAC ¶ 193); *see also* (*Mangroe I* at 15). Likewise, Dream's comment about the Beyonce tour does not suggest that he had fraudulently induced Plaintiff to engage in commercial sex. *See* (Opp. at 19).[1]

---

[1] As alleged, it is not even clear whether Dream was referring to a particular tour or, more generally, about his ability to have Plaintiff featured when Beyonce next went on tour. *See*

Plaintiff further argues that "SME acquired actual knowledge of Dream's violent sexual abuse before Dream forced [Plaintiff] to engage in another commercial sex act" in early August 2015. (Opp. at 21). In support, Plaintiff relies on allegations that Coulter witnessed Dream force Plaintiff to drink vodka and brushed it off as an attempt to "loosen [her] up," saw explicit sexual text messages between Dream and Plaintiff, saw Dream touch Plaintiff in a sexual manner, and saw Dream bring Plaintiff to a private room. *See* (Opp. 22 (citing SAC ¶¶ 229–32). However, as the Court previously noted, "[m]ere knowledge of sexual abuse does not establish beneficiary liability under § 1595." (*Mangroe I* at 15). "While Plaintiff may have adequately alleged SME's awareness of some other crime, such as battery, there is no allegation that SME should have known that force would be used to cause Plaintiff to engage in a commercial sex act." (*Mangroe I* at 16). As in the FAC, to establish a § 1591 violation, Plaintiff does not allege in the SAC any instance of a commercial sex act after Plaintiff confided in Coulter about Dream's abuse. *See* (*Mangroe I* at 20); *see also* (SAC ¶¶ 250, 256–57).

The SAC also fails to allege sufficient facts to show SME executives acted in a way that suggests a tacit agreement to support Dream's alleged sex trafficking. "[T]he majority of courts" have found that, absent a defendant's direct participation in the conduct alleged to constitute sex trafficking, a plaintiff may show participation by alleging "the existence of 'a continuous business relationship between the trafficker and the defendant such that it would appear that the trafficker and the defendant have established a pattern of conduct or

---

(SAC ¶ 193). Even if Dream was referring to a particular tour, Plaintiff has not alleged sufficient facts in the SAC to establish that Reid and Arbagey "would have known that Beyonce was not working on a tour at that time and that Dream's promises were fraudulent." (*Id.*). Dream "had a close personal and professional relationship with Beyonce," (*id.* ¶ 187), and there are no allegations to show that Reid and Arbagey, as Epic executives, would have knowledge of Beyonce tour dates, as Plaintiff does not allege Beyonce was signed to Epic, *see* (*id.* ¶¶ 19, 187, 190, 210). Additionally, even if Reid and Arbagey knew that Beyonce was not scheduled to go on tour, this does not establish that they were aware of Dream's conduct alleged to be sex trafficking.

could be said to have a tactic agreement.'" (*Mangroe I* at 20 (quoting *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 970 (S.D. Ohio 2019)).

Here, Plaintiff argues that SME had a tacit agreement to support Dream's alleged sex trafficking conduct. *See* (Opp. 23). As the Court previously explained, "[t]he key to finding a tacit agreement is that 'the alleged participant have an ongoing interest in the success of a specific venture and elect to further the ends of the venture beyond what would reasonably be expected in an ordinary commercial transaction.'" (*Mangroe I* at 21 (quoting *Doe (S.M.A) v. Salesforce, Inc.*, No. 3:23-CV-0915-B, 2024 WL 1337370, at *13 (N.D. Tex. Mar. 28, 2024)). Plaintiff purports to show a tacit agreement based on allegations that SME "fail[ed] to intervene in overt displays of Dream's sexual violence, fraud, and control" and "instruct[ed] [Plaintiff] to figure out a way to continue working with Dream despite having specific knowledge of his sexual abuse." (Opp. at 23). However, while SME's actions "may be objectionable in light of SME's knowledge of Dream's abuse," (*Mangroe I* at 17), they do not suggest that SME went beyond what would be expected in an ordinary commercial transaction. "To the contrary, they suggest that SME entered into an earnest commercial venture to pair Plaintiff's singing with Dream's producing, and that, when Dream allegedly refused to participate in the venture, SME lost interest in continuing." (*Id.* at 17–18).

Since Plaintiff has failed to allege SME's participation in a venture that engaged in sex trafficking, the Court GRANTS the Motion and DISMISSES the SAC as to SME.

**B.     Leave to Amend**

Generally, "in dismissals for failure to state a claim, a district court should grant leave to amend." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). Nevertheless, a district court may, in its discretion, deny leave to amend when amendment would be futile. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009). Amendment is considered futile where "allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010).

Here, the Court already dismissed Plaintiff's § 1595(a) claim based on Plaintiff's failure to allege SME's participation in a venture engaged in sex trafficking. *See* (*Mangroe I* at 19–21). As noted above, the Court's previous decision dismissing the FAC identified two fatal defects with respect to Plaintiff's participation theory, (*id.* at 20), and the SAC does nothing to remedy those defects. Indeed, the majority of new allegations in the SAC merely build on allegations the Court has already rejected as insufficient to state a claim. *See, e.g.*, (SAC ¶ 231 (alleging that, after Dream forced Plaintiff to drink vodka, Coulter told Plaintiff that Dream just wanted her to "loosen up"); *id.* ¶ 232 (Coulter saw Dream touch Plaintiff in a sexually explicit manner, then take her to a private room); *id.* ¶ 257 (Coulter pushed Plaintiff to continue working with Dream, despite knowing he was abusive); *see also* (*Mangroe I* at 14 (allegations that "Coulter witnessed Dream pull Plaintiff's hair back and forcibly pour vodka down her throat, saw Dream touch Plaintiff's body, and saw explicit text messages between Dream and Plaintiff" insufficient to show SME's knowledge of alleged sex trafficking); *id.* at 15 ("To be sure, the FAC plausibly alleges that, at least as of mid-August 2015, SME was aware that Dream and Plaintiff had a sexual relationship and that Dream had engaged in acts of physical violence against Plaintiff."); *id.* at 19 (rejecting argument that SME participated in trafficking venture based on allegations that "SME's agents order[ed] Plaintiff to figure out a way to continue working with Dream").

Because the allegations in the SAC are not meaningfully different from those set forth in the FAC and have not remedied the deficiencies that the Court identified in its order dismissing the FAC, the Court concludes that amendment would be futile. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (failure to cure deficiencies identified in order dismissing complaint as "a strong indication that [plaintiffs] have no additional facts to plead"); *see also Sumana Forest Retreat v. Cnty. of San Diego*, No. 24-CV-1196-RSH-DDL, 2025 WL 1296696, at *8 (S.D. Cal. May 5, 2025); *Carrow v. Roberts*, No. EDCV211525JGBSHKX, 2022 WL 2102934,

at *6 (C.D. Cal. Jan. 3, 2022); *Yetter v. Ford Motor Co.*, 428 F. Supp. 3d 210, 235 (N.D. Cal. 2019).

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the Motion and DISMISSES the SAC as to SME with prejudice.

**IT IS SO ORDERED.**

Dated: November 3, 2025

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE