**VENABLE LLP**
Desirée F. Moore (admitted *Pro Hac Vice*)
*dmoore@venable.com*
Abram I. Moore (admitted *Pro Hac Vice*)
*amoore@venable.com*
Nelson M. Hua (admitted *Pro Hac Vice*)
*nmhua@venable.com*
227 West Monroe Street, Suite 1900
Chicago, Illinois 60606
Telephone: 312.820.3400
Facsimile: 312.820.3401

**VENABLE LLP**
Kaidyn P. McClure (SBN 352627)
*kpmcclure@venable.com*
2049 Century Park East, Suite 3400
Los Angeles, CA 90067
Telephone: 310.229.9900
Facsimile: 310.229.9901

*Attorneys for Defendants Terius Gesteelde-Diamant p/k/a "The-Dream" and Contra Paris, LLC*

**(Additional Attorneys on Next Page)**

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 3400
LOS ANGELES, CA 90067
310.229.9900

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

CHANAAZ MANGROE,

Plaintiff,

v.

TERIUS GESTEELDE-DIAMANT p/k/a "THE-DREAM"; CONTRA PARIS, LLC; and SONY MUSIC ENTERTAINMENT

Defendants.

Case No. 2:24-cv-04639-SPG-PVC

Hon. Sherilyn Peace Garnett
Courtroom 5C

**JOINT BRIEF REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

[*Filed concurrently with Joint Appendix of Facts; Joint Appendix of Evidence; Joint Appendix of Objections; and [Proposed] Order*]

Date: May 13, 2026
Time: 1:30 p.m.

**UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

DOUGLAS H. WIGDOR (NY SBN 2609469)
dwigdor@wigdorlaw.com
MEREDITH A. FIRETOG (NY SBN 5298153)
mfiretog@wigdorlaw.com
KATHERINE VASK (NY SBN 6094635)
kvask@wigdorlaw.com
(All admitted *pro hac vice*)
**WIGDOR LLP**
85 Fifth Avenue, Fifth Floor
New York, NY 10003
Tel.: (212) 257-6800
Fax.: (212) 257-6845

ROBERT J. GIRARD II (BAR NO. 216949)
rgirard@girardbengali.com
OMAR H. BENGALI (BAR NO. 276055)
obengali@girardbengali.com
**GIRARD BENGALI, APC**
355 S. Grand Street, Suite 2450
Los Angeles, CA 90071
Tel.: (323) 302-8300
Fax.: (323) 302-8310

*Attorneys for Plaintiff Chanaaz Mangroe*

# TABLE OF CONTENTS

**Page**

I. DEFENDANT'S INTRODUCTION .... 1
II. PLAINTIFF'S INTRODUCTION .... 3
III. DEFENDANT'S STATEMENT OF FACTS .... 5
A. The Parties' Professional Relationship. .... 5
1. The Parties connect through music-industry contacts. .... 5
2. Plaintiff begins recording music and enters into a contract with CPL. .... 5
3. CPL secures a deal with Epic Records for Plaintiff. .... 6
4. The Epic deal falls apart. .... 7
B. Plaintiff's Living Expenses while Recording. .... 8
C. Plaintiff's Living Conditions while Recording. .... 9
D. The Parties' Sexual Relationship and Contemporaneous Messages. .... 10
IV. PLAINTIFF'S STATEMENT OF FACTS .... 14
A. Mangroe Was an Aspiring Young Songwriter and Singer. .... 14
B. Defendant Introduced Plaintiff to the Concept of a "Sanctuary Relationship." .... 15
C. Defendant Signed Mangroe to CPL. .... 16
D. Defendant Used Violence, Intimidation, and Lies to Get Mangroe to Submit to Sex. .... 18
1. There was a Significant Power Imbalance between Defendant and Mangroe. .... 18
2. Defendant Further Intimidated and Instilled Fear in Mangroe through Sexual Recordings and Firearms. .... 19
3. Mangroe was Financially Dependent on Defendant. .... 19

E. Defendant's violence toward Mangroe. .......... 20

1. Defendant Forcibly Ejaculated Inside of Her after She Asked Him Not To. .......... 20

2. Defendant Assaulted Mangroe in her Hotel Room in March 2015. .......... 21

3. Defendant Assaulted Mangroe at the Movie Theatre in April 2015. .......... 21

4. Defendant Assaulted Mangroe In his Van on the Same Day in April 2015. .......... 21

5. Defendant Assaulted Mangroe in a Music Studio Staircase in August 2015 .......... 21

F. After Plaintiff Refused Sex, Defendant Sabotaged Her Career .......... 22

V. ANALYSIS .......... 23

A. Legal Standard .......... 23

B. Plaintiff's Legal Standard .......... 23

C. Defendants' Argument 1: Plaintiff Cannot Establish a Commercial Sex Act under the TVPA. .......... 24

1. Plaintiff denies having sex with Diamant in order to "get something" in return. .......... 25

2. Plaintiff denies being promised that sex would cause career opportunities. .......... 26

3. Plaintiff's "sex as part of a creative process" theory does not meet the definition of a commercial sex act. .......... 26

4. There is no evidence that payment of living expenses was because of any sex act. .......... 28

D. Plaintiff's Response to Defendants' Argument 1: Sufficient Facts Exist to Support a Commercial Sex Act under the TVPA .......... 30

1. The Record Supports the Existence of a Commercial Sex Act .......... 31

2. Defendants' Arguments Are Unavailing .............................. 32

E. Defendants' Argument 2: Plaintiff Cannot Establish that Diamant Engaged in the Requisite Knowing Trafficking Conduct. .................................................................. 34

1. Plaintiff cannot show any trafficking act with knowledge of or for the purpose of a later commercial sex act. ............. 35

F. Plaintiff's Response Defendants' Argument 2: Plaintiff Can Establish that Diamant Engaged in Knowing Trafficking Conduct .................................................................. 41

1. The Record Evidence Shows Illicit Means Were Knowingly Used .............................................................. 42

2. The Record Shows there is a question of fact as to whether the illicit means caused the commercial sex act .................. 46

G. Defendants' Argument 3: CPL Cannot Be Liable under 1591(a) on a Direct-Liability Theory. ........................................................ 47

H. Plaintiff's Response to Defendants' Argument 3: CPL Can Be Liable under 1591(a) on a Direct-Liability Theory. ....................... 47

I. Defendants' Argument 4: CPL Cannot Be Liable under 1595(a) on a Beneficiary-Liability Theory. ................................................ 49

J. Plaintiff's Response to Defendants' Argument 4: CPL Can Be Liable under 1595(a) on a Beneficiary-Liability Theory. ............. 50

K. Defendants' Argument 5: Count II Is Time-Barred Because Plaintiff Cannot Prove an Enumerated 'Sexual Assault' Under CCP Section 340.16. ................................................................ 52

1. Cal. Penal Code § 243.4 does not apply to the alleged February 2015 sexual assault. ............................................ 53

2. Cal. Penal Code § 261(a)(4)(D) similarly does not apply to the alleged February 2015 sexual assault. ........................ 54

L. Plaintiff's Response to Defendants' Argument 5: Count II Is Not Time-Barred ................................................................... 56

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A. B. v. Salesforce.com, Inc.*,
No. 4:20 Civ. 1254, 2021 WL 3616097 (S.D. Tex. 2021) ................................ 52

*A.B. v. Interstate Management Company*,
LLC, No. 3:23 Civ. 388 (IM), 2025 WL 3254620 (D. Or. Nov. 21, 2025) ................................ 46

*A.B. v. Marriott Int'l, Inc.*,
455 F. Supp. 3d 171 (E.D. Pa. 2020) ................................ 51

*Acevedo v. eXp Realty, LLC*,
713 F. Supp. 3d 740 (C.D. Cal. 2024) ................................ 52, 57

*Anya Roberts v. eXp Realty, LLC et al. Additional Party Names: Emily Keenan, Golden*,
No. 2:23-CV-10492-AB-AGR, 2025 WL 4036423 (C.D. Cal. May 2, 2025) ................................ 53

*Associated Vendors, Inc. v. Oakland Meat Co.*,
210 Cal. App. 2d 825 (Cal. App. 1963) ................................ 48

*Cabral v. State Farm Fire and Casualty Company*,
582 F. Supp. 3d 701 (D. Ariz. 2022) ................................ 33

*California Steel and Tube v. Kaiser Steel Corp.*,
650 F.2d 1001 (9th Cir. 1981) ................................ 32

*Croft v. Dolan*,
No. 24-6150, 2025 WL 3720844 (9th Cir. Dec. 23, 2025) ................................ 34, 39, 41

*Croft v. Dolan*,
No. CV 24-371 PA, 2024 WL 4536309 (C.D. Cal. Sept. 17, 2024), *aff'd*, No. 24-6150, 2025 WL 3720844 (9th Cir. Dec. 23, 2025) ................................ 29, 34, 44

*Doe #1 v. Red Roof Inns, Inc.*,
21 F.4th 714 (11th Cir. 2021) ................................ 51, 52

*Doe v. Gross*,
No. 23-CV-6325 (JPC), 2024 WL 3729007 (S.D.N.Y. Aug. 7, 2024) ........ 53

*Doe v. Scottsdale Inns LLC*,
No. 23 Civ. 00759 (PHX) (JJT), 2024 WL 3494375 (D. Ariz. July 22, 2024) ........ 52

*Does 1-6 v. Reddit, Inc.*,
51 F.4th 1137 (9th Cir. 2022) ........ 49

*Dominguez-Curry v. Nevada Transp. Dep't*,
424 F.3d 1027 (9th Cir. 2005) ........ 24

*Earp v. Ornoski*,
431 F.3d 1158 (9th Cir. 2005) ........ 33

*Exchart v. Fox News Network, LLC*,
No. 20 Civ. 5593 (RA), 2021 WL 4124616 (S.D.N.Y. Sept. 9, 2021) ........ 31

*G.G. v. Salesforce.com, Inc.*,
76 F.4th 544 (7th Cir. 2023) ........ 51

*Hill v. Walmart Inc.*,
32 F.4th 811 (9th Cir. 2022) ........ 23

*J.B. v. G6 Hospitality, LLC*,
No. 19 Civ. 07848 (HSG), 2020 WL 4901196 (N.D. Cal. 2020) ........ 51

*Longshore v. Russell*,
No. C11-5278, 2012 WL 2892197 (W.D. Wash. June 15, 2012) ........ 24

*Martinez v. 189 Chrystie St. Partners, LP*,
No. 22 Civ. 3111 (VEC), 2023 WL 5390442 (S.D.N.Y. Aug. 22, 2023) ........ 31

*Nigro v. Sears, Roebuck & Co.*,
784 F.3d 495 (9th Cir. 2015) ........ 24

*Noble v. Weinstein*,
335 F. Supp. 3d 504 (S.D.N.Y. 2018) ........ 30

*People v. Bautista*,
163 Cal.App.4th 762 (2008) ........ 55

*People v. Icke*,
9 Cal. App. 5th 138, 214 Cal. Rptr. 3d 755 (2017) .......... 55, 56

*People v. Ortega*,
240 Cal. App. 4th 956, 193 Cal. Rptr. 3d 142 (2015) .......... 54

*People v. Pham*,
180 Cal. App. 4th, 103 Cal. Rptr. 3d .......... 55

*People v. Robinson*,
63 Cal. 4th 200, 370 P.3d 1043 (2016) .......... 55

*People v. Sommer*,
61 Cal. App. 5th 696, 275 Cal. Rptr. 3d 872 (2021) .......... 55

*Ramsbottom v. Ashton*,
No. 3:21-CV-00272, 2024 WL 4993391 (M.D. Tenn. Dec. 5, 2024) .......... 25, 32, 33, 40, 47

*Roberts v. eXp Realty, LLC*,
No. 2:23 Civ. 10492 (AB), 2024 WL 3005892 (C.D. Cal. May 23, 2024) .......... 31

*Roe v. Howard*,
No. 1:16 Civ. 562 (LOG), 2018 WL 284977 (E.D. Va. Jan. 3, 2018), *aff'd*, 917 F.3d 229 (4th Cir. 2019) .......... 34

*Rousey v. Jacoway*,
544 U.S. 320, 125 S. Ct. 1561, 161 L. Ed. 2d 563 (2005) .......... 25

*S.E.C. v. M & A W., Inc.*,
538 F.3d 1043 (9th Cir. 2008) .......... 24

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
809 F.2d 626 (9th Cir. 1987) .......... 24

*Treminio v. Crowley Maritime Corp.*,
707 F. Supp. 3d 1234 (M.D. Fl. 2023) .......... 46, 51

*U.S. v. Basa*,
817 F.3d 645 (2016) .......... 36

*U.S. v. Chang Ru Meng Backman*,
817 F.3d 662 (2016) .......... 37, 45

*U.S. v. Hornbuckle*,
784 F.3d 549 (2015) .......... 36

*United States v. Alexander*,
No. 24 Cr. 676 (VEC), 2025 WL 3154981 (S.D.N.Y. Nov. 11, 2025) .......... 30, 31

*United States v. Cook*,
782 F.3d 983 (8th Cir. 2015) .......... 30

*United States v. Dann*,
652 F.3d 1160 (9th Cir. 2011) .......... 45

*United States v. Mickey*,
897 F. 3d 1173 (9th Cir. 2018) .......... 39, 43

*United States v. Peeters*,
776 F. App'x 948 (9th Cir. 2019) .......... 25

*United States v. Purcell*,
967 F.3d 159 (2d Cir. 2020) .......... 42, 45, 46

*United States v. Raniere*,
55 F.4th 354 (2d Cir. 2022) .......... 25, 30, 31

*United States v. Todd*,
627 F.3d 329 (9th Cir. 2010) .......... 35, 36, 43

*United States v. Wilkins*,
538 F. Supp. 3d 49 .......... 45

*United States v. Williams*,
666 F. App’x 186 (3d Cir. 2016) .......... 42

*Wood v. Beauclair*,
692 F.3d 1041 (9th Cir. 2012) .......... 24

**Statutes**

18 U.S.C. § 1591 .......... 24, 25, 30, 35, 36, 37, 38, 39

18 U.S.C. § 1591(a) .......... 42, 47

18 U.S.C. § 1591(a)(1) .......... 35, 41

18 U.S.C. § 1591(e)(2) .......... 40

18 U.S.C. § 1591(e)(2)(B) .......... 44

18 U.S.C. § 1591(e)(3) .......... 24, 30

18 U.S.C. § 1595(a) .......... 49, 51, 52

22 U.S.C. § 7102(12)(2015) .......... 35

Cal. Code Civ. Proc. § 340.16 .......... 2, 5, 53, 56, 57

Cal. Penal Code § 243.4 .......... 53, 54, 57

Cal. Penal Code § 261(a)(4) .......... 56

Cal. Penal Code § 261(a)(4)(D) .......... 54, 55, 56, 57

**Court Rules**

Fed. R. Civ. P. 56(a) .......... 23

## I. DEFENDANT'S INTRODUCTION

This case arises from a decade-old contractual dispute and creative falling out between a producer and an artist over a failed recording project. Plaintiff now attempts to convert that time-barred contractual dispute into claims based on violations of criminal laws prohibiting sex trafficking and rape—serious forms of abuse and exploitation subject to longer statutes of limitation. But Plaintiff's attempt to cast herself as a survivor of sex-trafficking is itself an abuse of the Trafficking Victims Protection Act and undermines the vulnerable sex trade victims the law was intended to protect. Her attempt to take advantage of California's statute of limitations for sexual assault fares no better, as no criminal sexual assault occurred during the two weeks that the Parties spent in Los Angeles in February 2015 (or at any time). In short, no reasonable jury could find in Plaintiff's favor on either claim.

Plaintiff, a professional singer from the Netherlands, spent twelve of the twenty-eight weeks between February and August 2015 in the United States recording music with Diamant, a well-known American artist and producer. During this same period, Plaintiff and Diamant developed a personal relationship reflected in extensive contemporaneous communications that were explicit and reciprocal.

In April 2015, Plaintiff signed with Diamant's label, Contra Paris Ltd. ("CPL"), which then secured a distribution deal with Epic Records. (Plaintiff's lawyer was involved in both deals.) Epic paid Plaintiff a $35,000 advance. While recording in the U.S., Plaintiff stayed in three- or four-star hotels paid for by Diamant or Epic. Typically, though, she was traveling overseas in this period, including to Amsterdam, the Middle East, and London. The album was recorded by August 2015, after which Plaintiff dealt with Epic directly. Shortly thereafter, Epic terminated the deal. Plaintiff blamed Diamant and her attorney claimed he breached their contract.

Ten years later, Plaintiff brought the present action referring to some of the Parties' old disputes but, for the first time, couching them in sexual-misconduct-related allegations. Defendants are entitled to summary judgment for multiple

independent reasons. First, Plaintiff cannot establish a threshold element of her TVPA claim, namely, that any alleged sex act was a "commercial sex act," i.e., that anything of value was given or received because of a sex act. Plaintiff's own testimony and contemporaneous communications confirm the opposite. She repeatedly denied engaging in any sexual conduct in exchange for money, career advancement, or any other benefit, and the financial support she received was tied to ordinary living expenses while awaiting her anticipated contractual advance.

Second, even if there was evidence of a commercial sex act, Plaintiff cannot show that Defendants engaged in trafficking conduct with the requisite knowledge or intent that force, fraud, or coercion would be used to cause such an act. The record reflects a legitimate music-business relationship in form and substance, including contracts negotiated by counsel, studio work, and a major-label deal, and not a trafficking enterprise. Nor does the evidence support any theory of force, fraud, or coercion within the meaning of the statute.

Third, Plaintiff cannot establish liability against CPL under either a direct or beneficiary theory. There is no evidence that CPL engaged in, knew of, or benefitted from any alleged trafficking conduct; to the contrary, the undisputed evidence shows that CPL's activities were limited to ordinary label functions and that it did not profit from its relationship with Plaintiff.

Finally, Plaintiff's claim for civil sexual assault would only be timely if she could demonstrate that Diamant violated one of the California Penal Code sections listed under Section 340.16. But even crediting her testimony, Plaintiff cannot show a violation of either of the two predicate offenses that she alleged.

In short, no reasonable jury could find in Plaintiff's favor on either claim. Plaintiff's allegations have had significant personal and professional consequences for Defendants, but they must now be tested against the evidence. The evidence here is clear and it forecloses Plaintiff's claims as a matter of law.

## II. PLAINTIFF'S INTRODUCTION

This case is about a young, talented, aspiring songwriter and singer who fell victim to the violence, manipulative control, and false promises of an older, powerful music producer.

Plaintiff Chanaaz Mangroe ("Plaintiff" or "Mangroe") was a 23-year-old Dutch artist living with her mom in The Netherlands when she posted a video of herself on Instagram singing. A man named Christopher Garland commented on that post and later told her that the famous producer, Defendant Terius Gesteelde-Diamant a/k/a "The-Dream," liked her music and wanted to meet her. What followed was a whirlwind experience wherein that producer flew Mangroe to Atlanta and to Los Angeles to record music and proceeded to use power, influence, deceptions, and violence to force Mangroe into an abusive sexual relationship.

Contrary to Defendants' contentions, this case is not about a contractual dispute or failed recording project. This case is about how a powerful producer lured a vulnerable young woman into having sex with him by convincing her through coercion and misrepresentations that only through sex with him would she create hit records and win Grammy Awards. While discovery in this matter has concluded, the facts relevant to Plaintiff's claims remain in dispute. The core issues in this case—whether the sex acts were causally related to Defendant's misrepresentations, whether Plaintiff's testimony concerning the force and fear she experienced can be credited, and whether the jury believes Plaintiff's narrative of rape and battery versus Defendant's contention that sex with Plaintiff was always voluntary—are all squarely for a jury to decide. Defendants are not entitled to summary judgment.

First, Plaintiff has plainly established a commercial sex act under the TVPA. Plaintiff testified that songwriting and working with Dream, and the promises he made regarding her career, were things of value. Defendants' attempts to split hairs about whether "the creative process" is something of value misses the point. Promised career opportunities carried value, and that is sufficient to satisfy the

commercial sex act element. Moreover, Plaintiff testified that Defendant repeatedly gave her cash after sex. As outlined below, the caselaw makes clear that this is sufficient to establish a commercial sex act. Plaintiff's testimony that "she would never" voluntarily sleep with someone for money does not change the fact that the sex acts she alleges were induced, by illicit means, in exchange for career promises. That she would not choose to do so does not mean that this exchange did not happen. In fact, this testimony underscores the crux of this case: Plaintiff did not want to engage in these sex acts with Defendant Diamant but was induced to do so by Defendants' false promises, coercion, and manipulation.

Second, the record reflects that Defendants engaged in sex trafficking conduct and there remains a factual dispute between the parties as to whether Defendants had the requisite knowledge or intent that force, fraud, or coercion would be used in connection with those acts. At the recruitment stage, Defendants transported and harbored Plaintiff, and within days, Defendant used fraudulent misrepresentations to induce sex. By March, Defendant began to use physical force to compel Plaintiff's compliance. Every sex act thereafter followed a similar pattern of fraud and manipulation, and Defendant's knowledge of his modus operandi creates a genuine dispute as to whether he had the requisite intent under the TVPA.

Third, Defendant Diamant and CPL are, in substance, one and the same. As the company's sole owner and controlling member, Defendant Diamant used its corporate form to lend false legitimacy to a fraud-based sex trafficking scheme such that Contra Paris, LLC ("CPL") should be held liable under a theory of direct perpetrator liability. Additionally, CPL, as a signatory to its contracts with Plaintiff and Epic, knowingly benefitted from participation in the venture with Defendant Diamant as it stood to gain financially, regardless of whether the venture ultimately proved profitable. As the company's sole owner and decision-maker, Defendant Dream's knowledge can be imputed onto CPL, and the record sufficiently demonstrates beneficiary liability.

Finally, Plaintiff alleges a timely claim for civil sexual assault against Defendant Diamant under Cal. Code Civ. Proc. § 340.16. While the record substantiates a violation of the two specific Penal Code offenses referenced in the Complain, her sexual assault claim is not limited to those two sections. To the extent the Court agrees with Defendants in that Plaintiff was required to specifically plead each Penal Code offense under Cal. Code Civ. Proc. § 340.16, Plaintiff reserves her right to assert such a claim in a separate action or move to amend the Complaint.

## III. DEFENDANT'S STATEMENT OF FACTS

### A. The Parties' Professional Relationship.

#### 1. The Parties connect through music-industry contacts.

Diamant is an American singer, songwriter, and record producer who has worked with many well-known artists. Plaintiff was a Netherlands-based singer-songwriter. In 2012, Plaintiff signed an exclusive songwriter agreement with U.S.-based production company, Shapiro, Bernstein & Co., Inc. She worked as a songwriter under the Shapiro Bernstein contract on an O-1 Visa they sponsored. JAF 48-49. In late 2014, Shapiro Bernstein declined to extend Plaintiff's contract. Ex. 58.

In January 2015, Plaintiff exchanged Instagram messages with Christopher Garland ("Garland"), Diamant's friend, discussing a meeting with Diamant. JAF 49. After Diamant listened to some of Plaintiff's music and liked her tone, he agreed to meet with her. JAF 51.

#### 2. Plaintiff begins recording music and enters into a contract with CPL.

On January 29, 2015, Plaintiff arrived in Atlanta. Ex. 59. The next day, Diamant sent a text to Christopher ("Tricky") Stewart, a producer he worked closely with: "after we meet with channi I may want to try her[] on a record and if she sounds good we should review whether signing her, her en[e]rgy was pretty cool last night." JAF 52. Diamant arranged for Plaintiff to spend time in a studio recording vocals on

January 30 and 31, 2015. JAF 53.

In the following days, Plaintiff and Diamant began discussing a contract between Plaintiff and CPL, an art and culture label founded and owned by Diamant and to which he himself was signed. JAF 54. Plaintiff later wrote to Diamant "u chose to sign me in Atlanta before the two of us even exchanged phone numbers!!" JAF 55. On February 3, 2015, Diamant sent a text to a record company executive stating, "I got this artist I'm about to put out, from Paris and Amsterdam, Channii and I want you to listen to it." Ex. 106. On February 4, 2015, Plaintiff flew to Los Angeles to continue recording vocals. Ex. 60. Halfway through that two-week recording session, Tricky texted Diamant: "the Channii records are so dope." JAF 57.

On February 21, 2015, after returning to Amsterdam for four days, Plaintiff arrived back in Atlanta to continue recording vocals. JAF 56. Plaintiff recorded for a few weeks before again returning to Amsterdam on April 7, 2015. JAF 59. During that period, the Parties' attorneys were negotiating their agreement. JAF 61.

On April 21, 2015, while Plaintiff was in Amsterdam, the Parties' attorneys finalized and executed their contract (the "CPL Contract"). JAF 60. The CPL Contract did not include any advance from CPL to Plaintiff. JAF 40, 60. Under the contract, Plaintiff recorded exclusively with CPL, who had a six month "shopping period" to negotiate a distribution agreement for Plaintiff's music with a major U.S. record label. JAF 60.

### 3. CPL secures a deal with Epic Records for Plaintiff.

Two weeks later, on May 1, 2015, CPL secured the promised distribution agreement with Epic Records ("Epic"), a division of Sony Music Entertainment (the "Epic Contract"). JAF 61. This was Plaintiff's first major label contract. Ex. 109 at. 134:15-16. On May 19, 2015, Epic wired Plaintiff a $35,000 advance. JAF 62.

Three weeks after signing the Epic Contract, Plaintiff flew from Amsterdam to Atlanta for a meeting with Diamant and Epic's then-CEO, L.A. Reid, who

Plaintiff concedes was one of the most influential people in the music industry. JAF 66; Ex. 109 at 137:18-25. Plaintiff performed for Reid and he seemed excited to keep recording and put out a record. JAF 67. After meeting with Reid, Plaintiff flew back overseas for a couple of months. JAF 69.

By the end of July 2015, CPL was ready to finish recording the album, so Plaintiff flew back to Atlanta. JAF 70. By August 8, 2015, Diamant wrote to Plaintiff, "We should be done with everything by Tom night and from there you can start to gather your team from an interior stand point. All music just about will be done." JAF 72. Plaintiff responded, "Wow that went super fast!" Ex. 30. The same day, Plaintiff texted her A&R representative at Epic: "Tomorrow we are done with the album!!!!!," "my baby is finished!!!!!!!" JAF 73.

Despite this, the Parties' business relationship was deteriorating. On August 17, 2015, Plaintiff and Diamant had an argument over text about her failure to show up at the studio or respond to his communications. Ex. 62. The exchange ended with Diamant telling Plaintiff that she would receive a letter from his attorney. *Id.* Immediately after that text, Plaintiff texted a vocal engineer she was friendly with that "shit just escalated; fuck this shit; he's going too far." Ex. 63.

By August 21, 2015, Plaintiff was in Los Angeles meeting with her new managers and introducing them to an Epic A&R representative. Ex. 109 at137:18-25. And on August 30, 2015, she flew back to Amsterdam. Ex. 64. After that, having completed her recording, Plaintiff never returned to Atlanta.

**4. The Epic deal falls apart.**

Shortly after returning to Amsterdam, Plaintiff started texting her manager about how Tricky and Dream's success rate was not what it used to be, and how she had a better chance at a hit song if she used younger, hotter producers. JAF 74-78. Despite the CPL Contract, she figured that it should be no problem to get Epic to agree. JAF 78-80. She told her manager she wanted to work with "A-Listers," suggesting Lauryn Hill and Andre 3000 (although she was concerned that Andre

"may not create the hype because he's not super 'hot' right now"). JAF 81-83.

In March 2016, Plaintiff worked out the vision and look for her music video, including choosing the director with her manager. SAC ¶ 292; *see* Ex. 65. In April 2016, Epic wrote to Plaintiff that, "we are all waiting to see the video" so Epic could develop a "roll out plan." Ex. 66. After the video was sent to Epic, Plaintiff wrote to her manager that Epic told her "everyone didn't like the video." Ex. 67. Later, she blamed her own manager for creating an "amateur" video and complained to her manager's colleagues that he "wouldn't even share my mood board with [the director], so crooked." Ex. 96.

On May 8, 2016, Plaintiff's own counsel cautioned her, "LA [Reid] can decide in two seconds to just drop the whole project because he doesn't want to deal with the drama." Ex. 68. Undeterred, Plaintiff wrote a series of inflammatory messages to Epic. Ex. 69; Ex. 67; Ex. 109 at 205:1-206:2. Within a couple of weeks, Epic terminated the Epic Contract, and Plaintiff's major record label deal was done. *Id.* at 206:19-207:10.

**B. Plaintiff's Living Expenses while Recording.**

Between Plaintiff's first arrival in Atlanta in late January 2015 and her final departure from Atlanta in August 2015, she spent two weeks recording in Los Angeles (Feb. 4-17) and ten weeks recording in Atlanta (Jan. 29-Feb. 3; Feb. 21-Apr. 7; Jul. 30-Aug. 21). She spent the remaining seventeen weeks of that period overseas, in Amsterdam, Geneva, London, and the Middle East. JAF 96.

Before the arrival of the Epic advance, Diamant provided Plaintiff with cash for living expenses while she was recording. Diamant told her that her recording contract would be done quickly and that she would "have [her] money," which would "be ***[her] own advance***." Ex. 109 at 123:18-126:15. But the Epic deal and $35,000 advance was not finalized until May 2015. JAF 64. In the interim, Plaintiff needed money "to live," "to eat," and for "transportation and things like that." Ex. 109 at 125:19-126:15. So, while the attorneys negotiated the contracts, Diamant gave

Plaintiff money out of pocket. JAF 42. Plaintiff sometimes asked for additional funds for living expenses and could not identify any instance in which Diamant refused to provide the requested funds (although she contends the requests caused arguments). JAF 43.

On March 12, 2015, only two weeks after returning to Atlanta, Plaintiff wrote to Diamant about the cash he had provided:"***uve givin me a lot upfront because it was needed at the time***," and "I haven't forgotten a single amount Uve givin me," and she considered it an "***advance of the advance***" that "should be deducted or given back from whatever the advance would be" after the agreement with Epic was finalized. JAF 44. Then, shortly after receiving her $35,000 advance from Epic in May, Plaintiff wrote to Diamant: "one of the things I want to ask u is if u can send me the info on where I can wire ***the 7k u have lent me***, now that I have the advance ***I can finally give that back to you***." JAF 45. Plaintiff's friend, Garland, who delivered funds to Plaintiff, also recalls giving her thousands of dollars in cash. Ex. 109 at 161:11–13; Ex. 115 ¶ 31.

Plaintiff later wrote to Diamant that her attorney confirmed that the funds provided by Diamant were not "out of the norm with what comes w a label production deal" because she went to Atlanta "***to work, with no job per your request [and] I need living money***." JAF 46. She wrote: "My publishers [Shapiro Bernstein] did the same thing when they moved me to London for a while, same amount too!" *Id.* At no time did she write that any portion of the $7,000 was for anything other than living expenses.

**C. Plaintiff's Living Conditions while Recording.**

While recording with Diamant, Plaintiff stayed in three-star and four-star hotels and AirBnB rentals in Atlanta and Los Angeles. Ex. 70; Ex. 71; Ex. 72; Ex. 73. On each of her trips to Atlanta and Los Angeles, Plaintiff found her accommodations satisfactory. JAF 84. Shortly after her initial return to Atlanta, while staying in a two-story suite in a Residence Inn in Atlanta (with a pool, gym,

and breakfast included), she found bedbug bites on her arm. Ex. 109 at 92:6-93:19. The hotel offered her a different room, but she asked Diamant's travel agent to move her to a new hotel; her request was accommodated the same day. *Id.* at 93:19-95:25. But soon she asked to move from that hotel to the W hotel in Buckhead because it was "so conveniently located close to malls." Ex. 115 ¶¶ 81-82. So, for the last two weeks of that trip to Atlanta, the W is where she stayed. Ex. 109 at 109:17-22. Plaintiff testified that when she returned to Atlanta for the first two weeks of August 2015, she stayed at a three-star hotel, while two other people working on the album stayed in four-star hotels. *Id.* at 141:20-143:3. The three-star hotel was acceptable, but she concluded this minor disparity in hotel quality was "designed to humiliate her." *Id.*

Plaintiff did not testify that anyone physically prevented her from leaving her hotels at any time. She testified only that Diamant told her that she should not "hang out with random people" as an artist, and that this made her "feel that [she] couldn't" leave her hotel. *Id.* at 128:3-23. Asked if anything else kept her from leaving the hotel, she testified that she was told that it could be unsafe for a girl like her to walk around Atlanta alone. *Id.* at 129:2-130:15.

When Plaintiff first arrived in Atlanta, Garland suggested that they provide her a car, then discovered that she did not yet have a driver's license. Ex. 115 ¶ 33 She therefore took Ubers or asked Diamant's colleagues for rides when she wanted to go somewhere. JAF 96. When she eventually requested a rental car, it was provided immediately. JAF 97.

Plaintiff's contemporaneous text exchanges with Garland (who she called her "big bro") reveal that the two of them often joked about the varying levels of success of their mutual efforts to exercise and avoid unhealthy foods. Ex. 115 ¶41-64. Plaintiff also texted him about enjoying alcohol and marijuana. *Id.* at ¶¶ 65-75.

### D. The Parties' Sexual Relationship and Contemporaneous Messages.

Plaintiff and Diamant also had a personal and sexual relationship. The contemporaneous text record reflects repeated affectionate and sexually explicit communications, although Plaintiff now contends some encounters were induced by an alleged "sanctuary" concept and some later incidents in Atlanta were abusive.

Within days of meeting, on February 1, 2015, Diamant texted Plaintiff asking if she had a boyfriend and she responded, "Haha no I'm single [wink emoji with tongue]." Ex. 74. The Parties continued exchanging flirtatious messages in the following days. Ex. 75. On February 4, 2015, Plaintiff and Diamant traveled to Los Angeles and their messaging became more directly suggestive. Plaintiff texted that she had lost her virginity at 17 and Diamant asked if Plaintiff wanted to lose her virginity "again" "right now," but expressly said, "it's ok to say no." JAF 4-5. Plaintiff responded, "it's not that I want to say no, but saying yes is kind of tricky 😉 👅." JAF 6.

That night, Plaintiff and Diamant left the recording area of the Los Angeles studio where they were recording and entered a bedroom. Ex. 110 at 382:15–20. There, Plaintiff testified that she told Diamant: "like, I don't want to ruin the music, this is not something that, you know, like it just—I didn't want to ruin it and I was really worried about that, so I don't know about this." *Id.* But Plaintiff claims that Diamant convinced her that sex would be good for the music, so she had sex with him. *Id.* at 382:15-23. Mere hours later, Plaintiff wrote to Diamant: "I was just thinking about it and I'm still wet . . . all because of u." JAF 7.

The Parties had sex multiple times during the following two-week period in Los Angeles, while sending texts describing their "undeniable" and "crazy" chemistry, how much they were attracted to and enjoyed having sex with one another, and the "crush" they each had on the other. JAF 8-18. Plaintiff testified that during one Los Angeles incident, she asked Diamant to pull out because antibiotics may have reduced the effectiveness of her birth control, but he did not. JAF 107. As Plaintiff departed Los Angeles for Amsterdam, she wrote to Diamant: "U mean so

much to me already, I don't know how u feel, but I feel like we have a special connection and the craziest chemistry ever." JAF 19. Plaintiff testified that, during the Los Angeles period, she believed sex with Diamant "served a purpose" for the making of music. Ex. 110 at 385:15-24.

After that, on the occasions when Plaintiff was in Atlanta between February and August 2015, Plaintiff and Diamant had sex numerous times. Ex. 76; Ex. 77; Ex. 78. Plaintiff at times initiated sexual contact by text. Ex. 79; Ex. 80; Ex. 81. The Parties exchanged many texts expressly detailing their mutual strong physical attraction (e.g. "it's beyond chemistry," "I just can't resist you"). JAF 20. But it was not purely physical; they also wrote about their romantic feelings for one another. JAF 16-17. When Diamant reminded Plaintiff that his responsibilities remained to his wife and kids, she responded "it is good that we talked so we know where we at, now that's out of the way, it can just be fun, and uncomplicated." JAF 21-22.

On a few occasions, the Parties agreed that they should stop having sex so they could regain their focus on work or keep things professional. JAF 28. But these efforts at restraint were short-lived. Ex. 82; Ex. 83; Ex. 84; Ex. 86; Ex. 87. For example, the same day that Plaintiff wrote to Diamant, "I completely understand u want to keep things strictly professional from now on," she also wrote, "U better not be cheating on me I'm ur only fucking mistress" and discussed in graphic terms the sex she wanted to have with him. JAF 30. On another occasion, Plaintiff texted, "I kinda still have a super crush on u . . . I know I said we should just end it, but we don't have to . . . no one needs to know" and "does this mean I'm still ur secret girlfriend?" JAF 27.

On May 26, 2015, Plaintiff texted Diamant asking him to have sex with her, writing "tell me ur mine" and "I want u; I wanna have a baby with u." JAF 31. Diamant responded "I'm scared of you." *Id.* The next week, when Plaintiff again flew back to Amsterdam, Diamant wrote to Plaintiff that she was young and should have fun and confirmed that they were "breaking up." Ex. 88; Ex. 89.

On June 7, 2015, Diamant texted Plaintiff that he was concerned that her feelings for him may not have been genuine and she might have used sex to "get something" from him:

> It hurt at first because I felt you didn't understand what I was giving to you and that I would never have given to anyone else[.] I never asked anyone to try to be that close to me[.] . . . And so yes I started to doubt who u were and just said maybe u were just fuckin to get something so I just fell back and let that part happen.

JAF 1. In response, Plaintiff reassured Diamant that their relationship was not transactional in nature:

> ***I would NEVER IN MY LIFE sleep with a guy to get something out of it!!!*** Believe me, I've turned everyone down!! . . . I slept with you because whenever u held my hand I felt something, when u looked me in the eyes I swear I got (wet)!! . . . I had and still have a crush on you, you look amazing and you are such a sweet caring guy, I could feel that from the start, ***that's why I slept with you***, ***I could feel your love*** . . .I am not some stupid chick sleeping with random guys, ***only when I feel something***[.] . . . I also told u found u very irresistible and I still do, there's some crazy chemistry that it so strong, I felt it from the moment we've met . . . don't worry I won't act on it anymore! But I want u to know that what I felt was real, more than u could ever imagine.

JAF 2. At her deposition, Plaintiff confirmed that she would never have sex with someone to get something in return, but testified that the issue was, in her view, "more nuanced" because she says Diamant had earlier framed intimacy as part of the creative process. JAF 3; Ex. 109 at 24:5-12.

The relationship continued, and the Parties resumed sexually explicit messaging. *See* Ex. 90; Ex. 91. Plaintiff wrote to Diamant that she had re-watched a sex tape they made, before deleting it from her phone (she produced the video in this

case). Ex. 92. Plaintiff graphically described the sex acts in the video and Diamant wrote, "I remember, ***I didn't get to look at it tho***." *Id.* Plaintiff alleged in her complaint that Diamant had possession of this video and threatened her with it, but now admits that the video was filmed on her phone. Ex. 109 at 315:15–25.

After the sexual relationship ended in August 2015, Plaintiff continued to send Diamant affectionate and sexually explicit messages. Ex. 93; Ex. 94; Ex. 107; Ex. 108. Plaintiff later testified that, at least at some points, she did this because she still believed Dream controlled unfinished music and the project. Ex. 109 at 183:10-184:12. But she continued texting him even after Epic terminated the project. Ex. 95. She also texted Garland that she "really wished everything went differently, I was so young too! But have a lot of respect for the opportunities I was given in that time. I never really go[t] to say any of that, and I assume it's not something [Diamant] cares to hear . . . which I'd respect! But never too late to say 'hey that could've gone differently' and I have a tremendous amount of respect! Life is about moments! And [I'll] always be grateful for the moments I got to spend in the studio with you and [Diamant]!" Ex. 115 ¶ 106, Ex. M.

Plaintiff testified that, on February 4, 2015, Diamant told her sexual intimacy was necessary for the creative process and that she therefore believed some unspecified sexual encounters "served a purpose" for the music. Ex. 110 at 385:15-23. But Plaintiff also separately testified that later incidents involving aggression were different: she said she did not object to sex "in the times that [she] believed that it served a purpose," whereas later in Atlanta when "aggression came into play" she said "no," and she did not believe the abusive conduct was "necessary in order to make music." JAF 36-37.

## IV. PLAINTIFF'S STATEMENT OF FACTS

### A. Mangroe Was an Aspiring Young Songwriter and Singer.

When Mangroe was 17, she dropped out of high school in the Netherlands to

pursue her passion for a musical career. JAF 116.[1] In 2012, at around 20-years old, Mangroe signed a publishing contract with Shapiro, Bernstein & Co., Inc. JAF 48.

In January 2015, a man named Christopher Garland commented on Mangroe's social media post of her singing, asking that she "send [him] some music" and that he would set up a meeting with Merck, Defendant's manager at the time. JAF 50, JAF 119. At the time, she lived with her mom in the Netherlands and occasionally traveled to the United States. JAF 117-118. She later learned that Garland was not in the music business and was instead an off-the-books security guard for Defendant Diamant. JAF 119-121. On January 29, 2015, Defendants booked Mangroe a round-trip flight from Los Angeles to Atlanta to meet with Defendant for the first time. JAF 126.

**B. Defendant Introduced Plaintiff to the Concept of a "Sanctuary Relationship."**

Mangroe was flown to Los Angeles, California on February 4, 2015, and as soon as she arrived, she was brought to a studio connected to a house with a kitchen and bedrooms. JAF 127-128. That night, Mangroe drank alcohol poured for her by Defendant and was encouraged to smoke marijuana by others at the studio. JAF 129-130.

Defendant took Plaintiff on the tour of the house connected to the studio. JAF 131. It was on this house tour that Defendant introduced Mangroe to the concept of a "sanctuary relationship." Defendant spent hours convincing Mangroe that in order to make great music, they needed to be intimate and have sex. JAF 133-135. explained that he had a sanctuary relationship with Beyonce and Rihanna and that in order to have success similar to the kind he has with those artists, he and Mangroe needed to have a relationship that included sex. JAF 136-138. Defendant told

1 Plaintiff's citations to the JAF fully incorporate her corresponding objections and responses.

Plaintiff that he has sex with other singers who had won Grammy Awards, including Beyonce, despite knowing that to be false, as he testified that he never had sex with Beyonce. JAF 138-139.

That night, Defendant took Mangroe to a bedroom connected to the studio. JAF 145. By that point, Mangroe felt intoxicated. JAF 146-147. Everything felt blurry, dizzying, and confusing to Mangroe, who was starstruck and believed what Defendant had spent hours convincing her of. Id., JAF 134-143, 154-155. In this pitch-dark room, Defendant proceeded to grab Mangroe's hands and place them on his genitals, which she did not want him to do. JAF 145, 148-149. Defendant then pulled Mangroe's pants down and began to have sex with her. JAF 150. In the middle of having sex, Defendant would periodically exit the bedroom, leaving Plaintiff alone, and locked the door while he was out. JAF 151-152. When he returned, he continued to have sex with Mangroe, during which Defendant continued to tell her that sex was part of the creative process. JAF 153. Impressed by Defendant's status and connections to artists she looked up to, Mangroe was very naïve and believed what Defendant convincingly said to her. JAF 154-155. Mangroe believed that she needed to have sex with him that night in order for Dream—a larger than life and successful producer who had incredibly shown interest in a young artist—to make music for her and make her into a successful artist. *Id.*, JAF 143, 162.

After the night of February 4, Defendant sent Mangroe a series of sexual text messages, asking her when she had lost her virginity and whether she wanted to lose her virginity "again." JAF 4-6. Defendant texted Mangroe that he had asked Rihanna the same personal question and received a response. Although Mangroe tried to avoid answering because it made her uncomfortable, she ultimately lied and said she was seventeen in an effort to impress him. JAF 4-6, 166-167.

**C. Defendant Signed Mangroe to CPL.**

On February 17, 2015, Defendant told Mangroe that he will be sending a contract to Mangroe's attorney, signing her as an artist to CPL. JAF 54. In the middle

of explaining the process and agreement, Defendant messaged Plaintiff "I need to see inside that pussy tho . . . As Ure man" and instructed Mangroe to "Go in the restroom pull [her] panties to the side and take a pic . . . NOW". JAF 157. Defendant told Mangroe to have her attorney "put in any and all contracts that . . . [her] option is always to go with [Dream] if there ever is a departure of [Dream] and [T]rick working together," referred to as a "key man" clause. JAF 158-159. Despite raising the possibility of a contract as early as February, Defendant and Mangroe signed the contract months later, on April 21, 2015. JAF 60. While the key man clause did not end up in the contract the parties ultimately signed, it reflects Defendant's intention that Mangroe remain "bonded" to him regardless of what happened contractually. JAF 159.

CPL was an entity created by Defendant, only months prior to his interactions with Mangroe, with the idea of "fusing art and culture within . . . the record industry." JAF 228-230. Creating CPL was exclusively Defendant's idea, who testified that he created "countless" entities as "it feels like [he] come[s] up with a brand name like every day." JAF 228, 231. CPL was exclusively owned and operated by Defendant and it never had any employees. JAF 232-233. CPL has never directly paid its financial services provider, Provident Financial Management, for financial services including payment of invoices and filing tax returns. JAF 234. According to the company's tax returns, CPL had no revenue and no expenses in 2015. Indeed, CPL's financial ledger shows that almost no money has been earned by the Company, and further indicates frequent transfers from CPL to Defendant Diamant, his wife Lalonne Nash, and other exclusively-Diamant owned entities such as The Nash Administration LLC and RadioKilla Touring LLC. JAF 235-236. Indeed, Defendant testified that he had paid Christopher Garland from his personal funds because "Contra had no money." JAF 237. In the entirety of its existence, CPL did not sign any other artist besides Mangroe. JAF 238. In fact, besides Defendant's own "Royalty" EP, CPL did not release any other music. JAF 239. The company had

never entered into any other contract like the one it executed with Epic concerning Mangroe. JAF 240.

CPL and Epic entered into a distribution agreement for the services of Mangroe on May 1, 2015. JAF 63. The same day, and immediately before inquiring whether Mangroe had signed the CPL-Epic distribution agreement as well, Defendant wrote "I want you now" and sent her sexually explicit text messages and photo, telling her "It will always be mine, not just your pussy. All of you. [U]re blood. [U]re mind. Your heart." JAF 241. CPL received a $125,000 profit advance from Epic pursuant to the contract on June 8, 2015. JAF 103. The entirety of this amount was transferred directly to Radio Killa Touring LLC, a record label solely owned by Defendant. JAF 104, 242. Defendant testified that any expenses related to Mangroe could not have been paid from Radio Killa. JAF 104. Defendant further testified that he does not recall how much of the advance was spent. JAF 104.

### D. Defendant Used Violence, Intimidation, and Lies to Get Mangroe to Submit to Sex.

#### 1. There was a Significant Power Imbalance between Defendant and Mangroe.

In 2015, Defendant was around 38 years old and understood that Mangroe was in her twenties. JAF 122-23, 169. Defendant had significantly more experience in the music industry than Mangroe, as he had been in music since the third grade and worked in the field for years before meeting her. JAF 124. He had won Grammy Awards and worked with high profile artists such as Beyonce, Rihanna, and Justin Bieber. JAF 125. Even Defendant repeatedly referred to Mangroe as young and naïve, telling her, "it's 37 year old vs a 23 year old with two diff ideas of reality." JAF 169.

Mangroe, who is from the Netherlands, came to the United States on a visa had never been to Atlanta before February 2015. JAF 49, 116, 156. She has never seen so many awards as Defendant showcased (JAF 132) and quickly saw Defendant

as her mentor and hero. JAF 155, 160. She thought of herself as his protégé, in part because he referred to her as such. JAF 161.

Defendant frequently sent sexually explicit messages in close temporal proximity to discussions of Plaintiff's music and career opportunities. JAF 164. Because Defendant also responded to Mangroe's sexually explicit messages with professional opportunities and promises, fomenting the pattern and link between sex and recording and releasing music, Mangroe felt that she needed to send him sexually explicit messages to get him to send her music and work with her. JAF 163-167. Understanding Defendant's power, Mangroe felt beholden to him and aimed to please him: she testified that because of Defendant's manipulation and the fear he instilled in her, she was not always truthful in her text messages with him, and often wrote messages appease him. *Id.* Mangroe sent Defendant text messages saying that she loved him when in fact she did not have romantic feelings towards him and they did not have a romantic relationship. JAF 168.

**2. Defendant Further Intimidated and Instilled Fear in Mangroe through Sexual Recordings and Firearms.**

Mangroe felt intimidated and fearful around Defendant, particularly after seeing him with a gun on multiple occasions. JAF 172. Defendant testified that he had guns in 2015 but did not have a gun license. JAF 173.

While Mangroe was intoxicated, Defendant took a sexually explicit video of them having sex despite her telling him that she did not want him recording. JAF 175. The sexual video he had taken of her made her fearful, she testified, "I started getting worried, because he also had taken a sexual video of me and just -- I was very scared." JAF 176.

**3. Mangroe was Financially Dependent on Defendant.**

Mangroe did not have a lot of money when she met Defendant, and she shared a bank account with her mother. JAF 177-178. Within a few weeks of meeting Mangroe, Defendant bought her a new phone. JAF 179.

Mangroe did not decide or control when she would travel to Los Angeles or Atlanta to record; rather, Defendant made travel decisions for her and his team arranged her flights and accommodations. JAF 180. When Defendant flew her to Atlanta in February 2015, Mangroe told him that she had no money and needed funds for basic expenses, including food and transportation. JAF 180-181. Without a driver's license, Mangroe relied on Defendant for transportation, including money for a taxi or Uber rideshare and getting rides from Christopher Garland and Bart Schoudel. JAF 96. This is particularly so because Mangroe had not received any advance pursuant to her contracts with CPL and Epic until May 19, 2015 (JAF 64), despite Defendant's promise that she would receive her advance when she arrived to work in Atlanta in February 2015. JAF 41. She depended on Defendant for providing her with accommodations whenever she traveled. *Id.*, JAF 180-181. She testified that she felt she could not come and go as she pleased, as she was told to "keep to [herself]" and had to share her location and whereabouts with Defendant. JAF 182-183. Defendant gave Mangroe cash, about a couple hundred dollars, after every time they had sex. JAF 243-244.

### E. Defendant's violence toward Mangroe.

Over the course of their time together, Defendant Diamant became increasingly violent with Mangroe, frequently causing her physical harm and instilling in her a near-constant fear of provoking future violence.

#### 1. Defendant Forcibly Ejaculated Inside of Her after She Asked Him Not To.

While Mangroe was in Los Angeles in February 2015, Defendant had sex with Mangroe in a room at a recording studio. JAF 184. Mangroe explicitly asked that he not ejaculate inside her and used her hands to cover her vagina and block him from being able to do so but Defendant physically moved her hands and ejaculated inside her anyway. JAF 185-187.

**2. Defendant Assaulted Mangroe in her Hotel Room in March 2015.**

In March 2015, Defendant arranged for Mangroe to stay at the Residence Inn in Atlanta. She requested to be moved to a different hotel after discovering bedbug bites on her body. JAF 188 - 189. Shortly after that request, Defendant arrived at her hotel room unannounced and an argument ensued, during which Defendant choked and sexually assaulted Mangroe. JAF 190-192. As a result of the choking, Mangroe sustained visible bruising. JAF 193.

**3. Defendant Assaulted Mangroe at the Movie Theatre in April 2015.**

One evening in April 2015, Defendant drove Plaintiff to a remote movie theatre. JAF 194. As soon as they got inside, Defendant demanded sex. JAF 195. Mangroe told Defendant that she was uncomfortable and did not want to have sex with him. JAF 196. Despite Plaintiff telling Defendant she did not want to have sex, Defendant grabbed Mangroe's shirt and pulled her on top of him and continued to have sex with her. JAF 197.

**4. Defendant Assaulted Mangroe In his Van on the Same Day in April 2015.**

After leaving the movie theatre, Defendant drove Mangroe to Triangle Studios in his Sprinter van. JAF 198. Defendant instructed Mangroe to leave the studio and return to his van. JAF 199. Once inside, Defendant locked the doors, pinned her onto a mattress, and forced her to have sex with him. JAF 200-202. During sex, Defendant choked Mangroe to the point that she lost consciousness and ignored her pleas for him to stop. JAF 203-204. Inside the van, Mangroe felt helpless and trapped. JAF 205.

**5. Defendant Assaulted Mangroe in a Music Studio Staircase in August 2015.**

Around August 14, 2015, Mangroe went to Silent Sound Studio to record

music. JAF 206. Her mother was visiting her in Atlanta and dropped her off at the studio, where she briefly met one of the music engineers. JAF 207. After learning that this engineer had met Mangroe's mother, Defendant demanded to speak with her privately. JAF 207-208. He led her into a staircase and placed a gun beside her. JAF 208-210. Defendant grabbed her wrists, pulled tightly on the collar of her dress, and began to have sex with her. JAF 211-212. Mangroe was scared after seeing the gun. JAF 210. During the assault, Defendant angrily expressed that he did not like that the engineer had met her mother. JAF 213.

Mangroe had told others, including her mother, her brother, Bart Schoudel, Ericka Coulter, Mark Stewart, Christopher Garland, Matthew Greenberg and possibly Julius Erving, that Defendant was having unwanted sex with her. JAF 214. She had confided in her former attorney, Greenberg, who had made efforts to find Mangroe new management, because Defendant was "controlling, manipulative and borderline abusive and is trying to force his people on her for management." JAF 217. Later, Mangroe also told her mental health provider that Defendant had sexually assaulted her more than once. JAF 215.

### F. After Plaintiff Refused Sex, Defendant Sabotaged Her Career

On August 8, 2015, Defendant texted Mangroe that they would be "[d]one with everything by Tom night" and that "[a]ll music just about will be done," signaling that his work on his music was coming to an end. JAF 72. The last time Mangroe and Defendant had sexual contact was on August 14, 2015—when he assaulted her in the staircase at Silent Sound. JAF 216. Soon thereafter, Plaintiff told Diamant that she no longer wanted to have sex with him. JAF 218. On August 16, 2015, Defendant told Mangroe, "Don't contact me about anything about this album . . ." JAF 219. After that day, Dream abruptly ended Mangroe's recording sessions at the studio even though Mangroe understood that additional recording work remained to be completed. JAF 220-221 Defendant made it abundantly clear that he was done working on Mangroe's music at that point and no longer wanted to deal

with her. JAF 222.

Despite Mangroe's repeated requests, Defendants never provided the recorded to music to her, her management, or Epic. JAF 223-225. Epic representatives told Mangroe that she needed to figure out a way to work with Defendants, so that they can receive a copy of her music. JAF 226-227. In December 2015, Defendant had blocked her number and had not sent her music to either her or Epic. JAF 225, 227. Mangroe was under continued pressure from Epic to "make nice" and find ways to continue working with Defendants. JAF 227. By that point, Mangroe understood that there was a pattern with Defendant wherein sex with him was linked to creating music. JAF 163-164. There were times when she wrote messages she did not mean in order to impress or appease Defendant Diamant, as she felt that she needed to send him sexually explicit messages to get him to work with her. JAF 163-167.

To this day, Plaintiff has not been released from her contract with CPL. JAF 246.

## V. ANALYSIS

### A. Legal Standard

Summary judgment is warranted where "there is no genuine issue as to any material fact[,] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact will be absent if, upon viewing the evidence and inferences which may be drawn therefrom in the light most favorable to the adverse party, the movant is clearly entitled to prevail as a matter of law." *Hill v. Walmart Inc.*, 32 F.4th 811, 815–16 (9th Cir. 2022) (citation omitted). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

### B. Plaintiff's Legal Standard

On a motion for summary judgment, "the judge does not weigh disputed evidence with respect to a disputed material fact. Nor does the judge make credibility

determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions. These determinations are within the province of the factfinder at trial." *Dominguez-Curry v. Nevada Transp. Dep't,* 424 F.3d 1027, 1036 (9th Cir. 2005) (quoting *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir. 1987); *see also S.E.C. v. M & A W., Inc.*, 538 F.3d 1043, 1054–55 (9th Cir. 2008) ("This Court, and others, 'have long recognized that summary judgment is singularly inappropriate where credibility is at issue.'"). Testimony that is "based on personal knowledge, legally relevant, and internally consistent," may be sufficient to establish a genuine dispute of material fact despite being uncorroborated and self-serving. *See Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497-98 (9th Cir. 2015) ("Although the source of the evidence may have some bearing on its credibility and on the weight it may be given by a trier of fact, the district court may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature.").[2]

### C. Defendants' Argument 1: Plaintiff Cannot Establish a Commercial Sex Act under the TVPA.

There is no evidence from which a reasonable jury could find that any sex act between Plaintiff and Diamant was a "commercial sex act" within the meaning of 18 U.S.C. Section 1591. A "commercial sex act" is "any sex act ***on account of which*** anything of value is given to or received by any person." *See* 18 U.S.C. § 1591(e)(3)

---

[2] In cases where sexual assault is alleged, courts in the Ninth Circuit have repeatedly denied summary judgment because of the credibility determinations that are necessary in evaluating the material issue of consent. *See, e.g.*, *Wood v. Beauclair*, 692 F.3d 1041 (9th Cir. 2012) (denying summary judgment in a prison sexual assault case where "the record reveals a clear dispute about whether Wood consented to Martin's advances"); *Longshore v. Russell*, No. C11-5278 RBL/KLS, 2012 WL 2892197, at *6 (W.D. Wash. June 15, 2012) ("At this point in the litigation, there remain open important questions regarding the alleged sexual and/or physical assault. Specifically, it is disputed that the assaults occurred. These are central factual issues that cannot be resolved based on the record before the Court today.").

(emphasis added). This requires a *causal* connection between the "thing of value" and the particular sex act. *See United States v. Raniere*, 55 F.4th 354, 363 (2d Cir. 2022) ("commercial sex act" is accurately described as "any sex act of which anything of value is given to or received by any person *because of* such sex act" as there is no meaningful distinction between "because of" and "on account of"), citing *Rousey v. Jacoway*, 544 U.S. 320, 326, 125 S. Ct. 1561, 1566, 161 L. Ed. 2d 563 (2005) (interpreting "on account of" in statutory language to mean "because of" and requiring causal connection); *Ramsbottom v. Ashton*, No. 3:21-CV-00272, 2024 WL 4993391, at *4 (M.D. Tenn. Dec. 5, 2024) ("'on account of,' as used in § 1591, means 'because of' and requires a causal connection between the sex act and the conveyance of a thing of value"). The statutory definition itself "spells out the required causation." *United States v. Peeters*, 776 F. App'x 948, 949 (9th Cir. 2019). This foundational "commercial sex act" element is missing here.

**1. Plaintiff denies having sex with Diamant in order to "get something" in return.**

Plaintiff herself expressly affirmed, in writing, that she did not engage in any sex act with Defendant on account of anything of value or in order to benefit herself in any way. Four months into their relationship, in response to *Diamant's* concerns that *Plaintiff* had sex with him in order "to get something," Plaintiff protested "**I would NEVER IN MY LIFE sleep with a guy to get something out of it!!!**" JAF 2. At her deposition, Plaintiff confirmed that this statement was true at the time and "always has been true." Ex. 109 at 23:4-10. In her text, Plaintiff went on to explain the *actual* reasons why she first had sex with Diamant, detailing her immediate physical attraction and emotional feelings toward him. JAF 2. Plaintiff now contends that this issue is "more nuanced" because she says Diamant had described intimacy as part of the creative process, but it is difficult to imagine better contemporaneous written evidence disproving any sex-for-benefit theory.

Indeed, the voluminous record of contemporaneous texts between the Parties

is entirely inconsistent with any sex-for-value arrangement. They explained again and again that they were having sex because of mutual physical attraction and accompanying emotional feelings. JAF 4-20, 25-31. They described how hard it was to control their sexual urges toward one another, despite acknowledging that they should instead focus on the music and "keep it professional." JAF 29. At no point did either party write that anything of value had been or would be exchanged on account of any sex act.

**2. Plaintiff denies being promised that sex would cause career opportunities.**

Plaintiff also expressly denied that Diamant promised her that sex would secure concrete career benefits. She admitted that Diamant never promised that, if she had sex with him, he would cause her to win a Grammy award or get an opening spot on a Beyoncé tour. JAF 33-34. Plaintiff instead testified that, "[t]he sanctuary situation was specifically to create music," and, when asked whether the idea was that sex could lead to better music that could then lead to the aforementioned opportunities, she answered: "Not necessarily. He really specifically said that it was needed for the creative process to create records." JAF 35. That testimony is fatal to Plaintiff's theory. It confirms that Plaintiff's account is about an alleged method of creating music, not a concrete thing of value transferred because of a sex act.

Further, the record shows that Diamant made music with Plaintiff *before* any sexual encounter occurred. Diamant facilitated Plaintiff recording in both Atlanta and Los Angeles, said he would sign her to a contract, and communicated effusively with label personnel about her—all before any sex act occurred. JAF 53-56. Diamant also continued to work on Plaintiff's project *after* the sexual relationship ended. JAF 32. Those facts are inconsistent with the notion that career opportunities were conferred (or even that music was created) because of sex.

**3. Plaintiff's "sex as part of a creative process" theory does not meet the definition of a commercial sex act.**

Even accepting Plaintiff's self-serving testimony, the "commercial sex act" element is missing here. She claims that Diamant told her on February 4, 2015, that "closeness, including sex," was part of a supposed "sanctuary" or "creative process" for making music or that sex was "needed" to "create records." Ex. 109 at 212:3-215:5; Ex. 110 at 391:4-393:15, 461:1-463:13. Specifically, Plaintiff claims that when she and Diamant went into a bedroom on February 4, 2015, she expressed that she did not want to "ruin the music" by having sex, but that Diamant told her that sex would actually be good for their music because of the "closeness" involved. *Id.* at 382:15-25. Plaintiff claims she was "led to believe that [sex] was part of the musical process, not . . . as if I was getting something else out of it." Ex. 109 at 23:11-24:3. Plaintiff claims that sex was linked with the "song writing" aspect of making music, rather than some other aspect like instrumentation, performance, production, or distribution. Ex. 110 at 395:13-21.

That testimony, if believed, does not establish that any sex act occurred on account of which any person was given or received a thing of value. It describes, at most, a purported theory that the sex act on February 4, 2015, was a necessary part of inspiration for great songwriting. Even if jointly created music was considered "something of value," it is not something Diamant allegedly said he would give to Plaintiff on account of sex. Rather, it would potentially be created mutually, from whatever source from which music flows.[3] Said differently, instead of a commercial sex act, Plaintiff describes a speculative aspiration about the potential downstream

[3] In the (translated) words of the composer Robert Schumann, "Music is the orphan whose father and mother no one can determine, and it may well be precisely in this mystery lies the source of its beauty." Robert Schumann, "Ferdinand Hiller," in Gesammelte Schriften uber Music und Musiker, vol 1 (Leipzig: G. Wigand, 1854), 71. Indeed, the word "music" is derived from the Greek *mousikē*, meaning "of the Muses"—goddesses believed to convey artistic inspiration to humans from another realm. Music (n.), etymonline, https://www.etymonline.com/word/music (last visited March 27, 2026).

inspirational impact of sex on artistic output, not sex in exchange for a distinct commercial benefit. No court has held that artistic improvement can be the "something of value" caused by sex under the TVPA.

Even if the Court were to accept Plaintiff's expansive interpretation of "commercial sex act," it would appear to apply only to their February 4, 2015, sexual encounter—when the alleged conversation took place. Plaintiff has not identified any similar discussion preceding the Parties' many other sexual encounters. Indeed, the contemporaneous written records reveal that those encounters were simply to satisfy sexual and emotional urges. JAF 4-20, 25-31. At most, Plaintiff's testimony limits the theory to the initial Los Angeles period, and she specifically excluded later sexual incidents when "aggression came into play," separate and apart from those that purportedly served a creative purpose, as discussed below in Section III.C.1.a. The Court should reject Plaintiff's frontier-expanding definition of "commercial sex act" that relies on speculative downstream artistic improvement as the "thing of value."

**4. There is no evidence that payment of living expenses was because of any sex act.**

There is likewise no evidence from which a reasonable jury could find that Diamant gave money for living expenses because of any sex act (a theory that is not even alleged). The first time Diamant gave Plaintiff money was on February 3, 2015—before the Parties had sex or even discussed the possibility of sex. JAF 38-39. Plaintiff explained that she needed money then because she had packed for only one night and needed basics such as underwear and other items. Ex. 110 at 353:10-355:3. That initial payment alone defeats any attempt to characterize all later money as consideration for sex.

Plaintiff's testimony and the Parties' text messages also clearly tie the money Plaintiff requested from Diamant to a delay in receipt of her $35,000 Epic advance, *not* a sex-for-money arrangement. She testified that she needed money for everyday

living expenses while awaiting the advance, that Diamant had said he would advance the funds, and that he did advance funds for that purpose. JAF 43; Ex. 109 at 123:18-126:15. In texts, Plaintiff also confirmed that the "advance of the advance" would pay for living expenses. JAF 44. Then, just after Epic paid her, Plaintiff asked where she could wire the $7,000 that Diamant "lent" her. JAF 45. She later wrote that this payment of her living expenses was normal and that her prior publisher had paid her the same amount when sending her to London. JAF 46. That is ordinary loan/advance language, not the language of commercial sex.

Although not alleged in any of Plaintiff's three complaints, she testified that in retrospect she recognized a "pattern" that whenever "something sexually occurred, that [Diamant] would leave cash." Ex. 109 at 119:1-120:4; *but see* Ex. 111 at 269:25-270:4. But there is no evidence Diamant ever gave money to Plaintiff because they had sex. And Plaintiff expressly disclaimed the existence of any sex-for-money arrangement, testifying she would "never" "sleep with someone for money." JAF 47. Taken together with the undisputed fact that the first cash payment predated sex (*see* CAF 39-40) and Plaintiff's own repeated characterization of the money as "cash handouts" (*see* Ex. 109 at 120:21-121:5, 122:7-14; Ex. 110 at 517:2-13) while she awaited the promised advance, no reasonable jury could infer that money was given **because of** sex rather than because Plaintiff was in Atlanta without the anticipated advance and in need of funds for food, transportation, and other living expenses.

*Croft* illustrates why Plaintiff's evidence falls short. There, the court dismissed the plaintiff's TVPA claim where she alleged that she received money, airfare, and hotel stays that accompanied sex acts but failed to plausibly connect those items to the parties' sexual relationship rather than her work as a masseuse on a musical tour. *Croft v. Dolan*, No. CV 24-371 PA (AGRX), 2024 WL 4536309, at *3 (C.D. Cal. Sept. 17, 2024), *aff'd*, No. 24-6150, 2025 WL 3720844 (9th Cir. Dec. 23, 2025). The same is true here. The fact that Plaintiff asked for and received money

for living expenses during the same period that she and Diamant were having sex does not establish that the money was given *on account of* any sex act.

Section 1591(e)(3) does not ask whether value existed somewhere in a mixed professional and sexual relationship. It asks whether a sex act occurred because of the exchange of something of value. Plaintiff's own testimony and contemporaneous text chronology foreclose any sex-for-money or sex-for-career-benefit theory.

**D. Plaintiff's Response to Defendants' Argument 1: Sufficient Facts Exist to Support a Commercial Sex Act under the TVPA**

Defendants asserts that there is no evidence in the record from which a jury could find that a sex act between Plaintiff and Diamant was a "commercial sex act" under 18 U.S.C. § 1591. They are wrong. The TVPA defines "commercial sex act" as "any sex act on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3). The phrase, "anything of value" is interpreted broadly and not limited to monetary compensation. *United States v. Raniere*, 55 F.4th 354, 361 (2d Cir. 2002); *United States v. Cook,* 782 F.3d 983, 988 (8th Cir. 2015) ("The phrase 'anything of value' [in Section 1591(e)(3)] is extremely broad."). For instance, courts have found a "thing of value" to include intangibles, including the opportunity for a sexual encounter, defendant's receipt of sexual photographs, and career promises or opportunities. *See Noble v. Weinstein*, 335 F. Supp. 3d 504, 521 (S.D.N.Y. 2018) ("For an aspiring actress, meeting a world-renowned film producer carries value, in and of itself. The opportunity, moreover, for the actress to sit down with that producer in a private meeting to review her film reel and discuss a promised film role carries value that is career-making and life-changing. The contention, therefore, that Noble was given nothing of value—that the expectation of a film role, of a modeling meeting, of 'his people' being 'in touch with her' had no value—does not reflect modern reality."). Courts have also found that 'material benefits,' such as domestic and international travel, hotel accommodations, and access can be things of value. *United States v. Alexander*, No.

24 Cr. 676 (VEC), 2025 WL 3154981, at *1, 4-5 (S.D.N.Y. Nov. 11, 2025).

A "commercial sex act" therefore exists where "any person" received "anything of value" because of a sex act. *See Raniere*, 55 F.4th at 363 (approving jury instruction in which "commercial sexual act" is defined as "any sex act of which anything of value is given to or received by any person because of such sex act"). "On account of" is synonymous with "because of." *Id.* But a commercial sex act "does ***not*** require a bargained for exchange." *Roberts v. eXp Realty, LLC*, No. 2:23 Civ. 10492 (AB) (AGR), 2024 WL 3005892, at *10 (C.D. Cal. May 23, 2024) (emphasis added). "The coexistence of the sex act and the thing of value is the exchange necessary to satisfy a commercial sex act." *Id*; *see also Alexander*, 2025 WL 3154981, at *4 ("[A]n explicit *quid pro quo*" is "not require[d]." (quoting *Exchart v. Fox News Network, LLC*, No. 20 Civ. 5593 (RA), 2021 WL 4124616, at *9 (S.D.N.Y. Sept. 9, 2021)); *Martinez v. 189 Chrystie St. Partners, LP*, No. 22 Civ. 3111 (VEC), 2023 WL 5390442, at *11 (S.D.N.Y. Aug. 22, 2023) ("The TVPA does not require 'an explicit *quid pro quo* in order to establish that a sex act was 'commercial.'").

**1. The Record Supports the Existence of a Commercial Sex Act**

Here, there are ample facts going to the various "things of value" that Plaintiff testified she believed she would receive in exchange for sex with Diamant. She was flown around the country, JAF 66, 69, 70, 126, 127, provided lodging, JAF 84, 189, given money, JAF 38, 39, 43, 46, 85, 178, 181, was booked time in a studio (JAF 53, 127, 128, 184, 206, received dedicated attention and songwriting from an acclaimed producer, JAF 160, 161, was given a recording contract, JAF 60, and was promised Grammys and the opportunity to open for Beyonce on tour, JAF 140, 144. All of those items constitute things of value and establish a commercial sex act. *See Alexander*, 2025 WL 3154981, at *1, 4-5.

There are also ample facts in the record that these things of value were given or promised in exchange for sex acts. Most notably, evidence shows that Defendant

Diamant told Mangroe that sexual intimacy was necessary for these career opportunities. JAF 142, 143, 154. Additionally, the facts in the record indicate that Diamant provided Plaintiff with cash payments immediately after sex acts. JAF 243-44. Courts have held that these exact facts are sufficient to raise a reasonable inference from which a jury could conclude that "the money constituted payment or remuneration for sex." *See Ramsbottom v. Ashton*, No. 3:21 Civ. 00272, 2024 WL 4993391, at *7 (M.D. Tenn. Dec. 5, 2024) (denying summary judgment where a jury question remained as to whether cash paid immediately to plaintiff after sex was casually connected to the sex, even when the cash was characterized as money for "emergencies"). Defendants are not entitled to summary judgment on this element.

**2. Defendants' Arguments Are Unavailing**

Defendants' reliance on Plaintiff's 2015 text messages with her abuser, including her proffer that she would "never sleep with someone for money," misses the mark. At the outset, the fact that Plaintiff testified she would never voluntarily sleep with someone for money is not inconsistent with her claim under the TVPA—that Defendant used illicit means to induce her to have sex in exchange for something of value.

Importantly here, the gravamen of Defendants' arguments is that the text messages impeach Plaintiff's testimony, further underscoring that there are material facts in dispute and summary judgment is not warranted. *California Steel and Tube v. Kaiser Steel Corp.*, 650 F.2d 1001, 1003 (9th Cir. 1981) (on a motion for summary judgment, "[t]he trial judge may not evaluate the credibility of a witness or weigh the evidence"). And moreover, in relying on the content of these messages as truthful, Defendants are ignoring explicit and conflicting testimony Plaintiff provided that she was not truthful in every message she sent to Diamant—that she sent him certain texts to appease him, to fend off his anger, and to ensure that he did not withdraw his support of her professionally or financially. JAF 165-67. Plaintiff further testified repeatedly that she did not have romantic feelings for Diamant,

creating a dispute about the truth of some of the messages Defendants rely on to say that this was just a consensual affair. JAF 168. These factual disputes require a jury to make credibility determinations at trial. *See Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005) ("Summary judgment is an inappropriate vehicle for resolving claims that depend on credibility determinations."); *Cabral v. State Farm Fire and Casualty Company*, 582 F. Supp. 3d 701, 709 n.5 (D. Ariz. 2022) ("Examples of 'specific facts' that raise genuine questions about a witness's credibility include when the witness's testimony has been contradicted, the witness's personal knowledge of or ability to perceive the topic of their testimony is doubtful, the witness has a character for untruthfulness, or the witness is biased by self-interest.").

Defendants next contort the testimony of Plaintiff to an illogical end, attempting to tease apart the various intangible things of value evidenced in the record. For example, Defendants contort the testimony to conclude that Plaintiff only stated that sex would lead to some "downstream artistic improvement," or suggest that there cannot be a commercial sex act because Plaintiff testified that Defendant did not verbally make every single promise of value every time sex occurred. Neither of these points are persuasive. Whether it was songwriting, artistic improvement, the creative process, the recording of music, the sale of music, the career promises of winning Grammys and opening for Beyonce, or other promises related to Plaintiff's career as a singer/songwriter, the facts have clearly established that there is something of value exchanged here. And by insisting that each promise be verbally articulated for each sex act, Defendants are essentially imposing a quid pro quo framework on the TVPA—something courts have explicitly rejected. *See supra* at 3-5 (citing cases).

Defendants' argument concerning whether living expenses were given in exchange for sex similarly ignores the evidence in the record that cash was left for Plaintiff after sex took place, which alone raises a sufficient factual inference for a jury to determine causation. *Ramsbottom v. Ashton*, 2024 WL 4993391, at *7. And

importantly, a thing of value may be given to a trafficking victim for more than one reason. *See, e.g.*, *Roe v. Howard*, No. 1:16 Civ. 562 (LOG), 2018 WL 284977, at *6 (E.D. Va. Jan. 3, 2018) (finding that domestic worker who was paid a monthly salary by her employer for her services, which included being subjected to forced sex acts, had properly pleaded a commercial sex act under the TVPRA), *aff'd*, 917 F.3d 229 (4th Cir. 2019). Thus even if some of the money Defendant provided her was in anticipation of an advance, or if some funds were provided before the sex acts took place, there remain sufficient facts for a jury to determine that some of these expenses were in exchange for sex.

Finally, Defendants' reliance on *Croft* is misplaced. In *Croft*, which was decided on a motion to dismiss, the Ninth Circuit affirmed dismissal based only on the illicit means elements of the TVPA, and assumed for purposes of its decision that Plaintiff had, in fact, pleaded a commercial sex act.[4] *Croft v. Dolan*, No. 24-6150, 2025 WL 3720844 (9th Cir. Dec. 23, 2025).

Defendants are not entitled to summary judgment.

### E. Defendants' Argument 2: Plaintiff Cannot Establish that Diamant Engaged in the Requisite Knowing Trafficking Conduct.

Even assuming arguendo that Plaintiff's "intimate sex was necessary for songwriting" theory could satisfy the commercial-sex-act requirement, Plaintiff's TVPA claim fails. Section 1591(a)(1) imposes two distinct requirements relevant here. **First**, Plaintiff must prove that Diamant knowingly committed at least one listed trafficking act—i.e., that they recruited, enticed, harbored, transported,

---

4 Undersigned counsel argued *Croft* before the Ninth Circuit in December 2025. Upon raising arguments rebutting the District Court's holding concerning a "commercial sex act," the panel indicated that it was not interested in those arguments and was more concerned with the pleadings concerning defendant's use of illicit means. Tellingly, the Circuit's decision affirmed on alternative grounds.

provided, obtained or maintained her (the "trafficking acts").[5] **Second**, Plaintiff must prove that Diamant committed the trafficking act "knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, [or] coercion . . . will be used to cause" her to engage in a commercial sex act. 18 U.S.C. § 1591(a)(1).

**1. Plaintiff cannot show any trafficking act with knowledge of or for the purpose of a later commercial sex act.**

At the time of the trafficking act, the defendant must know that force, fraud or coercion *will be used in the future* to cause a commercial sex act. *United States v. Todd*, 627 F.3d 329, 334–35 (9th Cir. 2010). This knowledge requirement can be met, for example, where the defendant is "aware of an established modus operandi that will in the future cause a person to engage in" a commercial sex act. *Id.* The very definition of "sex trafficking" is "the recruitment, harboring, transportation, provision, or obtaining of a person *for the purpose of* a commercial sex act." 22 U.S.C. § 7102(12)(2015) (emphasis added).

That threshold trafficking act requirement is not satisfied here. There is no evidence that Diamant recruited Plaintiff at all, much less for the purpose of commercial sex. He was introduced to her in a music-business context, she already had U.S. music experience, and she recorded almost immediately upon meeting him in Atlanta. JAF 50-53. Diamant may have flown Plaintiff to Los Angeles on February 4, 2015, and paid for her hotel while she was there, but this, too, was for the purpose of recording music—and she continued recording immediately upon arriving in Los Angeles. JAF 56. There is no evidence whatsoever that any transporting or harboring of Plaintiff prior to the alleged February 4, 2015, "commercial sex act" was done for the purpose of such an act, much less knowing such an act would be caused by force, fraud or coercion (it was not, as discussed

---

[5] Citations are to the version of 18 U.S.C.A. Section 1591 that was effective between December 23, 2008 and May 28, 2015.

below).

Indeed, this never changed. At all later times when Plaintiff was provided lodging, transportation, and money for expenses, she was in Atlanta for the recording project. All of the facts point to ordinary artist travel and lodging: she had an attorney advising her; she entered into agreements that her attorney heavily negotiated; Epic paid her a $35,000 advance for her recording work; she attended meetings with the CEO of Epic; Epic flew an A&R representative to Atlanta to meet her; and she completed recording an album. JAF 60-73. All of her accommodations were satisfactory, she traveled freely overseas, and she spent her money as she pleased (although she claims Diamant asked for expense reports). JAF 84-85, 96-98. On this record, the introduction, flights, hotel stays, and studio access had substantial music-business explanations. If there was some later or contemporaneous commercial sex act (and none is alleged or supported by the evidence), that would not transform those business acts into trafficking verbs under Section 1591.

These facts stand in stark contrast to the type of conduct the Ninth Circuit has considered knowing sex trafficking acts. *See U.S. v. Todd*, 627 F.3d 329 (2010) (defendant told women they could get rich if they prostituted for him, advertised them, imposed quotas, took the proceeds, and enforced rules with beatings); *U.S. v. Basa*, 817 F.3d 645 (2016) (defendant housed two 15-year-old girls, introduced them to adult men, drove them to sexual encounters, threatened to throw them out if they refused, and received money or methamphetamine for facilitating the sex); *U.S. v. Hornbuckle*, 784 F.3d 549 (2015) (defendants ran a prostitution ring in which homeless minors lived with them, performed sex acts for clients, were transported to motel "dates," and surrendered their earnings); *U.S. v. Chang Ru Meng Backman*, 817 F.3d 662 (2016) (victim was induced to travel on false promises of legal work and then forced into prostitution). Even crediting Plaintiff's testimony, Diamant's conduct bears no resemblance to the world in which the Ninth Circuit has applied the verbs "recruits, entices, harbors, transports, provides, obtains, [and] maintains."

Even if Plaintiff could somehow satisfy the threshold "trafficking act" requirement, her claim still fails because the record does not permit a reasonable inference that Diamant acted knowing, or in reckless disregard of the fact, that force, fraud, or coercion would be used to cause any alleged commercial sex act.

**a) Force.**

Plaintiff cannot satisfy Section 1591 on a force theory based on her own testimony. Section 1591 requires evidence that force was the means Diamant knew would be used to bring about an alleged commercial sex act. But that is not what Plaintiff says happened. In Plaintiff's own version of events, the operative mechanism that caused the alleged commercial sex act on February 4, 2015 was not force but the alleged "sanctuary" pitch that convinced her to have sex with him. She certainly does not allege that Diamant had any plan to use force to cause that alleged commercial sex act.

Indeed, the foundation of Plaintiff's commercial-sex-act theory is that commercial sex occurred when she ***agreed*** to have sex with Diamant ***because*** he told her that the intimacy was necessary to make great music. The very nature of this unique theory limits the "commercial sex acts" to those that Plaintiff agreed to engage in to achieve this level of intimacy. If Plaintiff was instead forced to engage in a sex act, then—under her own invented formulation—that would not be a commercial sex act.

Plaintiff contends that Diamant engaged in aggressive physical conduct during certain specific sexual encounters later in Atlanta, specifically: (1) in a hotel room on March 8, 2015[6]; (2) in a movie theater on March 26, 2015[7]; (3) in Diamant's

---

[6] Immediately after this sexual encounter Plaintiff texted "[redacted] 🐵 😍 Got me fallin for dat dickkkkkk 👅" and "Mmm felt so good 👅[.] JAF 86.

[7] On April 15, 2015, Plaintiff texted Diamant about this incident: "Reminds me of how I fucked u at the movies, took it so deep." "Do u remember ….. 😉 ??"

sprinter van on March 26, 2015[8]; and (4) in a stairwell of a music studio on August 14, 2015. Ex. 109 at 279:11-25; *but see* JAF 114-115; Ex. 115, ¶ 14. Assuming the alleged conduct qualifies as "force," Section 1591 still requires evidence that force was the means Diamant knew would be used to bring about an alleged commercial sex act. There is no such evidence.

The later alleged incidents of abuse in Atlanta may have supported assault claims (if they were not time-barred under Georgia's statute of limitations), but they do not fit a TVPA force theory. Plaintiff testified that the alleged incident of choking on March 8, 2015 was ***not*** "necessary in order to make music" but she just "felt like he became abusive." JAF 37. She added that she did not think it was part of the earlier understanding, but that "something escalated," and that she was "stuck in a situation and it was scary." JAF 93. Plaintiff conceded "I can't really tell you what went through his mind," but she believed that each of the incidents of alleged force in Atlanta just constituted Diamant "taking out his anger." JAF 94-95. There is no evidence that anyone was given or received anything of value on account of those incidents. That is fatal to Section 1591 force liability.

---

[redacted] 😍. Thinking of u." JAF 87. Over a year later, Plaintiff sent Diamant the following texts: "Wait I know what ure doing at the movies lol. I remember what we did at the movies 🤐😂 . . . 💦🍆⬅️ that's what ur doin right now I'm sure 😋[.]" JAF 88. After Diamant told Plaintiff he was "with [his] kids," Plaintiff responded: "I don't know what's going on w me 😂" "Yesterday u had me in my feels and today my imagination is running wild 😂❌❌" "Terrible" "I need to get my act together lol[.]" JAF 89.

[8] Immediately after this sexual encounter, Diamant texted "Wow"; Plaintiff responded "Crazyyyy; I think ur falling for Ya girlfriend 👀; Diamant responded "Out of this universe"; and Plaintiff responded "It wasn't a fuck 🚐🚐🚐🚐🚐🚐[.]" JAF 90-91. On June 8, 2015, in a series of texts in which Plaintiff was coaxing Diamant to "[t]ell me something ur into that I wouldn't expect sexually" (his response "Nothing, I like the basics") she wrote "Lollllll 😍 the van!!!!!" "Hahahahah that emoji reminds me of that; I came so good 😩 haven't felt this good in a min 👀👅." JAF 92.

**b) Fraud.**

Plaintiff's fraud theory also fails. Even crediting her testimony about the purported "sanctuary" concept, the record does not show that Diamant engaged in any trafficking conduct knowing that fraud would be used to cause a commercial sex act. In this context "fraud" means "any deliberate act of deception, trickery, or misrepresentation." *Mickey* 897 F.3d at 1179–80. To support a TVPA claim on this basis, a plaintiff must show the defendant engaged in a trafficking act with knowledge that fraud would be used to cause the commercial sex act itself. *Croft v. Dolan*, No. 24-6150, 2025 WL 3720844, at *2 (9th Cir. Dec. 23, 2025) (not enough that the plaintiff had allegedly been lied to about why she was invited to Los Angeles, which merely placed her in proximity to exploitation). There is no evidence that Diamant engaged in any trafficking act knowing that he would later defraud Plaintiff to cause a commercial sex act.

The substantial evidence of actual songwriting, real recording work, real label involvement, and real contract negotiations via counsel only underscores the point: this was not a sham invitation to create music. JAF 51-73. Nor is there evidence that Plaintiff engaged in any sex act because of any fraud by Diamant. Even by Plaintiff's own account, the alleged falsehood was not a discrete misrepresentation that sex would secure a contract, money, or a specific career benefit. Instead, Plaintiff describes Diamant speaking in broad, subjective, impressionistic terms about trust, closeness, artistry, spirituality, and the need to know "all of" her to write better music for her. Ex. 109 at 212:3-215:5; Ex. 110 at 391:4-393:15, 461:1-463:13. Even assuming such statements could qualify as actionable misrepresentations, Plaintiff still must show they were knowingly false and used to cause the particular sex act. *Ramsbottom*, 2024 WL 4993391, at *13 ("fraud means a **knowing misrepresentation** of a material fact made to induce another to act to his or her detriment" (quotation omitted) (emphasis added)). Plaintiff's testimony supports, at most, a claim that Diamant advanced a self-serving theory about artistic intimacy.

**c) Coercion.**

Finally, there is no evidence that Defendants intended to or did in fact cause Plaintiff to engage in any alleged commercial sex act by means of coercion. Critically, "coercion" in this context has a very specific definition, requiring threats of serious harm or a scheme, plan or pattern intended to cause a person to believe that they must perform a sex act to avoid serious harm or physical restraint. 18 U.S.C. § 1591(e)(2). "Serious harm" is "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." *Id.* § 1591(e)(5). "While the standard [for coercion] is objective—referring to whether a 'reasonable' person would feel compelled to engage in commercial sex acts—it also requires that the court take into consideration 'all the surrounding circumstances,' including any factors that might make the victim particularly vulnerable." *Ramsbottom*, 2024 WL 4993391, at *13 (citations omitted).

With respect to the single alleged commercial sex act on February 4, 2015, there were no alleged threats, much less a threat of serious harm. As with any force theory, a coercion theory would also be inconsistent with the very premise of Plaintiff's commercial-sex-act theory: that she ***agreed*** to have sex with Diamant ***because*** he told her it was part of the creative process. Indeed, there is no evidence that Diamant caused Plaintiff to have ***any*** sex with him by threatening her with serious harm of any sort. Plaintiff does not identify threats of immediate financial ruin, blacklisting, deportation, criminal or civil process, or any other concrete consequence comparable to trafficking cases.

Notably, even if there were evidence that Diamant threatened to withhold career opportunities, causing Plaintiff to have sex (there is no such evidence), even that would be insufficient to show coercion. *Croft*, 2025 WL 3720844 at *2 (mere

understanding that "rebuffing [sexual advances] would jeopardize. . . current and future work opportunities" does not amount to the sort of "financial pressure" contemplated by the TVPA).

Nor is there evidence that Plaintiff was particularly vulnerable. She was a well-traveled international citizen with a long-term New York lawyer engaged to advise on business dealings and another for immigration and visa-related matters. JAF 98-100. She was a professional songwriter, just coming out of a long-term songwriting contract with a New York music publisher. JAF 48-49. Plaintiff came from a family of professional investors and remained in close contact with her mother in the Netherlands. JAF 101-102. In short, she had virtually nothing in common with the typical victim of sex trafficking who is vulnerable to coercion.

**F. Plaintiff's Response Defendants' Argument 2: Plaintiff Can Establish that Diamant Engaged in Knowing Trafficking Conduct**

Defendants next contend that Plaintiff cannot establish that Defendant Diamant engaged in knowing trafficking acts as required under the TVPA. A Defendant violates the TVPA when he "recruited, enticed, harbored, transported, provided, obtained or maintained" the victim "knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, [or] coercion . . . or any combination of such means will be used to cause" her to engage in a commercial sex act. 18 U.S.C. § 1591(a)(1).

The evidence in the record shows that Defendants transported, harbored, and maintained Plaintiff in Los Angeles and Atlanta. Defendants booked her flights and arranged and paid for her lodging—quintessential transportation and harboring acts. JAF 180 (paid for her accommodations), JAF 66, 69, 70, 127, 180 (arranged her flights). And, the TVPA covers a broad range of activity beyond recruitment, including obtaining and soliciting. 18 U.S.C. § 1591(a). There is ample evidence that those other acts also took place here as well. JAF 171 (Defendant asked Plaintiff for

sex).

The question for the factfinder is whether Diamant knew illicit means (force, fraud, or coercion) would be used when these acts took place. While disputes remain in the record, a jury could determine that he had the requisite knowledge.

**1. The Record Evidence Shows Illicit Means Were Knowingly Used**

Defendants make fundamental legal errors and ignore material facts in contending that there is no evidence that illicit means were used or that Diamant had knowledge that those means would be used to induce commercial sex. First, Defendants ignore the plain language of the § 1591(a), which provides that illicit means includes "force, fraud, coercion, ***or any combination of such means***." (emphasis added). Considering all evidence in the record, a jury could reasonably find that illicit means were used—Plaintiff does not need to show, for example, that each and every commercial sex act was induced by all of the illicit means alleged. *See, e.g.*, *United States v. Purcell*, 967 F.3d 159, 193 (2d Cir. 2020) (upholding a sex trafficking verdict where the victim was not threatened each and every time she engaged in a commercial sex act, but where the defendant's "conduct, viewed cumulatively, suggested a pattern of behavior designed to intimidate and exert control over" the victim); *see also United States v. Williams*, 666 F. App'x 186, 197 n.6 (3d Cir. 2016) ("[Section] 1591 does not require that there be a direct temporal nexus between the threats, force, fraud, or coercion and the commercial sex act although the closer the coercive conduct is to the [sex acts], the more likely the causation element of the offense will be satisfied."). Importantly, force, threats of force, fraud, and coercion are not separate "elements" of sex trafficking, but instead are "possible means to commit the crime." *United States v. Mickey*, 897 F. 3d 1173 (9th Cir. 2018).

And, because there is sufficient evidence that illicit means were used, *see supra*, a jury can reasonably infer knowledge here because of the facts establishing

Defendant Diamant's modus operandi throughout the relevant time period. *United States v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010) ("What the statute means to describe, and does describe awkwardly, is a state of mind in which the [defendant] is familiar with a pattern of conduct. . . . What the statute requires is that the defendant know in the sense of being aware of an established modus operandi that will in the future cause a person to engage in prostitution.").

**a) Force**

Incredibly, Defendants try to argue that there is no evidence supporting Defendant's use of force, while simultaneously acknowledging that there is testimony about Defendant physically hurting Mangroe. Plaintiff testified that she was physically held down, beaten, and choked by Diamant. JAF 191-92. She took contemporaneous pictures of bruises she received from that choking. JAF 193. And in therapy years later, she recounted the same exact violence she testified to. JAF 215. Defendant, of course, denies he was violent. This dispute must be resolved by the factfinder.

Unwilling to acknowledge the clear factual dispute necessitating trial, Defendants instead contend that there was no evidence that Diamant knew he was going to use force. But because there is evidence of a pattern of violence, *e.g.*, JAF 93, 94, 95 191, 192, 193, 201, 203, 204, 205, 211, 215, a jury can infer from that that Diamant was aware of his established modus operandi of using force. *Todd*, 627 F.3d at 334.

**b) Fraud**

Defendants are also incorrect that the record does not know that Defendant had knowledge he would use fraud to cause a commercial sex act. The record here includes the following relevant facts: Within days of arranging Plaintiff's transportation and lodging in California, Defendant told Plaintiff that to create good music for Plaintiff like he did with Beyonce, he needed to have an intimate sanctuary relationship that involved sex, because he had that relationship with Beyonce. JAF

127, 128, 133, 134, 135, 136, 137, 138. The record also shows that Defendant has never had a sexual relationship with Beyonce. JAF 139. A reasonable jury could easily find that Defendant knew this representation to be fraudulent and false, intended to trick Plaintiff into believing its truth, and that this lie was made in order to induce Plaintiff to submit to sex. And, because these misrepresentations occurred so soon in time after the act of transportation, a jury could find that Defendant acted with the requisite intent to use those misrepresentations to induce sex acts.

Unlike in *Croft*, this is not a situation where Plaintiff was lied to about the circumstances that resulted in her being in a place where she was assaulted—here, Plaintiff was lied to about the purpose of the sex itself, and was induced to submit to the sex for that reason.

To the extent Defendants contend that legitimate work on Plaintiff's music obviates the fraud, they again ignore the ample evidence that Defendant lied to Plaintiff about how he created music with other artists in order to get her to have commercial sex with him.

**c) Coercion**

Additionally, Defendants mistakenly conclude that there is "no evidence" of coercion. The TVPA embraces a broad definition of "coercion," which includes any "scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm." 18 U.S.C. § 1591(e)(2)(B). "[S]erious harm," means "any harm" including "financial, or reputational harm, that is sufficiently serious, under all the surrounding facts and circumstances, to compel a reasonable person of the same background and in similar circumstances to perform or continue performing commercial sexual activities." *Id.* § 1591(e)(5). In determining whether the statements and actions were sufficiently coercive under the TVPA, courts look to both the victim's testimony about her subjective beliefs and the cumulative effect of the totality of the circumstances to determine whether such a belief is objectively reasonable. *See United States v. Dann*, 652 F.3d 1160, 1172 (9th Cir. 2011)

(affirming a forced labor conviction holding that the treat of being forced to leave the country "could constitute serious harm to an immigrant who came to the United States in part to study English and who dreamed of starting a business"); *United States v. Chang Ru Meng Backman*, 817 F.3d 662, 670 (9th Cir. 2016) (finding relevant to coercion the fact that victim was "effectively under lock and key," had her movements limited and "was always accompanied by [Defendant] or her agent," and had no ties to the geographic location where she was trafficked); *United States v. Wilkins*, 538 F. Supp. 3d 49, 72-73 (finding that evidence of past assaults "constitute[d] direct, intrinsic evidence of coercion"); *Purcell*, 967 F.3d at 192-93 (crediting a victim's testimony that she was subjectively in fear of serious harm and holding that defendant's conduct "viewed cumulatively, suggests a pattern of behavior designed to intimate and exert control" over the victim, thereby satisfying the objective prong of coercion).

While correctly identifying the objective and subjective components used to evaluate coercion, Defendants ignore the extensive evidence from which a jury could conclude that Plaintiff had a reasonable fear that serious physical, financial, reputational, and emotional harm would befall her if she did not submit to Diamant's demands.

For example, the facts in the record show that Defendant had significant power over Plaintiff, and that Plaintiff was especially vulnerable. He was a decade and a half older than her, she was a foreign citizen in a city and state she had never been in, working on a soon-to-expire visa, did not drive, and crucially—did not have money. JAF 96, 117, 122-25, 132, 141, 160-61, 169, 170, 177-78. Defendant ignores evidence of her age, her lack education or musical training, and her background to try to cast Plaintiff as some wealthy European brat, but there is no evidence in the record to support that finding—and even if there was, at most it would create a dispute of fact as to whether Plaintiff actually was vulnerable in those circumstances. There is ample evidence that Plaintiff did not have expenses to survive, could not

move around easily, and was beholden on Defendant for cash handouts for food. JAF 43, 46, 85, 96, 178, 243. Beyond the loss of career opportunities, failing to submit to Defendant's sexual demands also put Plaintiff at risk of losing her lodging, her source of food, and her ability to return home. *Id*. There is also evidence that Defendant possessed guns and used them around Plaintiff. JAF 172, 209-210. And, Plaintiff testified that Defendant took a videorecording of him having sex with Plaintiff, and she testified that she was worried and scared that he would release the video and cause serious reputational and professional damage. JAF 174-76. Whether the threats of harm were sufficiently serious, and whether Plaintiff actually felt that she could end the sexual relationship at any time "based on her precarious financial position" is a question of fact squarely within the provenance of the jury. *Treminio v. Crowley Maritime Corp.,* 707 F. Supp. 3d 1234, 1254 (M.D. Fl. 2023)

**2. The Record Shows there is a question of fact as to whether the illicit means caused the commercial sex act**

Ultimately, the question of whether the illicit means caused the commercial sex act is a factual question for the jury—that is, the jury is charged with considering the victim's relationship and history with the trafficker to determine whether prior acts or statements caused the sex act. And here, Plaintiff testified that she only had sex with Defendant because she was defrauded into believing that it was necessary for her music and record deal, and because she felt beholden to, dependent on, and fearful of Defendant. JAF 141, 143, 154, 162, 166-67. *See A.B. v. Interstate Management Company,* LLC, No. 3:23 Civ. 388 (IM), 2025 WL 3254620, at *5 (D. Or. Nov. 21, 2025) (denying summary judgment and finding a genuine dispute of material fact as to whether plaintiff was coerced to engage in a commercial sex act "through manipulation, blackmail, threats, and force by her trafficker" where plaintiff testified to violence, including choking, and to defendant's ownership of video recordings of plaintiff engaging in sex acts). This question cannot be determined on this record as a matter of law.

**G. Defendants' Argument 3: CPL Cannot Be Liable under 1591(a) on a Direct-Liability Theory.**

CPL's direct-liability exposure rises or falls on company conduct, not merely on Diamant's alleged personal conduct. There is no evidence that would support a finding that CPL is liable for sex trafficking under Section 1591(a). The only concrete, company-level acts attributable to CPL are ordinary label acts (like signing a contract with Epic Records and recording Plaintiff's music) that evidence an actual recording project, not a sham trafficking front. JAF 51-72. Plaintiff's own complaint says Diamant used her for his own personal "base desires." SAC ¶ 8. Those allegations conflict with any theory that Diamant's alleged sexual acts were undertaken in the ordinary course of CPL's label business or for a company purpose.

Likewise, "[Diamant's] knowledge of his own (alleged) trafficking activities does not provide a legal basis for attributing liability for those activities to [CPL], in a sort of inverse veil-piercing." *Ramsbottom*, 2024 WL 4993391, at *16. Plaintiff cannot present "any facts that any others knew about or were involved in or facilitated [any] alleged sex trafficking." *Id*. There is no evidence that CPL planned or knew that force, fraud, or coercion would be used to cause commercial sex acts.

**H. Plaintiff's Response to Defendants' Argument 3: CPL Can Be Liable under 1591(a) on a Direct-Liability Theory.**

Defendants contend that there is no evidence that would support a finding that CPL is directly liable under the TVPA. But there is significant evidence in the record that CPL was merely an alter-ego of Defendant Diamant, thereby imputing direct liability onto the entity. Under California law, a corporation is an alter ego of an individual if "the corporation is not only influenced and governed by that person, but . . . there is such a unity of interest and ownership that the individuality, or separateness, of such person and corporation has ceased, and that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice."

*Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 838-40 (Cal. App. 1963). Factors pertinent to a determination of alter ego liability include: "[c]ommingling of funds and other assets, failure to segregate funds of the separate entities, . . . ; the treatment by an individual of the assets of the corporation as his own. . . ; the holding out by an individual that he is personally liable for the debts of the corporation; the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities; the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; . . . the employment of the same employees and/or attorney; the failure to adequately capitalize a corporation; the total absence of corporate assets, and undercapitalization; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation; the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; the use of the corporate entity to procure labor, services or merchandise for another person or entity." *Id.*

Here, the facts give rise to a strong inference that CPL and Diamant were one in the same. The record shows that CPL regularly transferred money to and from other Diamant-owned entities, including RadioKilla Touring LLC and The Nash Administration. JAF 104, 236, 242. Defendant testified that all of these entities were merely his ideas, and that he creates new shell companies whenever he had new ideas. JAF 231. He further testified that as to all of these entities, he alone had complete domination over all of them, used the same tax provider and attorney for all of them, and based on CPL's limited production of documents in this action, there remains a factual dispute as to whether CPL appropriately maintained corporate records. JAF 232, 234. CPL's corporate ledger also shows regular transfers of money

to Diamant and his family members from CPL, and Defendant testified that he had to use his own money to pay Christopher Garland out of the company. JAF 236-37. CPL was plainly undercapitalized. And additionally, Diamant misrepresented the identity of the responsible ownership and management of CPL, as evidenced by the social media postings by CPL and Diamant in which Christopher Stewart was credited as co-founding and running CPL. JAF 245. Together, the facts suggest that CPL was a mere alter ego of Diamant. And, because Diamant explicitly used the promise contract with CPL to induce sex acts with Plaintiff, it would be unjust if CPL was not held equally liable as a perpetrator.

### I. Defendants' Argument 4: CPL Cannot Be Liable under 1595(a) on a Beneficiary-Liability Theory.

Plaintiff also cannot establish beneficiary liability against CPL. The 2015 version of Section 1595(a) imposes civil liability on a defendant who "knowingly benefits, financially or by receiving anything of value from participation" in a sex trafficking venture. 18 U.S.C. §1595(a). "[K]nowingly benefitting from participation in such a venture requires actual knowledge and a causal relationship between affirmative conduct furthering the sex-trafficking venture and receipt of a benefit." *Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137, 1145 (9th Cir. 2022) (citation omitted). That standard has multiple requirements, and Plaintiff cannot satisfy any.

First, CPL cannot have benefitted from participation in a sex-trafficking venture where the record does not support the existence of any qualifying trafficking conduct in the first place. As set forth above, there is no such conduct here.

Second, there is no evidence that CPL participated in a trafficking "venture," as opposed to an ordinary music project. As discussed above, the company-level acts Plaintiff identifies are all routine label acts consistent with an actual artist-development project, not with a venture that "engaged in" sex trafficking. JAF 51-72. At most, Plaintiff alleges that Diamant personally pursued a sexual relationship with her the same time that CPL was developing her music. That is not enough to

transform CPL's record-project activity into participation in a trafficking venture.

Third, Plaintiff cannot show that CPL knew or should have known that any such venture had engaged in sex trafficking. Diamant's personal knowledge of his own alleged acts is insufficient to attribute liability for those acts to CPL, whether as a perpetrator or a beneficiary. *See supra* at III.D.

Fourth, there is no evidence of a trafficking-linked benefit to CPL. The only benefits it plausibly sought were the ordinary hoped-for benefits of a legitimate record project: recorded masters, a shopping deal, a distribution agreement, and eventual commercial success for Plaintiff's music. Those are not benefits from sex trafficking; they are benefits from artist development. And on this record, even those hoped-for business benefits never materialized. Epic dropped Plaintiff, the project collapsed, and CPL lost money. JAF 103-106.

Moreover, Plaintiff's trafficking claim rests on the premise that the CPL Contract—and the Epic Contract—were fraudulent, and Defendants did not intend to ever actually produce or release music for Plaintiff. *See* SAC ¶ 337. In other words, the theory is that the alleged trafficking scheme was designed to lose money. CPL could not have expected to benefit from participation in any such scheme.

Plaintiff further alleges that CPL has "benefited . . . by keeping [Diamant] . . . satisfied[,]"thus "ke[eping] [its] relationship with [Diamant] viable and ensur[ing] continued profit from his work." SAC ¶ 336. But it is nonsensical that CPL would be concerned about maintaining its relationship with its founder and sole member.

### J. Plaintiff's Response to Defendants' Argument 4: CPL Can Be Liable under 1595(a) on a Beneficiary-Liability Theory.

Alternatively, the facts in the record establish a genuine dispute about whether CPL benefitted from the trafficking venture. A claim for beneficiary liability under Section 1595(a) requires that a defendant (1) "knowingly benefitted . . . financially or by receiving anything of value" (2) "from participation in a venture," (3) which it "knew or should have known" that "force, threats of force, fraud [or] coercion"

would be used to cause a person to engage in a commercial sex act. *See A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 189 (E.D. Pa. 2020). A defendant need not commit an overt act that furthered the sex trafficking or have participated in the sex trafficking act itself. *J.B. v. G6 Hospitality, LLC*, No. 19 Civ. 07848 (HSG), 2020 WL 4901196, at *8 (N.D. Cal. 2020); *see also G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 554 (7th Cir. 2023) (the venture "can be a 'commercial venture' like running or expanding a business") (internal citations omitted). Participation in a venture merely requires that defendants "took part in a common undertaking [ ] involving risk or profit." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724-25 (11th Cir. 2021) (citing Oxford English Dictionary 520 (2d ed. 1989) which defines "venture" as "[a]n enterprise of a business nature in which there is considerable risk of loss as well as chance of gain; a commercial speculation").

CPL and Diamant were undoubtedly a venture from which CPL benefited from financially. The facts in the record show that CPL was solely Diamant's project. JAF 232. Diamant used CPL as part of the means of luring Plaintiff into his world and helping to convince her that he would make her dreams come true. JAF 54-55, 60. CPL stood to benefit from bringing Plaintiff on as a signed artist; indeed, CPL received a $125,000 advance from Sony related to Plaintiff. JAF 103. Whether Diamant "used the mutual business venture he engaged in with [CPL] to his advantage or acted in concert with [CPL] to then sex traffic Plaintiff is a question for the jury. That the focus of such a relationship did not specifically involve sex trafficking is not fatal to a finding of a venture under the TVPRA." *Treminio*, 707 F. Supp. 3d at 1249. And, that this venture was purportedly lost money does not change the analysis, as the venture existed even if it was not profitable—it remained "a common undertaking [ ] involving risk or profit," as required under the law. *Red Roof Inns*, 21 F. 4th at 724-25.

There are also sufficient facts in the record from which a jury could conclude that CPL knew or should have known about Diamant's trafficking acts. Constructive

knowledge "invokes a negligence standard," which is satisfied "along a spectrum." *Acevedo*, 713 F. Supp. 3d at 779-80; *see, e.g.*, *Red Roof Inns*, 21 F.4th at 725 (in the context of the TVPA, explaining that constructive knowledge is that knowledge which "one using reasonable care or diligence should have") (citing *Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019)).

Under the TVPA, constructive knowledge is pleaded through the existence of red flags that should have alerted defendants—or a reasonably prudent person in defendant's position—to the fact that the venture they are benefiting from or participating in is involved in sex trafficking. Though factual scenarios will vary, courts are required to consider the particular circumstances alleged to determine whether it is plausible that a defendant "was in a position to learn" about the illegal practices of their co-defendant. *A. B. v. Salesforce.com, Inc.*, No. 4:20 Civ. 1254, 2021 WL 3616097, at *3 (S.D. Tex. 2021).

The facts indicate that CPL's sole owner and shareholder was its co-defendant, Diamant. JAF 288, 232. Given that close relationship, there is sufficient evidence for a jury to infer that CPL was in a position to learn what the sole owner and operator was doing. Alternatively, a plaintiff is permitted to allege a vicarious liability theory without alleging a knowing benefit under a § 1595(a) beneficiary liability theory. *E.g. Doe v. Scottsdale Inns LLC*, No. 23 Civ. 00759 (PHX) (JJT), 2024 WL 3494375, at *4–6 (D. Ariz. July 22, 2024). As the sole owner and shareholder of CPL, Diamant's knowledge is imputed to CPL under this alternative theory.

### K. Defendants' Argument 5: Count II Is Time-Barred Because Plaintiff Cannot Prove an Enumerated 'Sexual Assault' Under CCP Section 340.16.

Count II, for Sexual Assault, does not survive because the purported California conduct does not fit within one of the Penal Code offenses incorporated by Section 340.16(b)(1). Section 340.16(a)(1), as applicable here, provides a ten-

year statute of limitations for "any civil action for recovery of damages suffered as a result of sexual assault." "Sexual assault" is defined as "any of the crimes described in Section 243.4, 261, 264.1, 286, 287, or 289, or former Sections 262 and 288a, of the [California] Penal Code, assault with the intent to commit any of those crimes, or an attempt to commit any of those crimes." Section 340.16(b)(1).

Accordingly, the statute "extend[s] the statute of limitations for certain claims of sexual assault," but "not all claims are revivable under the . . . statute[.]" *Anya Roberts v. eXp Realty, LLC et al. Additional Party Names: Emily Keenan, Golden*, No. 2:23-CV-10492-AB-AGR, 2025 WL 4036423, at *2 (C.D. Cal. May 2, 2025); *Doe v. Gross*, No. 23-CV-6325 (JPC), 2024 WL 3729007, at *7 (S.D.N.Y. Aug. 7, 2024) (dismissing assault and battery claim based on failure to show "liability under Section 289" one of three requisite offenses identified in complaint).

Here, Plaintiff alleges a "sexual assault" based only on two penal code sections: (a) Section 243.4 and (b) Section 261(a)(4)(D). Plaintiff cannot establish that Diamant committed either of these crimes in California and therefore cannot establish the requisite sexual assault under either provision.

**1. Cal. Penal Code § 243.4 does not apply to the alleged February 2015 sexual assault.**

Plaintiff claims that Diamant violated Section 243.4 when she asked him to "pull out" during sexual intercourse and he did not. But Section 243.4 addresses touching-based "sexual battery" and expressly does not apply to sexual intercourse. "[S]exual battery," is "touch[ing] an intimate part of another person while that person is unlawfully restrained by the accused or an accomplice, . . . if the touching is against the will of the person touched and is for the purpose of sexual arousal, sexual gratification, or sexual abuse[.]" Section 243.4(f) further defines "touch[ing]" as "physical contact with the skin of another person whether accomplished directly or through the clothing of the person committing the offense." Finally, Section 243.4(g)(2) clarifies that "'[s]exual battery' does not include the crimes defined in

Section 261 or 289." In other words, each of Sections 261, 289, and 243.4 "encompasses different types of contact." *People v. Ortega*, 240 Cal. App. 4th 956, 967, 193 Cal. Rptr. 3d 142, 149 (2015). While Section 261 encompasses "act[s] of sexual intercourse" and Section 289 encompasses "act[s] of sexual penetration . . . by any foreign object, substance, instrument, or device, or by any unknown object," Section 243.4 encompasses certain touching ***at the exclusion of those acts***.

Even crediting Plaintiff's account, the referenced incident is not covered under Section 243.4. She told Diamant while they were having sex that the antibiotics she was taking for strep throat could reduce the effectiveness of her birth control, so he should pull out before ejaculating. JAF 107-108. In short, Plaintiff "wanted him to pull out and he didn't[.]" *Id*.

The only act Plaintiff relies on to support a sexual battery under Section 243.4 is this alleged act of ejaculation during intercourse. Because offenses based on acts during intercourse are governed exclusively by Section 261, this alleged event cannot support a sexual assault under Section 243.4 (or, incidentally, any other enumerated penal code section). *See* SAC ¶ 343.

**2. Cal. Penal Code § 261(a)(4)(D) similarly does not apply to the alleged February 2015 sexual assault.**

Plaintiff's own testimony defeats any liability under Section 261(a)(4)(D), which applies to "an act of sexual intercourse" where the victim is "unconscious of the nature of the act, and this is known to the accused." A victim is "unconscious of the nature of the act" if they are "incapable of resisting because [they] . . . w[ere] not aware, knowing, perceiving, or cognizant of the essential characteristics of the act due to the perpetrator's fraudulent representation that the sexual penetration served a professional purpose when it served no professional purpose."

The touchstone of criminal liability is whether or not the alleged victim was unaware of essential characteristics, i.e. the **sexual nature** of the act itself, based on some fraudulent representation that it **instead** served a professional (non-sexual)

purpose. *See People v. Sommer*, 61 Cal. App. 5th 696, 702, 275 Cal. Rptr. 3d 872, 876 (2021); *People v. Robinson*, 63 Cal. 4th 200, 208, 370 P.3d 1043, 1048 (2016) (the related § 243.4(c) applies "when the victim is 'unconscious' of [an act's] sexual nature"). Examples include where patients were fondled during treatments by chiropractors (*People v. Pham*, 180 Cal. App. 4th at 928, 103 Cal. Rptr. 3d at; *People v. Icke*, 9 Cal. App. 5th 138, 149, 214 Cal. Rptr. 3d 755, 765 (2017)), a patient was fondled by a psychologist as part of "exposure therapy" (*Sommer*, 61 Cal. App. 5th at 702, 275 Cal. Rptr. 3d at 876—the victim was unaware of the sexual nature of the acts until she "noticed [the perpetrator's] erect penis"), and a teenage congregant was told by a pastor that he needed to check her virginity by digital penetration (*People v. Bautista*, 163 Cal.App.4th 762 (2008)). In other words, Section 261(a)(4)(D) only applies where the victim is unaware the offensive act was of a sexual nature and for the purpose of sexual gratification.

Here, Plaintiff was aware of the sexual nature of the alleged intercourse on February 4, 2015. Shortly after receiving texts from Diamant asking if she wanted to lose her virginity again, "right now," Plaintiff went to a bedroom with him. JAF 4-6. She testified that it was clear Diamant wanted to engage in sexual intercourse with her, she "obviously understood that he was taking it somewhere sexual"; "physically [she] could see obviously he was escalating it towards something sexual"; and while she was having sex with him, she was aware that she was having sexual intercourse with him." JAF 109-112. Indeed, when asked if she was "aware that what the two of [them] were doing was sexual in nature," she answered, "I obviously understood that it was sex." *Id.* at 389:18-23. Just hours after, she sent a text about her own continued state of arousal after this sexual encounter. JAF **7.** Because Plaintiff understood the intercourse was sexual in nature and was for the purpose of sexual gratification, Section 261(a)(4)(D) does not apply. *See, e.g.*, *Icke*, 9 Cal. App. 5th at 149, 214 Cal. Rptr. 3d at 765.

Moreover, Plaintiff claims she was told, and believed, that sex was beneficial

to the process of making music because the "closeness" and "intimacy" associated with sex was "part of the creative process." Ex. 110 at 380:4-8. That is materially different from the medical, therapeutic, chiropractic, and pastoral cases, where *the act itself* was presented as part of the professional service being rendered. Moreover, these alleged statements about sex—that it involves closeness and intimacy—are not deceptive about the nature or characteristics of the sexual act. Nor can Plaintiff show that *Diamant could have known* that Plaintiff did not understand the sexual nature of the alleged intercourse, which alone defeats liability. Cal. Penal Code § 261(a)(4) (Plaintiff's belief must be "known to the accused").

Nevertheless, Plaintiff appears to contend that ***all of her sexual interactions*** with Diamant in California constitute assault by professional purpose fraud. This only highlights the weakness of this theory, as the Parties exchanged many texts during this two-week period expressly and explicitly cataloguing the sexual nature of their interactions. JAF 4-19. Because the Parties understood the sexual nature of their alleged intercourse in California, Section 261(a)(4) does not apply, and Plaintiff's claim for civil sexual assault is time-barred.

### L. Plaintiff's Response to Defendants' Argument 5: Count II Is Not Time-Barred

Defendants contend that Plaintiff's claim for civil sexual assault under California Code of Civil Procedure § 340.16 is time-barred because Plaintiff's SAC specifically references only two potential penal code violations.

Plaintiff brings a cause of action for civil sexual assault against Defendant Diamant pursuant to California's Sexual Abuse and Cover-Up Accountability Act, Cal. Code Civ. Proc. § 340.16(b)(3). Section 340.16 extends the statute of limitations for "any civil action for recovery of damages suffered as a result of sexual assault." "Sexual assault" under Cal. Code Civ. Proc. § 340.16 "is defined to mean any of a number of crimes described in the California Penal Code, assault with the intent to commit any of those crimes, or an attempt to commit any of those crimes. This

definition includes sexual battery and rape, which are described in distinct sections of the California Penal Code." *Acevedo v. eXp Realty, LLC*, 713 F. Supp. 3d 740, 788-89 (C.D. Cal. 2024) ("[S]ection 340.16, by its terms, is not limited to *claims* of sexual assault, but applies to *any action* seeking damages *as a result of* sexual assault, regardless of the legal theory alleged.") (cleaned up). Nothing in the text of Cal. Code Civ. Proc. § 340.16 requires Plaintiff to specifically plead each Penal Code offense as a prerequisite to recovery.[9] Construing all inferences in Plaintiff's favor, the record presents sufficient facts establishing conduct falling within multiple enumerated offenses.[10]

Admittedly, in the SAC, Plaintiff specifically noted Section 243.4 (sexual battery) and Section 261(a)(4)(D) (sex for a professional purpose) as potential underlying penal code violations for Count II. Now, however, discovery has concluded and the facts in the record are what the Court must consider on summary judgment. The facts in the record going to civil sexual assault include: that defendant took Plaintiff's hands and placed them on his genitals, JAF 148-49, that Plaintiff believed that sex served a professional purpose of creating music, JAF 162, that Defendant ejaculated inside of Plaintiff when she specifically requested he not do so (as Defendants phrase it, "Plaintiff wanted him to pull out and he didn't"), JAF 108, and that Plaintiff has testified that these acts were against her will, JAF 108, 149. There is therefore more than ample evidence for a reasonable jury to conclude that

---

9 Defendants have not moved for summary judgment on Plaintiff's claim for civil sexual assault in its entirety but instead insist on limiting the claim to certain sub-theories for which they contend summary judgment is appropriate. Because Plaintiff's claim is for civil sexual assault, narrowing the theories of liability is not appropriate on this record.

10 To the extent the Court agrees with Defendants in that Plaintiff was required to specifically plead each Penal Code offense and dismisses this claim on that basis, Plaintiff will refile this claim in a separate action prior to the expiration of the statutory limitations period.

Plaintiff has suffered damages "as a result of sexual assault." And, of course, because Defendant denies all claims of nonconsensual sex with Plaintiff, there is a dispute of fact that renders this claim only suitable for adjudication by a jury.

Dated: April 15, 2026

Respectfully submitted,

**WIGDOR LLP**

By: *Meredith Firetog*
Meredith A. Firetog
Katherine Vask

*Counsel for Plaintiff Chanaaz Mangroe*

Dated: April 15, 2026

**VENABLE LLP**

By: *Desirée Moore*
Desirée F. Moore
Abram I. Moore
Nelson M. Hua
Kaidyn P. McClure

*Attorneys for Defendants Terius Gesteelde-Diamant p/k/a "The-Dream" and Contra Paris, LLC*